COMPOSITE EXHIBIT 1

# COMPOSITE EXHIBIT 1



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

18 - 15277

--------------------------------------------------X

CAROLYN HICKS-WASHINGTON,      :

               Plaintiff,      :

v.      :

The HOUSING AUTHORITY OF THE      :
CITY OF FORT LAUDERDALE and
TAM ENGLISH,      :

               Defendants.      :

--------------------------------------------------X

Civil Action No. _____

**PRO SE COMPLAINT, OR IN THE**
**ALTERNATIVE, REQUEST TO**
**CONVERT COMPLAINT INTO**
**MOTION FOR SUMMARY**
**JUDGMENT**

**DEMAND FOR THE**
**APPOINTMENT OF AN**
**IMPARTIAL FEDERAL JUDGE &**
**JURY TRIAL**

A TRUE COPY

JUN 27 2018

CLERK OF THE CIRCUIT COURT
BROWARD COUNTY, FL

## NATURE OF CLAIMS

1.    This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' Housing Authority of the City of Fort Lauderdale, (hereinafter referred to as "HACFL") and Tam English ("Mr. English"), (collectively, "Defendants"), unlawful employment practices that constitute individual disparate treatment against *pro se* Plaintiff Mrs. Carolyn Hicks-Washington (or "Mrs. Washington"), due to her race, color, national origin, sex and/or age and complaints of discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, as codified, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), the Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. § 626, *et seq.* ("ADEA"), and the Florida Civil Rights Act of 1992, §§ 760.01-.11, Fla. Stat. (1999).

    This action is also for Common Law Defamation *Per Se* (libel and slander), General Defamation (libel and slander) and Intentional Infliction of Emotional Distress, as a result of Defendants, via their attorneys, causing compensatory damages, and giving rise to punitive damages as well, including continuing and aggravated harm to the Plaintiff's professional and personal reputation and livelihood.

DATE:
HOUR:
DEPUTY SHERIFF

-1-

## I. JURISDICTION AND VENUE

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, § 1343 and 42 U.S.C. § 2000e-5(f), § 2000e-6(b) as this action involves federal questions regarding the deprivation of Plaintiff's civil and human rights under Section 1981, Title VII and the ADEA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful and discriminatory employment practices alleged herein, occurred in this district.

## II. THE PARTIES

4.     Carolyn Hicks-Washington is a natural person, an individual, and a citizen of the United States. She is a resident of the State of Florida, Broward County.

5.     At all relevant times, Mrs. Washington met the definition of an "employee" under all applicable statutes.

6.     Defendant Housing Authority of the City of Fort Lauderdale ("HACFL" or "the Company") was created by the City of Fort Lauderdale in 1938. The HACFL manages, develops and administers government subsidized programs such as public housing and the housing choice voucher program to low-income families and/or individuals.

7.     At all relevant times, the HACFL's principal place of business locate 437 SW 4th Avenue, Fort Lauderdale, Florida 33315.

8.     At all relevant times, Defendant HACFL has met the definition of an "employer" under all applicable statutes.

9.     At all relevant times, Defendant Tam English – a former board member and current CEO of the HACFL – had the authority to make personnel decisions concerning Mrs. Washington's work schedule, assignments and other employment benefits as CEO of the HACFL. Defendant English also had, and continues to have, authority to discipline, including the right to hire, and terminate, other prospective and current employees of the HACFL.

## III. PROCEDURAL REQUIREMENTS

10.     Mrs. Washington filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII, 42 U.S.C. §§ 2000e *et seq.* and the Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. § 626, *et seq.* against the HACFL on April 19, 2016. The charges arise out of the same facts alleged herein, in addition to subsequent events that have transpired since filing a complaint with the EEOC.

11.     After abruptly ending its investigation without reason or explanation, the EEOC issued a Dismissal and Notice of Right to Sue letter to Mrs. Washington's complaint on March 30, 2018. *See* **Exhibit A.**

12.     Any and all other prerequisites to the filing of this suit have been met.

## IV. PERTINENT CIVIL RIGHTS LAWS OF THE UNITED STATES OF AMERICA

**A. The Civil Rights Act of 1964:**

13.     Although race is a social and legal construct and racism is a learned behavior, Europeans and/or those classified as "white" have created, projected and advanced the myth that people of African descent are "inferior," "uncivilized," "less than," etc. for more than five centuries.

14.     America was "discovered" on the basis of this racist belief and people of African descent were brought to this land as slaves, helping the new nation and its inhabitants amass considerable wealth and prosperity.

15.     Title VII was a direct legislative byproduct of the black-led civil rights movement of the 1950s and 1960s and the larger struggle of African Americans to live free from both invidious and institutional racism in all areas of life in America.

16.     "[Title VII] was the first comprehensive civil rights legislation since the Reconstruction Civil Rights statutes...This statute has provided a strong vehicle for minorities and women to challenge the myriad conscious and unconscious, historically erected impediments that severely hindered [and continue to severely hinder] equal opportunities throughout society and the working life of this country." [Employment Discrimination Law and Litigation, WestLaw.]

17.     Nearly 100 years after the Civil War, the Civil Rights Act of 1964 was enacted by Congress on July 2, 1964.  It states, in part, that it is unlawful for an employer to: "(1) to fail or refuse to

hire or to discharge any individual, or otherwise **to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin**; or (2) to **limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities** or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." (emphasis added)

18.     "The law that emerged out of Title VII recognized that employers might abandon their express policies of discrimination but nonetheless continue to treat members of groups differently or adopt 'neutral' polices that locked in segregation without sufficient business reason. These practices, too, were declared unlawful by the Supreme Court" in the famous case of Griggs v. Duke Power Co.[, 401 US 424 (1971)]. [Tristin K. Green, Discrimination Laundering, pg. 21. 2017.]

19.     Disparate treatment discrimination is often described as "the most easily understood type of discrimination. A plaintiff need not prove actual, subjective animus against a protected group to present a successful disparate treatment case. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." International Broth. of Teamsters v. U.S., 431 U.S. 324, 335 n.15 (1977). Discriminatory intent or motive is the key to a disparate treatment case, "although it can...be inferred from the mere fact of differences in treatment." Id.

20.     "Discrimination is often subtle or unconscious, and today's employers are too sophisticated to implicate themselves." [Employment Discrimination Law and Litigation, WestLaw.]

21.     "Cases of individual discrimination are often difficult for plaintiffs to win. After all, evidence that a particular decision was made because of the plaintiff's protected characteristic can be hard to come by in a modern age when managers are less likely to make their racial and gender biases known." [Green. pg. 49. 2017.]

22.     "Because discrimination is often subtle and there rarely is a 'smoking gun,' determining whether race played a role in the decision making requires examination of all the surrounding facts and circumstances." [EEOC Compliance Manual Section 15: Race and Color Discrimination.]

23.     Plaintiffs do not need direct or "smoking gun" evidence to show that their protected characteristic played a "motivating factor" for the adverse employment decision made and/or taken

against them. In almost every case, an employee must rely on circumstantial evidence to prove discriminatory intent by an inference.

24.     "The Supreme Court's conceptual framework for the order and allocation of proof was set out in McDonnell Douglas Corp. v. Green and its progeny. The tripartite standard for establishing whether there exists different treatment based on the plaintiff's protected group is as follows: (1) the plaintiff must establish a prima facie case; (2) the defendant must 'articulate some legitimate, nondiscriminatory reason' for the employment action; and (3) the plaintiff must then prove that the defendant's reason was a mere pretext for discrimination." [Employment Discrimination Law and Litigation, WestLaw.]

25.     To establish a prima facie case of discrimination by disparate treatment, "the plaintiff must show that (1) [she] is a member of a protected class; (2) [she] was subjected to an adverse employment action; (3) [her] employer treated similarly situated employees outside [her] protected class more favorably than [she] was treated; (4) [she] was qualified for the job." *See* Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319 (11th Cir. 2006).

26.     Fifty-four years after the passage of Title VII, African Americans continue to be the principal victims of employment discrimination.

**B. Section 1981:**

27.     "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contacts, including employment contracts." Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472 (11th Cir. 1999).

28.     Title VII and Section 1981 have the same requirements of proof and use the same analytical framework. *See* Anyanwu v. Brumos Motor Cars, Inc., 496 F. App'x 943 (11th Cir. 2012).

**C. The Florida Civil Rights Act of 1992:**

29.     In subsection two of section 760.01, it states: "The general purposes of the Florida Civil Rights Act of 1992 **are to secure for all individuals within the state freedom from discrimination** because of **race**, **color**, religion, **sex**, pregnancy, **national origin**, **age**, handicap, or marital status and thereby **to protect their interest in personal dignity, to make available to the state their full productive capacities**, to secure the state against domestic strife and unrest,

-5-

to preserve the public safety, health, and general welfare, and **to promote the interests, rights, and privileges of individuals within the state.**" (emphasis added)

**D. The Age Discrimination in Employment Act of 1967:**

30.    The Age Discrimination in Employment Act of 1967 protects applicants and employees who are 40 years of age or older from employment discrimination based on age.

31.    The ADEA applies to private employers with 20 or more employees, state and local governments, employment agencies, labor organizations and the federal government.

32.    Under the ADEA, it is unlawful to discriminate against a person because of his or her age with respect to any term, condition, or privilege of employment, including hiring, firing, promotion, layoff, compensation, benefits, job assignments, and training.

**E. Liberal Construction:**

33.    Each antidiscrimination law cited in this case is to be liberally construed to effectuate the public policy goals of each statute.

## V. BRIEF BACKGROUND INFORMATION ABOUT MRS. CAROLYN HICKS-WASHINGTON

34.    Mrs. Washington is an African-American woman, born in a racially segregated town called Roanoke Rapids, North Carolina in December of 1959.

35.    Throughout all of her life, Mrs. Washington has been a hard worker. The fifth child out of eight on her mother's side, Mrs. Washington was the first and only child in her family to graduate from college.

36.    In May of 1982, Mrs. Washington graduated with a bachelor's degree in Business Administration – with a concentration in Housing Management – from Winston-Salem State University.

37.    On August 10, 2005, Mrs. Washington was hired by the HACFL as Assistant Director of Section 8.

38.    As the Assistant Director of Section 8, Mrs. Washington's job duties entailed assisting former Director of Section 8 – Mrs. Veronica Lopez – with running the whole department. This included directly supervising Section 8 staff, ensuring compliance with federal, state, and local laws and regulations that govern the HACFL, preparing reports to agencies such as the U.S.

Department of Housing and Urban Development ("HUD"), reviewing applications for Section 8 assistance, training staff members, and many other duties.

39.    Prior to her unlawful termination by the HACFL on November 13, 2015, Mrs. Washington had accumulated a total of 30 years of work experience at various housing authorities throughout the United States.

40.    Outside of work, Mrs. Washington has also been extremely active in her service to her community, as demonstrated through her involvement with various organizations such as The Girl Scouts of America and the Alpha Kappa Alpha Sorority, Inc., as well as her church First Baptist Church Piney Grove.

## VI. BRIEF BACKGROUND INFORMATION ABOUT THE HACFL & CEO TAM ENGLISH

41.    The HACFL administers public housing programs sponsored by the federal, state and local governments.

42.    The HACFL receives partial funding from the U.S. Department of Housing and Urban Development ("HUD") and is required to follow HUD's strict regulations in managing communities.

43.    The HACFL's "Section 8" Department is a subsidized housing program in which participants receive housing subsidies for the rental of housing in the private marketplace.

44.    The HACFL administers that program with an internal staff of trained employees who accept applications, supervise the process of awarding housing subsidies to applicants, monitor the quality and care of the living units available to participants, and every other aspect of the program.

45.    Due to historical and widespread, modern-day racism in this country, majority of low-income families that apply and qualify for public housing and the housing choice voucher program are African American or other individuals and/or families of color.

46.    According to the HACFL's website, "The Board of Commissioners for the Housing Authority of the City of Fort Lauderdale consists of a five-member Board. The Mayor of the City of Fort Lauderdale appoints each member to serve a four-year term. The main responsibility of the Board of Commissioners includes creating a vision and direction for the Housing Authority and approving policies and procedures. Commissioners ensure that the Housing Authority operates within the law and according to HUD regulations."

47.     As of 2015, the current members of the Board of Commissioners are: James Camp III, Robert W. Kelley, Dr. Nicholas Tranakas, Dan Lindblade and Shirley Carson.46. The Board of Commissioners are comprised of four white males and one black female (Shirley Carson), who is a resident of the HACFL housing community.

48.     Since Mrs. Washington's employment at the HACFL in August of 2005, one (1) of the board of Commissioners have been an African American non-resident. No black males have served on the board of Commissioners and there was one non-resident black female, Maria Freeman, who served for more than 5 years (2010-2015).

49.     Senior management for the HACFL is currently comprised of Tam English (CEO), Mike Tadros (CFO), Scott Strawbridge (Director of Development and Facilities), Andrea Ayala (Human Resources), Anthony Moten (Director of Maintenance) and Trina Cook (Regional Property Manager).

50.     The CEO, Mr. English, is an "agent" of the HACFL and, as the CEO, was the ultimate decision maker during a significant duration of Mrs. Washington's employment.

51.     During all relevant times, the HACFL has employed and currently employs more than 15 employees.

## VII. FACTS SURROUNDING TERMINATION OF MRS. WASHINGTON

52.     On Friday, November 13, 2015, Mrs. Washington was terminated from her position as the Assistant Director of Assisted Housing, by CEO, Tam English and CFO, Michael Tadros without warning.

53.     During Mrs. Washington's termination, Mr. English also shared that the Director of Assisted Housing, Mrs. Lopez, had been terminated as well.

54.     Both Mrs. Washington and Mrs. Lopez are women of color with considerable work experience who are over the age of 40.

55.     When Mrs. Washington asked Mr. English why she was being terminated, Mr. English stated to her that the company was moving in a "different direction." No other explanation was provided.

56.     Throughout Mrs. Washington's entire professional career, she had never been fired.

57.     A minimal severance package was presented to Mrs. Washington, which she ultimately refused to accept.

58.    Mrs. Washington also refused the severance offer because it contained an arbitration clause, which would have prevented her from taking legal action in a public, judicial forum.

## VIII. EFFORTS TAKEN BY MRS. WASHINGTON TO KNOW WHY SHE WAS TERMINATED

59.    Because of Mrs. Washington's hard work, dedication and exceptional service to the HACFL, Mrs. Washington believed that her race, color, perceived national origin, gender and/or age played a motivating factor in the HACFL's decision to terminate her, as well as Mrs. Lopez, without a legitimate, non-discriminatory reason.

60.    On December 2, 2015, Mrs. Washington met with HACFL's HR Manager, Andrea Ayala, to discuss the Severance Agreement and General Release Form.

61.    On December 4, 2015, Mrs. Washington submitted a counter offer to the Mrs. Ayala and Mr. English. In her letter, she expressed that due to the circumstances surrounding the abrupt termination of Veronica Lopez and herself, she believed that the HACFL and CEO, Tam English's decision to terminate their employment was a result of their race, color, sex and/or age and that the adverse employment action taken by English on behalf of the HACFL violated federal, state and local law prohibiting discrimination in employment based on such protected characteristics.

62.    On December 10, 2015, Mrs. Washington attended the Board meeting of the HACFL and submitted a letter to one of the board members, Shirley Carson, seeking an explanation of the termination of her employment and failure to reinstate her. Mrs. Washington also spoke to Board member Robert W. Kelley. He asked if Mrs. Washington had spoken to Tam English and he was informed that Mr. English refused to communicate any further with her.

63.    On December 10, 2015, Mrs. Washington emailed Andrea Ayala, asking if she could be rehired. No response was provided.

64.    On December 15, 2015, Mrs. Washington picked up a copy of her personnel file from HR, Andrea Ayala.

65.    On December 16, 2015, Mrs. Washington sent a follow-up letter to the Board of the HACFL requesting a meeting to discuss her abrupt termination of employment by the HACFL and their refusal to rehire her.

66.    On December 17, 2015, Mrs. Washington received a letter from the HACFL's legal representative, Atty. Frank Henry of Bluerock Legal, P.A., advising her that no discrimination had taken place with regards to her termination.

67.     On January 11, 2016, Mrs. Washington sent an email to each member of HACFL's Board of Commissioners following up on the two (2) previous letters that were sent to them requesting a meeting. No response was provided.

68.     On February 11, 2016, Mr. English, responded to the two (2) letters sent to the HACFL Board of Commissioners via email. His e-mail, in part, stated: "[W]e will not be making a counter offer to your severance proposal.  You received our proposal in November 2015 which you chose not to accept."

69.     On May 26, 2017, a letter was sent to the HACFL Board of Commissioners as a final attempt to have the Board conduct an immediate and impartial investigation into the actions of Mr. English and CFO, Michael Tadros for the wrongful and unlawful termination of Mrs. Washington and refusing to consider Mrs. Washington for a position within the company that was commensurate with her experience.

70.     According to the minutes of the HACFL's Board of Directors' meeting, they held a "closed session" to "discuss claims for wrongful and unlawful termination of former employee Carolyn Washington."

71.     On January 12, 2018, Attorney Henry sent Mr. Washington an e-mail stating in part: "In your most recent email of December 27, 2017, you inquired as to whether the HACFL had conducted an investigation into "the actions of CEO, Tam English and CFO, Michael Tadros regarding [your] abrupt termination....' Please rest assured that the HACFL has conducted a thorough investigation into the termination of your employment relationship.  Your termination was for legitimate, non-discriminatory reasons."

## IX. THE EEOC'S INVESTIGATION INTO MRS. WASHINGTON'S CLAIMS

72.     On April 19, 2016, Mrs. Washington submitted an Intake Questionnaire to the EEOC, alleging individual disparate treatment in the terms and conditions of her employment based on her race, color, national origin, sex and age.

73.     In less than a week, on April 25, 2016, EEOC investigator Mr. Michael Mathelier removed Mrs. Washington's claims of race, color, national origin and sex-based discrimination on the Charge of Discrimination form and focused solely on Mrs. Washington's claims of age discrimination.

74.    On July 29, 2016, Mrs. Washington sent Mr. Mathelier an e-mail checking on the status of the charge.

75.    On July 29, 2016, Mr. Mathelier replied to Mrs. Washington's e-mail and stated, "We have not heard from the Respondent at this time, still pending status.   Your case is relatively new and has not been assigned to an investigator please give 6 months for a response.   If this process is to long for you to wait and you would like to proceed without our assistance, you can request a notice of Right to Sue so you can proceed with an attorney."

76.    In response, Mrs. Washington wrote via e-mail on July 29, 2016: "I thought the Respondent had a deadline date to respond. If I misinterpreted the process, then let me know the deadline date the Respondent had to respond to the Charge. I can wait for EEOC outcome of the charge before proceeding further."

77.    On August 25, 2016, Mrs. Washington sent Mr. Mathelier an e-mail asking for him to advise her of the status of the complaint.

78.    In response, Mr. Mathelier stated on August 26, 2016, that "the charge is still in the intake stage therefore Respondent has not had a chance to review this charge and reviewed it.  Once they are advised of the Charge and respond to our inquiry we will be in contact with you."

79.    Unaware of Mr. Mathelier's e-mail, Mrs. Washington called him on August 26, 2016, and was advised there was a backlog of cases to investigate and that it could take six months or more before the EEOC would be able to investigate Mrs. Washington's complaint. Mrs. Washington informed Mr. Mathelier that she would continue to follow-up with him because handling a legal matter without an attorney was becoming overwhelming and stressful.

80.    On November 28, 2016, Mrs. Washington received an e-mail from Miguel Escobar, Esq – a mediator with the EEOC's Mediation Unit – asking her if she wanted to participate in voluntary federal mediation in hopes of resolving her case.

81.    On December 21, 2016, both parties attended mediation. Attorneys Frank Henry and Eric Gonzalez represented the HACFL and Mr. English was present. During the mediation, Attorney Henry argued that Mrs. Washington's termination of employment was due to the high rate of turnover her "harsh" and "oppressive" management style caused. Mrs. Washington was shocked by the claim because those statements were false.

82.    Mrs. Washington also argued that the HACFL's attorneys' claims were untrue and were not reflective of her character or nature.

83.     During her rebuttal, Mrs. Washington addressed Mr. English directly. She discussed the ageist comments Mr. English made to herself and Mrs. Lopez throughout 2015 and how she had informed Mr. English that the HACFL had qualified staff that they had trained.

84.     Mrs. Washington also recalled how Mr. English would, at one point, come into her office approximately three times a week, would make comments about politics and would even bring his son into the office, but never made mention that he was receiving complaints regarding her "harsh" management style.

85.     Mrs. Washington recollected the times that she had been mistreated by lower-level staff during her employment and how she never let that affect her ability to be a leader and team-player. Mrs. Washington brought up how she spoke to Mr. English about a couple issues she was having with employees, in which Mr. English supported her and told her that she didn't have to put up with that type of disrespectful behavior.

86.     Since the Defendants offered Mrs. Washington the same severance agreement she received during her termination, the mediation resulted in no resolution.

87.     On May 15, 2017, Mr. Mathelier sent Mrs. Washington an e-mail, providing her with a copy of the HACFL's Position Statement, which had been submitted to the EEOC three months earlier. *See* **Exhibit B**.

88.     Dated February 2, 2017, the Defendants' attorneys stated that after "conduct[ing] an investigation," they "determined that the charge [of age discrimination was] entirely without merit."

89.     To summarize the HACFL's defense, they stated: "[Mrs. Washington] and her supervisor were terminated from employment at the same time and for the same reasons. The Charging Party could not keep a stable staff of competent personnel in the department. Ms. Washington had an oppressive management style and, for several years, employees had resigned from the department citing the way that they had been treated by her. Employee turnover in the department was extreme during the last year of her employment. The Charging Party was terminated on November 13, 2015. Since then, turnover has moderated."

90.     On June 5, 2017, Mrs. Washington submitted her Reply to the HACFL's Opposition via e-mail to Mr. Mathelier.

91.     On August 24, 2017, Mr. Mathelier sent an e-mail to Mrs. Washington, which stated, "to date we have not heard from you. Please provide your rebuttal to our office as soon as possible by COB tomorrow 8/25/2017" and sent questions for Mrs. Washington to respond to.

92.     Mrs. Washington immediately forwarded him the original email dated 6/5/2017 which contained her response to the HACFL's Position Statement. She also informed Mr. Mathelier that the answers to the questions he submitted were answered in her response and if he still needed her to respond to the questions, to let her know.

93.     On August 29, 2017, Mr. Mathelier requested additional information from Bluerock Legal, P.A.

94.     On October 19, 2017, Mr. Mathelier sent Mrs. Washington the following statement via e-mail: "Good Morning Ms Washington, Some additional investigation related to your case however, Interviewed several individuals. I could not find supporting evidence that showed you were discriminated against on the bases of age. Therefore, **we are going to suspend and dismiss this matter and issue you a right to sue.**" (emphasis added) Included as an attachment in the email was a letter dated 10/19/2017 from Bluerock Legal, P.A., responding to the EEOC's questions. *See* **Exhibit C.**

95.     On November 6, 2017, Mrs. Washington sent an e-mail to the HACFL's legal counsel, David Eric Gonzalez, Esq. of Bluerock Legal, P.A., requesting information as to the termination of Barbara Baer – the recently hired Director of Housing Choice Voucher – because a couple days earlier, an employee of the HACFL informed Mrs. Washington that due to Mrs. Baer's felony record, the Office of Inspector General terminated her since, by law, she could not work in a federally subsidized department.

96.     On November 17, 2017, Mrs. Washington sent Mr. Mathelier an e-mail, which stated: Mr. Mathelier, "Attached, please find my 'appeal' to your October 19, 2017 decision which dismissed my age discrimination claims. After reading the EEOC's rules of procedure, it appears that you have violated my right to due process. Since I am seeking for the EEOC to remove you as an investigator of this case, I respectfully ask that you forward this pleading to EEOC Director Michael Farrell so that he can take appropriate action to correct your gross errors.  In order to preserve the statute of limitations, I am also submitting this pleading as an appeal to the EEOC's Office of Federal Operations."

97.     Mrs. Washington also forwarded this e-mail to Michael Farrell (District Director, EEOC Miami District), Victoria Lipnic (Commissioner, Acting Chair), Chai Feldblum (Commissioner), Jenny Yang (Commissioner) and Charlotte Burrows (Commissioner).

98.     On November 20, 2017, Mr. Mathelier sent Mrs. Washington an e-mail which stated: "Good Morning Ms. Washington, **This email it to advise you that your case is still under review and a final decision has not been made.** Once a final review has been made you will be notified." (emphasis added)

99.     On November 22, 2017, Mrs. Washington sent an e-mail to Mr. Mathelier, stating:

> "Mr. Mathelier: As requested in the pleading submitted to yourself, Supervisory Investigator Katherine Gonzalez and EEOC Director Michael Farrell on November 17, 2017, I do not believe you have been impartial throughout your investigation because you violated the EEOC's rules of procedure by stating in your October 19, 2017 email to me that you 'could not find supporting evidence that showed [I was] discriminated against on the bases of age' after conducting your unknown, 'additional investigation.'
>
> Furthermore, if you had not completed your investigation and issued your *unauthorized* 'final decision,' *why did you also write that you were going to* 'suspend and dismiss this matter and issue you a right to sue [letter]'?
>
> To further prevent harmful delay, I am seeking for the EEOC to remove you my case and allow me discovery and a hearing before an AJ issues his/her 'final decision' as to the merits of my claims."

100.    On November 30, 2017, Mrs. Washington sent Mr. Mathelier an e-mail as a follow-up to inquire about the status of the case.

101.    On the same day, Mr. Mathelier responded via e-mail: "Good Morning Ms. Washington. We have not concluded the final review, you will be notified once we have."

102.    On December 1, 2017, Mr. Mathelier sent an additional list of questions for Mrs. Washington to answer via e-mail.

103.    On December 1, 2017, Mrs. Washington gave her son – Mr. Marcus Washington – permission to represent her and seek answers as to why Michael Mathelier dismissed her complaint without reason and decided to issue a Right to Sue letter, then stated that the investigation as still on-going. *See* **Exhibit D.**

104.    On December 4, 2017, Mr. Washington spoke to Michael Farrell, Director of EEOC, regarding the EEOC improper handling and investigation into Mrs. Washington case and possible

resolutions. Mr. Farrell didn't know that Mr. Washington had been assisting his mother from the moment she had gotten fired by the EEOC and did not know Mr. Washington's legal background.

105.    Mr. Farrell said he had recently gotten debriefed by Mr. Mathelier and stated: "I am satisfied that he is acting an impartial investigator and I am satisfied that he is doing a thorough investigation, which by the way is still on-going, because of the new information." Mr. Farrell maintained that was nothing "unusual or nefarious" regarding Mr. Mathelier's investigation and stated that he would be "the one to make the final determination."

106.    In defending Mr. Mathelier, he continued to give an incorrect procedural timeline of events that took place during the EEOC's investigation. Mr. Farrell adamantly defended Mr. Mathelier's impartiality as an EEOC investigator, although he admitted at the end of the conversation that Mr. Mathelier didn't have the authority to make a final decision. He also concluded that "everything [Mr. Mathelier] did was proper" and stated that the reason Mr. Mathelier reopened the case was because he received some "new information" although.

107.    Mr. Washington disagreed because Mrs. Washington had not submitted any new information. The only thing "new" she did was forward her issue to key members at the EEOC. Mr. Washington stated that had Mrs. Washington not challenged Mr. Mathelier's dismissal and forwarded her response to Karen Gonzalez and Michael Farrell at the EEOC, the case would still be dismissed. The two continued to disagree.

108.    Mr. Washington also addressed how the EEOC prematurely denied Mrs. Washington's race and sex-based discrimination claims and should not have done so. Mr. Farrell informed Mr. Washington that he was going to look at the file, but if Mrs. Washington included those claims on her initial complaint, then she "preserved her rights."

109.    Near the end of their conversation, Mr. Farrell stated the plan of action would be: "Let's look at this file and let's address our first issue here, which is 'What is this charge?' because we really can't move forward until we know what that is and then secondly we'll move on to 'Where are we in this investigation and how is it going to move forward?' So, hopefully this afternoon, or maybe tomorrow morning, [I'll] be able to look at the file and address the first issue…, and then we'll address the second issue…"

110.    On December 11, 2017, Mr. Washington e-mailed Mr. Farrell and Mr. Mathelier Mrs. Washington's response to the additional questions requested by Mr. Mathelier.

111.    On December 15, 2017, Mr. Washington e-mailed Mr. Farrell. He stated, in part: "I am following up with you being that you have not responded to any of my e-mails since December 4, 2017. This is quite troubling since you told me you would get back to me within a day or two after we spoke, and I also explained that we wanted a quick resolution since a lot of time had already been wasted unnecessarily. Can you please provide me with an update as to how the EEOC plans to proceed regarding Mrs. Washington's complaint and investigation?..."

112.    On December 22, 2017, Mr. Washington forwarded his December 15, 2017 e-mail to Mr. Mathelier to the EEOC's Board of Commissioners Victoria Lipnic, Chai Feldblum, Jenny Chang and Charlotte Burrows.

113.    Since Mr. Farrell had not followed up with Mr. Washington about the two things which were discussed during their December 4, 2017 call, Mr. Washington sent an e-mail on February 11, 2018 to Mr. Farrell inquiring about the status of Mrs. Washington's pending case with the EEOC. *See* **Exhibit E.**

114.    On February 12, 2018, Mr. Farrell responded to Mr. Washington's e-mail. In the last paragraph, he stated: "I regret that we were unable to reach agreement in this matter. However, **I cannot justify the ongoing, and potentially indefinite, expenditure of Agency resources you seem to be pursuing in this matter.**" (emphasis added) *See* **Exhibit E.**

115.    On February 12, 2018, Mr. Washington replied to Mr. Farrell via e-mail. *See* **Exhibit E.**

116.    Since the EEOC was unwilling to complete the investigation, Mrs. Washington e-mailed Mr. Mathelier on March 20, 2018 and asked him to send her the Right to Sue letter as a way to prevent further harmful delay.

117.    The EEOC had sufficient information from which to make a determination, but for reasons unknown, they chose not to. On April 5, 2018, Mrs. Washington received the Right to Sue letter from Mr. Mathelier, which was dated March 30, 2018.

118.    pon information and belief, Mr. Mathelier does not have a law degree and his prior experience antidiscrimination law and/or investigating complaints of discrimination are minimal.

119.    Mrs. Washington believes Mr. Mathelier and the EEOC were unable to remain impartial. Instead of issuing an adverse decision against the HACFL, they refused to make a final decision.

## X. THE REASONS PROVIDED BY THE HACFL FOR MRS. WASHINGTON'S TERMINATION ARE A PRETEXT FOR UNLAWFUL DISCRIMINATION

### A. HACFL's "Legitimate, Non-Discriminatory Reason" For Mrs. Washington's Termination:

120.   Elsewhere in the HACFL's Position Statement, they argued that Mrs. Washington "exhibited a harsh and overbearing management style and inability to get along with the subordinate employees in the department. She was known to berate employees, make sarcastic and demeaning comments, and deliver criticism harshly." [HACFL Position Statement, 3.]

121.   "The Charging Party's management style created a difficult and uncomfortable work environment that drove many employees away. This created considerable turnover and instability in the Respondent's workforce for several years." [HACFL Position Statement, 4.]

122.   "In the year of her termination, nearly 75% of the employees working for the Charging Party left their jobs...The overwhelming majority of these employees, however, quit their jobs. The Respondent was consistently turning over an average of greater than 50% of its staff every year." [HACFL Position Statement, 4.]

123.   "The instability caused by the [Mrs. Washington] created staffing problems for the Respondent." [HACFL Position Statement, 5.]

124.   "The [Defendant's] Executive Director, Mr. Tam English, had been concerned about the excessive turnover for some time by the time he made the decision to terminate [Mrs. Washington]. While he realized that any employer will have some natural turnover, he was concerned that the turnover in Section 8 was far greater than any other agency in the area... Mr. English decided that a change needed to be made to improve employee morale and to maintain a stable workforce. He decided that the Charging Party and Ms. Lopez needed to be." [HACFL Position Statement, 5.]

125.   The Defendants state that they didn't share the true reason for Mrs. Washington's termination with her because they wanted to "protect" Mrs. Washington's "future employment prospects." "Mr. English knew that the reason for the Charging Party's termination would become part of the public record. Mr. English did not desire to limit the Charging Party's future job prospects by unnecessarily discussing the negative details in the public record." [HACFL Position Statement, 6.]

**B. A Timeline of Mrs. Washington's Professional Accomplishment & Achievements While Employed at the HACFL:**

126.    Mrs. Washington had been a highly-regarded and productive employee throughout her career with various housing authorities throughout the nation. Below includes a partial timeline of important professional events pertaining to Mrs. Washington's employment with the HACFL:

- August 10, 2005: Mrs. Washington was hired as the Assistant Director of Assisted Housing with a starting salary of $45,000.00.
- February 10, 2006: After a six (6) month performance review (performance review completed 3/23/06), Mrs. Washington received an 11% merit increase, which increased her salary to $50,000.00.
- August 10, 2006: After one year of employment, Mrs. Washington received a 5% merit increase in her salary, increasing her yearly pay to $52,499.26. The performance review was completed 11/4/2006.
- August 10, 2007: After two years of employment, Mrs. Washington received a 5% merit increase, raising her salary to $55,124.16. The performance review was completed on 11/16/07.
- August 10, 2008: After three years of employment, Mrs. Washington received another 5% merit increase, raising her salary to $57,876.00. The performance review was completed on 10/8/2018.
- August 10, 2009: After four years of employment, Mrs. Washington received a 4.5% merit increase, raising her salary to 60,491.29. The performance review was completed on 11/16/09.
- August 10, 2010: After five years of employment, Mrs. Washington was Promoted to Assistant Director of Assisted Housing and received a 16% increase, increasing her salary to $70,000.00. The adjustment was approved on 12/10/13, retroactively applied starting on 8/1/10.
- August 1, 2011: After six years of employment, Mrs. Washington received a 3.5 % merit increase, raising her salary to $72,450.00. The performance review was completed on 10/24/11.
- August 1, 2012: After seven years of employment, Mrs. Washington received a 3% merit increase, raising her salary to $74,623.50. The performance review was completed on 9/25/12.
- August 1, 2013: After eight years of employment, Mrs. Washington received a 3% merit increase, raising her salary to $76,862.21. The performance review was completed on 10/23/13.
- August 1, 2014: After nine years of employment, Mrs. Washington received a 2% merit increase, which was completed on 6/8/15, but she never received the increase due to the salary cap, she was told.
- August 1, 2015: After ten years of employment, Mrs. Washington's performance review was never completed.

-18-

127.   Mrs. Washington was a dedicated and hardworking team-player who would be one of the first to arrive at the office every morning, and would be one of the last to leave each day.

128.   Mrs. Washington displayed a management style that sought to unite employees from all departments.

129.   Below are a few of Mrs. Washington's contributions to increase employee morale at the HACFL:

- During Mrs. Washington's first year of employment at the HACFL, she suggested during the annual Holiday event, to have a talent show, "HACFL Idol," which was successful. The planning process included subordinates from all departments within the agency. This continued to be part of the Holiday event for several more years.
- As part of uniting various departments, Mrs. Washington met with managers to spearhead Thanksgiving fellowship annual dinners with employees from all departments.
- As Assistant Director, Mrs. Washington implemented celebrations of employees' birthdays, births and farewells.
- Bring your daughter/son to work day is a national event but Mrs. Washington requested for the HACFL provide their staff this opportunity because it had never been done before.

130.   Over a thirty-year period, Mrs. Washington successfully attended more than fifty (50) workshops, seminars, etc. pertaining to public housing, Section 8 and leadership.

131.   Unlike other employees whose job titles changed, or positions were removed entirely, Mrs. Washington was not transferred or offered another position within the HACFL.

**C. Exit Interviews**

132.   In order to support their claim that Mrs. Washington had a "harsh" and "oppressive" management style, the Defendants provided the EEOC with exit interviews of four former employees: Anita Flores (employed for a combined 13 years), Barbara Colas (employed 8 years), Joyce Hill (employed 4 years) and Raquel Brutus-Thomas (employed 5 years).

133.   During Mrs. Washington's employment, HR conducted two investigations into complaints made by two disgruntled employees – Anita Flores and Raquel Brutus-Thomas.

134.   One employee who complained about Mrs. Washington was a person by the name of Anita Flores.

135.   "Ms. Flores had previously been employed as an "Intake Coordinator" under the supervision of the Charging Party, and her job duties included reviewing and processing

-19-

applications for Section 8 assistance and supervising intake staff. She resigned in January, 2015...She resigned because she said that she could no longer stand working under [Mrs. Washington]." [HACFL Position Statement, pg. 6.]

136.     Since all accusations were proven to be untrue, the HACFL cannot use these same meritless accusations against Mrs. Washington to buttress their deceptive and insufficient legal defenses.

137.     Ms. Flores was rehired by the HACFL shortly before Mrs. Washington was terminated. She was rehired as a Community Manager in the Affordable Housing department.

138.     The exit interview of Mrs. Brutus-Thomas should be invalidated due to the fact that Mrs. Washington and Mrs. Lopez were no longer employed with the company and should have had no bearing on her decision to leave the HACFL.

139.     To further put the exit interviews into perspective, if one were to believe the negative statements contained in the exit interviews of Mrs. Washington's former subordinate colleagues, then that would amount to one negative review every two years.

**D. Evaluations**

140.     In the HACFL's Position Statement, they argued: "[Mrs. Washington] received annual performance reviews from her supervisor, Ms. Lopez. While the reviews were mostly positive, they contained negative comments about the Charging Party's communication with and leadership of employees...These negative comments consistently appeared on her performance reviews throughout her employment. The Charging Party was continually reminded of her mistreatment of employees. The Housing Authority tolerated this part of her performance for years because of her valuable knowledge of Section 8 programs, but she continually failed to improve." [HACFL Position Statement, 3.]

141.     Mrs. Washington's evaluations are one way to demonstrate that the HACFL's claims about Mrs. Washington's "harsh" and "oppressive" management style and as a result, being largely responsible for the company's high turnover rate, are pretextual and demonstrative of the company's efforts to retaliate against her for defending her civil and human rights.

142.     Over the course of a ten-year period, Mrs. Washington receive nine evaluations.

143.     Below are quotes of key comments made in the nine Performance Reviews Mrs. Washington received while employed with the HACFL:

-20-

- **Review Period 8/10/05-02/10/06:** **Planning & Organization:** "During this period the Department has experienced a great turnover and therefore, having to work as an Occupancy Specialist in many instances and train new employees." [Is this the full quote?] **Leadership:** "...not only communicates a strong confidence in herself but also a confidence in others that encourages them to perform to their best. Carolyn H inspires the respect and trust of others through her actions. She influences others to perform better."

- **Review Period 8/10/06-8/10/07:** **Communication:** "...I have not detected sarcasm or impatience and Carolyn has in fact advocated for some of our employees who are undergoing probation insisting on providing every opportunity for training on the job prior to resorting to disciplinary action." **Judgment:** "Carolyn H can be relied upon to make decisions even under the tightest timeframes. **Leadership:** "...She tolerates a great deal of pressure and she quickly assumes a strong leadership role when action is needed." **Summary:** "Her dedication to improving the quality of our services on a day to day basis and indefatigable drive is to be commended and supported by the administration."

- **Review Period 8/10/07-08/10/08:** **Communication:** "Her upbeat attitude and straightforward manner contribute to her skills in dealing with the public. Routinely displays courteous and tactful behavior. Projects a positive and professional image of HACFL." **Managing People:** "Carolyn H is always available to her subordinates." **Summary:** "She is dedicated, resourceful and a definite asset to the Housing Authority..."

- **Review Period 8/10/08-08/10/09:** **Problem solving:** "She is also able to see both sides of an issue that both employees and clients are fairly treated when resolving conflicts." **Adaptability:** "Throughout all tasks she almost invariably maintains a positive attitude." **Leadership:** "Ms. Washington leads by example producing work that is impeccable."

- **Review Period 08/02/10-02/11/11:** **Cooperation:** "Her outlook is generally positive." **Dependability:** "Carolyn is always positively responsive to assignments...she is a proponent that if it affects the agency it affects all of us regardless of assigned responsibilities." **Summary:** "Carolyn is a highly valuable employee she is always willing to take on new responsibilities and recently has accepted to assist the Director in supervising the PH Department."

- **Review Period 08/01/2010-08/01/2011:** **Quality:** "Carolyn continues to display in this position the commitment to excellence and strong dedication to assure that the new Department of Assisted Housing comprising both PH and Section 8 programs excels and that employees under her supervision maintain strict adherence to quality to assure continuance of correct payments to landlords in Section 8 and appropriate application of HUD regulations and the HACFL's policies in both the Section 8 and Public Housing Programs. **Quantity:** Carolyn usually produces a high quantity of work and demonstrates a strong commitment to increasing productivity, if an increase in duties or responsibilities requires it, Carolyn will freely engage in as many hours as needed to assure tasks under her responsibility are completed. **Managing People:** "She demands high standards in compliance with HUD regulations and clearly delineates expectations through appropriate documentation. However, PH staff has proven to be a challenge since previous

management styles may have fostered a cycle of dependence and non-accountability which imbues some of our PH staff attitudes towards their duties. **Summary**: "Her integrity and commitment to quality is exceptional."

- **Review Period 08/01/2011-08/01/2012**: **Cooperation**: "She maintains satisfactory relationships with employees, landlords, and/or participants in PH and Section 8 programs." **Managing People**: "Carolyn has a genuine interest in assisting her employees in their growth though she should sharpen her listening skills to encourage more open communication with them." **Leadership**: "Carolyn has shown great growth in this area though facilitating positive interactions." **Summary**: "The expectation of quality work is now well entrenched and that is a great achievement."

- **Review Period 08/01/2012-08/01/2013**: **Quantity** "Carolyn serves as an excellent role model of productive and is able nonetheless to focus on people as well as productivity and able to maintain output even under less than perfect conditions." **Cooperation**: "Her Supervisors have never received a negative answer when requesting her assistance. She maintains satisfactory relationships with employees, landlords, and/or participants in PH and Section 8 programs. **Managing People**: "...she has further learned to express frustration and discontent without becoming involved in a conflict facilitating the preservation of the relationship and still getting the Department's needs met."

- **Review Period 08/2/2013-08/2/2014**: **Planning & Organization**: "Carolyn makes a point of providing recognition and credit for the work she delegates." **Leadership**: "She exhibits an appropriate level of confidence in herself as well as in others and she reacts well in pressure situations." **Customer Service and Attire**: "Carolyn is always neat and professional in appearance setting up an excellent example for all subordinates her commitment to good customer service is exemplary whereas she will assume any role including assisting with the reception area and or Occupancy as needed to assure clients are seen timely and efficiently."

144.   Mrs. Washington's evaluations clearly show that she did not have a "harsh" or "oppressive" management style and none of her evaluations directly and/or indirectly allude to the fact that she was the reason for the company's high turnover rate.

145.   At the time of Mrs. Washington's discharge, Mr. English could not have legitimately or honestly relied upon the belief that Mrs. Washington had a "harsh" or "oppressive" management style and/or was responsible for the company's high turnover rate.

146.   If Mrs. Washington management style was as "harsh" and "oppressive" as the Defendants' claim, then she would have been reprimanded, it would have been reflected in at least one of her evaluations and she would not have been employed at the company for a decade.

147.   The select evaluations presented by the HACFL are actually positive. For example, the Defendants referenced the 2006 evaluation. the 2006 evaluation is where the Respondent pulls the

quote that Mrs. Washington made "sarcastic comments," but two sentences later, her supervisor Mrs. Lopez states: "In my own interactions with Carolyn H. **I have not detected sarcasm or impatience and Carolyn has in fact advocated for some of our employees who are undergoing probation insisting on providing every opportunity for training on the job prior to resorting to disciplinary action.**" (emphasis added)

148.   In no way does Mrs. Washington claim to have been perfect or without faults – she's a human being. With each evaluation, Mrs. Washington accepted any criticisms made in good faith and always strove to be a better supervisor.

149.   Due to Mrs. Washington's positive performance, she received merit/salary increases which caused her salary to rise from $45,000.00 to $76,862.00 annually over the ten (10) year period.

**E. Mrs. Washington Cannot Be Solely Blamed For The HACFL's High Turnover Rate**

150.   In order to support their claim that Mrs. Washington had a "harsh" and "oppressive" management style, the Defendants provided statistics on the number of employees that left the Company between 2007 to 2015.

151.   The Defendants stated in their Position Statement: "It is important to note that [the HACFL] only employs approximately 20 employees at the office where [Mrs. Washington] worked, and [she] also supervised an additional two employees Community Managers that worked at other locations. In 2012, 12 employees (more than half) terminated employment. In 2013, 9 employees left (nearly half). In 2014, 7 employees left. And finally, in 2015, the year that the Charging Party was terminated from employment, 14 employees left the department. In the year of her termination, nearly 75% of the employees working for the Charging Party left their jobs…[Mrs. Washington] was consistently turning over an average of greater than 50% of its staff every year." [pg. 4]

152.   The HACFL provided the EEOC with a spreadsheet containing the names of 60 former employees "that abandoned employment" to support their argument that Mrs. Washington "harsh" and "oppressive" management style "created a difficult and uncomfortable work environment that drove many employees away." *See* **Exhibit F.**

153.   The HACFL advanced this false argument while being aware of the fact that Mrs. Washington **did not** directly supervise and/or work closely with the Occupancy Specialists. They

managed by and worked under the Occupancy Specialist Supervisors: Raquel Brutus-Thomas and Willie Mosley.

154.    35 out of the 60 employees who left the Company between 2007-2015 or 58% held the position of "Occupancy Specialist."

155.    For each year provided by the HACFL, Occupancy Specialists comprise the largest percentage of employees who left the company.

156.    For example, in the year 2008, three employees from the HACFL left the company. They all held the title of "Occupancy Specialist." In 2010, three out of the four employees who left the company were "Occupancy Specialists"

157.    One reason this low-level, data-entry position had a high rate of turnover, was due to the large numbers of residents the HACFL serviced, which increased workload and meant having to do more tedious, monotonous repetitive and time-consuming tasks.

158.    Another important reason employees resigned is indicated on the exit interviews of Barbara Colas and Joyce Hill: low pay.

159.    The HACFL also argued that Mrs. Washington's management style "did not improve" after she received her 2010 evaluations, however, the statistics provided by the HACFL shows that the turnover rate decreased from 12 to 7 between 2012 and 2014.

160.    The HACFL is trying to hold Mrs. Washington to an unrealistic and different standard. Throughout this litigation, the HACFL has tried to admonish Mrs. Washington for her management style, but had not high standards for herself and not held her colleagues accountable for complying with company policies and federal guidelines and regulations, she would have been admonished and possibly terminated.

## F. Mr. English's Subjective Hiring Decisions Tainted with Racial Bias and Preferential Treatment Towards Those Classified As "White"

161.    Mr. English – a male classified as "white" – was born before the passage of the Civil Rights Act of 1964, during a time in America when de jure racial segregation existed in all areas of society.

162.    Upon information and belief, Mr. English has never read the statutory language contained in Title VII, the ADEA or the Florida Civil Rights Act of 1992 to know what does and what does not constitute unlawful employment actions under our nation's antidiscrimination statutes.

163.    English has demonstrated his preferential treatment towards whites and has created number of jobs for his friends and/or associates as stated below:

1.  **Scott Strawbridge:** A white male, over the age of 40. Hired as the Director of Development & Facilities. He is currently employed.
2.  **Robert Evans:** A white male, over the age of 40. Hired as the Facility Management Specialist. He is currently employed.
3.  **Rebecca Walters:** A white female, under the age of 40. Hired as the Director of Research, Education and Grants. She resigned after she received her Doctorate degree. The position no longer exists.
4.  **Laura Valdes:** A white/Hispanic female, over the age of 40. Hired as the Community Manager for Affordable Housing. Before Valdes was hired, an African American woman held this position. The position was discontinued and a year after, Valdes filled the position. Valdes is currently employed.
5.  **Barbara Baer (hired after Mrs. Washington's termination):** A white female, over the age of 40. Hired as the Director of Housing Choice Voucher Programs. She was later removed from the position of Director of Housing Choice Voucher by another federal agency due to her past criminal conduct.

164.    Out of the five jobs mentioned above, only one – the Director of Housing Choice Voucher Programs – was advertised to the public.

165.    Mr. English's highly subjective hiring decisions – consciously and/or unconsciously – were tainted with racial bias.

166.    "Over the past several decades, social science research on cognitive bias has exploded, and it has revealed that we all hold biases and stereotypes, deep inside our brains that come out as we process information and make judgments...More important for understanding discrimination, however, is the fact that cognitive biases tend to develop around socially salient categories like race and sex, and they lurk behind our mundane decisions as much as our life-changing ones." [Green, pg. 29-30. 2017.]

167.    According to the June 15, 2006, Special Meeting of the Board of Commissioners of HACFL, Attorney Frank Henry and Commissioner Kelley met with Mr. Phillip Goombs – the then African American CEO of the HACFL – to discuss his resignation and Severance Package based on his employment contract and accumulated sick and vacation benefits.

168.    For reasons unknown, Mr. English made false allegations about Mr. Goombs and as the result of a 3-2 vote by the Board of Commissioners, the HACFL announced that Mr. English would become the new Executive Director/CEO at the meeting held on December 14, 2006. Information

surrounding the replacement of a new Executive Director/CEO was published in *The Sun Sentinel* in an article titled "Critics Rejoice Housing Board" on June 23, 2006. *See* **Exhibit G.**

169. As a proud supporter of the Republican party, Mr. English was very vocal to Mrs. Washington about his disapproval of Obama and his administration throughout his eight-year term as the country's first mixed-race president.

170. "It is well documented that conscious and unconscious race bias, even rank discrimination based on race, remain alive in our land, impeding realization of our highest values and ideals." Grutter v. Bollinger, 539 U.S. 306, 345 (2003) (Ginsburg, J., concurring).

171. Based on America's longstanding and on-going history of both blatant and subtle white racism, as well sexism, no presumption can be made that Mr. English is a racial egalitarian and/or harbors no explicit and/or implicit biases against people of color or women.

**F. Ageist Comments Made By Mr. English During Mrs. Washington's Employment**

172. During the end of Mrs. Washington's employment with the HACFL, Mr. English, on more than one occasion, made remarks about Mrs. Washington and Mrs. Lopez' age.

173. Mr. English came in and out of Mrs. Washington's office on a regular basis.

174. On July 2, 2015, Mr. English made remarks to Mrs. Washington about her age, stating that she was getting older and inquiring about who she thought could replace her from within the company.

175. On September 30, 2015, Mr. English was at the Kelley building and stopped by Mrs. Washington's office to discuss the meeting at Suncrest Court that evening. They discussed such things as the meeting agenda with the residents of Suncrest Court and Sunny Reach Acres to discuss relocation due to the submission of Demo Disposition proposal of both Public Housing developments.

176. Later in their conversation, Mr. English told a couple of jokes, and then made reference to Mrs. Washington's age stating, "Carolyn you seem to be getting older." Mrs. Washington commented, "now Mr. English, so are you?"

177. Mrs. Washington did not think anything of Mr. English's comments. He went on to mention with the elimination of the Public Housing units, we would need to place the current managers in other Tax Credit developments, if the funding is awarded, and positions were

available. He was reminded this process was done when other developments were demolished such as Dixie Court, Sunnyland Park and Oak Park developments.

178.    On October 20, 2015 – the day Mrs. Washington had a meeting in Andrea Ayala's office for an unemployment hearing of an ex-employee – Mr. English came into her office to discuss the lease-up of Northwest Gardens. They discussed the vacancies and he wanted to ensure that Mrs. Washington and her staff could remove a client from the Section 8 waiting list into the Tax Credit unit.

179.    He was reminded that the unit would have to be add into the AHAP Contract in order for the lease-up to occur with Section 8 funding.  Mr. English then stated, "I approve to lease the unit, which will be changed in the AHAP contract.  There is too much paperwork, you need to share with the Tax Credit Manager the information from the Section 8 file."  He was advised that they could not share information, since they were two separate entities.

180.    Mr. English went on to make other comments, which eventually led him to making the following statement: "You and Mrs. Lopez are getting too old to run this program. Who would replace you?" Mrs. Washington replied, "Mr. English, we have qualified staff whom we have trained, and they are based throughout the agency."

181.    Again, Mrs. Washington disregarded Mr. English's comments and she continued to work diligently for the agency.

182.    Mrs. Lopez was also present when some of these comments were made.

**G. Further Reasons Demonstrating Pretext**

183.    Although Mrs. Washington did partake in interviewing potential employees of the HACFL, she had no role in the selection of applicants. That job duty belonged to the Occupancy Specialist supervisors of the Section 8 Department – Raquel Brutus-Thomas and Willie Mosley. Based on this fact, Mrs. Washington cannot be blamed for the lack of "competent personnel in the department."

184.    Even if Mr. English's discriminatory actions towards Mrs. Washington were unintentional, it doesn't change the fact that she was treated differently in the terms and conditions of her employment than her white counterparts.

Mrs. Washington never received a disciplinary notice to know what actions were contributing to her "harsh" management style and oppressive behavior – something she and Mrs. Lopez were required to do for subordinate employees.

186.    Mrs. Washington's management style was not "harsh" and labeling it as such post-termination, despite evaluations to the contrary, further reflects the HACFL's racial and/or gender bias (e.g. trying to conjure up the image of the "angry black woman" in the mind of the finder of fact).

187.    In the June 5, 2017 Reply to the HACFL's Position Statement, Mrs. Washington stated: "I believe that it is highly unlikely that the same types of criticisms (e.g. focusing on my body language, 'indicating impatience' or frustration with co-workers who displayed 'low performance' although trained, etc.) would have been made had I been a white male. I was a team player who showed respect to my colleagues. As the Respondent states, I "had strong knowledge of housing regulations and how the department was supposed to function," and like any supervisor that takes their job seriously, I held my staff accountable for their actions. Some employees did not like that and it was reflected in some of their exit interviews." [pg. 2-3.]

188.    Since Mrs. Washington's termination, four former and/or current employees of the HACFL have written character statement letters, which further demonstrate that Mrs. Washington did not display a "harsh" or "oppressive" management style. *See* **Exhibit H.**

## H. Conclusion:

189.    For the numerous reasons stated above, the Plaintiff's discharge occurred under circumstances that give rise to an inference of unlawful discrimination based on race, color, sex and/or age.

190.    The Defendants' stated nondiscriminatory reasons for Mrs. Washington's termination are not credible, and are a pretext.

## XI. FACTS SURROUNDING MRS. WASHINGTON'S CLAIMS OF DISCRIMINATORY FAILURE TO REHIRE

191.    On November 23, 2015, Mrs. Washington applied for the position of Director of Housing Choice Voucher Program, which was posted on the HACFL's website during the absence of the HR Manager, Andrea Ayala, who was on vacation.

192.    On December 1, 2015, the HACFL temporarily hired Beatriz Cuenca-Barberio as Director of Housing Choice Voucher.

193.    On January 26, 2016, Mrs. Washington sent an email to HR, Andrea Ayala, inquiring if the position of Director of Housing Choice Voucher had been filled. Ayala told Mrs. Washington the position had been filled.

194.    In or around February 6, 2016, Medina Johnson, black female over the age of 40, was hired as Director of Housing Choice Voucher.

195.    On June 17, 2016, Mrs. Washington applied for the Program Analyst position at the HACFL. She was interviewed and did not get the job. She was later informed by an unnamed source that this position was created for and given to a friend of Medina Johnson.

196.    On March 5, 2017, Mrs. Washington applied with HACFL for the position of Director of Housing Choice Voucher for the second time. Mrs. Washington was not allowed to interview for the position.

197.    In or around March 24, 2017 was Medina Johnson's last day with HACFL as Director of Housing Choice Voucher – less than 14 months on the job. Reason for departure is unknown.

198.    In or around May 9, 2017, the HACFL hired Barbara Baer as the new Director of Housing Choice Voucher. Baer is a white female, over the age of 40.

## XII. THE REASONS PROVIDED BY THE HACFL FOR REFUSING TO REHIRE MRS. WASHINGTON ARE A PRETEXT FOR UNLAWFUL DISCRIMINATION

**A. HACFL's "Legitimate, Non-Discriminatory Reasons" For Mrs. Washington's Failure to Rehire:**

199.    Since the HACFL's argument was that Mrs. Washington's "harsh" management style caused her to be fired, they also argued that this prevented her from being rehired.

200.    "[Mrs. Washington's] claim in the charge that she was replaced by Anita Flores is false. The [Defendant] did not replace [Mrs. Washington]. Instead, the [Defendant] eliminated her position and only hired a new Director of Assisted Housing to replace Ms. Lopez. The person who was hired as the Director of Assisted Housing was Ms. Medina Johnson-Jennings. It is also false that the Charging Party was replaced by someone 'under 40 years of age,' as alleged in the charge. Ms. Johnson was 43 years of age at the time she was hired." [HACFL Position Statement, 3.]

201.    They also argued that Mrs. Washington was not qualified for the Director of Housing Choice Voucher Program position she applied for. ["[Mrs. Washington] applied after her termination for a vacancy as Director of Assisted Housing. She was not given an interview. The position that she applied for as Director of Assisted Housing had more responsibility than her prior position as Assistant Director of Assisted Housing. In other words, the [Plaintiff] was applying for her boss' former job as the head of the Department."] [HACFL Position Statement, 7.]

202.    "The [Defendant] had just terminated [Mrs. Washington] for all of the reasons set forth above. The [HACFL] was certainly not going to 'promote' her by rehiring her to an even higher management position after just having terminated her. The [Plaintiff] was essentially asking for a promotion to her former supervisor's job after having just been terminated from her own job. The reasons for not having granted her an interview for this position are obvious." [HACFL Position Statement, 7.]

**B. Background Information on the Four Individuals Hired For The Director of Housing Choice Voucher Program:**

**a. Beatriz Cuenca-Barberio:**

203.    Mrs. Cuenca-Barberio is a woman, but her race, ethnicity and/or age are unknown.

204.    Upon information and belief, Mrs. Cuenca-Barberio is Hispanic, non-white.

205.    *Mrs. Curenca-Barberio was hired by an "outside contractor," the Miami Beach Community Development Corporation.*

206.    Mrs. Cuenca-Barberio held the Interim Director of Housing Choice Voucher Program position for a total of three (3) months.

**b. Medina Johnson:**

207.    Mrs. Johnson is a non-white woman, but her race, ethnicity and/or age are unknown.

208.    Mrs. Johnson held the position of Director of Housing Choice Voucher Program for *thirteen (13) months, from February 16, 2016 to March 24, 2017.*

209.    Prior to being hired for this position, Mrs. Johnson was the Case Management Manager for Nan McKay and Associates, LLC.

**c. Barbara Baer:**

210. Mrs. Baer identifies as a white woman and upon information and belief, is over the age of 40.

211. Before being hired by the HACFL as the Executive Director of Housing Choice Voucher Program, Mrs. Baer's previous job was Executive Director of the Hot Springs Housing Authority in Arkansas.

212. In or around May of 2015, Mrs. Baer "pleaded guilty...to a felony information accusing her of stealing more than $5,000 in Housing Urban Development funds in the Hot Springs Division of the Western District of Arkansas" *See* **Exhibit I.**

213. On March 31, 2016, Mrs. Baer "was sentenced to two years' probation for embezzlement...by a federal judge in Texarkana."

**d. Anita Flores**

214. Due to Mrs. Baer's unexpected and abrupt departure, the Interim Director of Housing Choice Voucher Program is currently being filled by Ms. Flores – a two-time former employee of the HACFL who claimed that she could not work with Mrs. Washington.

215. In or around the time Mrs. Washington was terminated, Ms. Flores was rehired by the HACFL for the third time on November 16, 2015 as the "Intake Coordinator".

216. Mrs. Flores is non-white woman, but her race and ethnicity are unknown.

217. Upon information and belief, Ms. Flores is under the age of 40.

218. According to Ms. Flores' LinkedIn page, she does not have a college degree and she has less than 30 years' work experience for the housing authority. *See* **Exhibit J.**

219. Prior to serving as the Interim Director of Housing Choice Voucher Program, Mrs. Flores worked for the HACFL on two separate occasions and quit both times.

220. Before Ms. Flores' second exit from the HACFL, in or around December of 2015 or January of 2016, she had been written up by Mrs. Lopez for being extremely disrespectful to Mrs. Washington in front of staff.

221. During Ms. Flores' second exit from the company, she deleted important files from her computer that contained HACFL's waiting list database.

222.    The HACFL sought the assistance of Gerry Computers to restore the information. If Cheryl Stewart had not shared this information, the HACFL would not have been able to recover some of this pertinent information.

**C. Explaining Why the HACFL's Refusal to Rehire Mrs. Washington Demonstrates Pretext:**

**a. Clarification:**

223.    Following the termination of Mrs. Lopez and Mrs. Washington, the HACFL eliminated the Director of Assisted Housing and the Assistant Director of Assisted Housing positions and created the Director of Housing Choice Voucher Program, which eliminated managing the public housing developments.

224.    Although the Defendants' attorneys stated otherwise, Mrs. Washington **never** applied for the Director of Assisted Housing Program. She only applied for the Director of Housing Choice Voucher Program.

**b. Mrs. Washington Was Qualified For the Director of Housing Voucher Programs Position and Met the Minimum Hiring Qualifications:**

225.    The Director of Assisted Housing and/or Director of Housing Voucher Program positions "were not an even higher management position" than the one Mrs. Washington held. The responsibilities of this position require the management of only one program – the Housing Choice Voucher program, which is formerly known as the Section 8 program.

226.    At the time of Mrs. Washington's discharge, she held the Assisted Director of Assisted Housing position. The position encompassed two (2) titles which included the Intake Coordinator (supervised three (3) employees) and Supervisor of Public Housing Managers (staff reduced to two (2) Housing Managers). Mrs. Washington also co-managed the Section 8 program and managed the Public Housing program.

227.    If formalized and objective hiring and promotion criteria existed, there's no possible way that Medina Johnson, Barbara Baer or Anita Flores would have been hired for the Director of Housing Choice Voucher position over Mrs. Washington.

228.    Based on Mrs. Johnson's educational background and supervisory experience, Mrs. Washington was more qualified for the position because her credentials were more aligned with the job title.

229.    The agency Mrs. Johnson managed – the Miami-Dade Department of Public Housing and Community Development – also had high turnover under her supervision due to similar case management issues the HACFL had.

230.    Objectively speaking, Mrs. Flores' qualifications and work experience are not comparable to that of Mrs. Washington.

231.    The hiring of Mrs. Flores as the Interim Director of Housing Choice Voucher Program establishes that Mrs. Washington **was** in fact qualified to be hired for position.

232.    Neither Mrs. Johnson or Mrs. Flores have more than 30 years' of work experience in public housing management, specifically Section 8.

233.    Despite the language contained in the HACFL's job description for this position, the criteria used to hire Mrs. Flores should be considered the minimum qualifications for the job.

234.    The disparities between the qualifications of Mrs. Cuenca-Barbero and Ms. Flores are glaring and demonstrates that the HACFL is hiring largely on subjective criteria.

235.    Based on the Defendants' decisions to hire Ms. Flores, it is clear that Mrs. Washington met the HACFL's legitimate performance expectations for the Director of Housing Choice Voucher Program position.

236.    Even if Mrs. Washington had not met the HACFL's objective requirements, she could still do the job.

237.    Since Mrs. Washington was just as qualified as the individuals hired for this position, a genuine issue of fact exists as to whether the HACFL's refusal to rehire her were based on Mrs. Washington's race, sex, age and/or other protected traits.

**c. Individual Disparate Treatment Based on Race:**

238.    A few months after arguing to the EEOC that Mrs. Washington was terminated because of her "harsh" and "oppressive" management style, they hired Mrs. Baer, who according to a Letter to the Editor in the *Hot Springs Daily* on April 5, 2016, was described as a "virtual dictator, who had over 60 staff fired, which represented in a 100% annual staff turnover." *See* **Exhibit K.**

239.    Upon information and belief, Mrs. Baer had either a personal and/or professional relationship with Tam English and Michael Tadros prior to being hired.

240.    Upon information and belief, Mrs. Baer was offered, but could not accept the position of Director of Housing Choice Voucher when Mrs. Washington applied on November 23, 2015, because she was on probation and could not leave the state of Arkansas.

241.    The hiring of Mrs. Baer supports Mrs. Washington's claims of individual disparate treatment because Mrs. Baer is a similarly situated individual outside the plaintiff's racial class who was treated more favorably than Mrs. Washington.

242.    Had Mr. English not been motivated by racial, sex and/or age bias, he would not have made the same adverse employment decisions against Mrs. Washington, as made evident by his decision to hire Mrs. Baer in spite of her criminal record and high turnover rate at previous place of employment.

243.    Absent any consideration of race, the subsequent hiring of Mrs. Baer supports that the HACFL and Mr. English would not have terminated and/or refused to rehire Mrs. Washington had she been white.

244.    The subsequent hiring of Ms. Baer supports the fact that had Mrs. Washington been white, she would still be employed with the HACFL and would have remained with the company past the age of retirement.

**d. Replacement Inside Protected Class Does Not Negate Mrs. Washington's Claims of Discrimination:**

245.    As a matter of law, Plaintiff is not required to show replacement outside of protected class to prove claims of discrimination.

246.    Since Mrs. Washington immediately gave the HACFL notice that she believed her termination was unlawful, the HACFL's decision to allow a third party to fill this position with women of color does not mean that Mrs. Washington's race and/or sex did not play a "motivating factor" for the adverse employment decisions made against her.

247.    Although a majority of the women hired for this position have been of color, the law recognizes that persons can be discriminated against even if they were not replaced by someone outside of their protected class.

**e. Important Information Surrounding the "Hiring" Of Mrs. Cuenca-Barberio:**

248.    The Miami Beach Community Development Corporation focuses on "developing affordable housing and serving the low-income residents of Miami Beach. Today, MBCDC owns and manages 14 residential projects and an office building. It has 340 units in its portfolio and primarily serves low-income elderly and disabled residents. In addition, MBCDC has a housing counseling program which assists 500 families a year in their quest to become first-time homebuyers."

249.    Mrs. Cuenca-Barberio is currently the Executive Director of the organization and has been since 2014 (she previously was the Program Director for Florida Quadel Consulting).

250.    Upon information and belief, Mrs. Cuenca-Barberio continued to serve as the Executive Director of MBCDC during the three months she was employed at the HACFL.

251.    When the above information is considered, it appears that Mrs. Cuenca-Barberio's placement in this position, in part, was merely to cast doubt into Mrs. Washington's claims of racial, gender and age discrimination.

**e. The HACFL Continues To Have "High Turnover" Post-Mrs. Washington's Termination:**

252.    In the HACFL's February 2, 2017, they stated that since Mrs. Washington and Mrs. Lopez's termination, "turnover has moderated." This is untrue.

253.    Since making the decision to "mov[e] in another direction," the HACFL has hired four individuals within the last two years to fill comparable director positions although Mrs. Washington and Mrs. Lopez held executive and/or director positions with the HACFL for a decade or longer.

254.    Discovery will show that post-Mrs. Washington's termination, Occupational Specialists continue to have a high rate of turnover at the HACFL and exit the company a rate higher than individuals employed in other departments.

**f. Conclusion**

255.    The Defendants' refusal to rehire Mrs. Washington, occurred under circumstances that give rise to an inference of discrimination based on race, color, sex and/or age.

256.   The Defendants' stated nondiscriminatory reasons for their refusal to rehire Mrs. Washington are not credible, and are a pretext.

257.   Even if the HACFL and Mr. English's decision to terminate and their refusal to rehire Mrs. Washington were motivated by legitimate, non-discriminatory factors, they were also motivated by discriminatory bias.

## XIII. DAMAGE TO MRS. WASHINGTON'S REPUTATION and FUTURE EMPLOYABILITY

258.   The actions of the HACFL have caused irreparable injury to Mrs. Washington's employment prospects, career, and reputation, and have caused severe emotional and psychological distress.

259.   The adverse employment actions taken by the HACFL and Mr. English resulted in tangible job consequences for Mrs. Washington (e.g. loss of employment, loss of future employability, etc.).

260.   The months following Mrs. Washington's termination were a very stressful and emotional time for her. For example, due the fact that Mrs. Washington's health/medical benefits terminated on November 30, 2015, she was unable to get refills on her medical prescriptions. This information was not shared with her until her meeting with HR on December 2, 2015.

261.   During job interviews, Mrs. Washington, was asked by potential employers, on more than one occasion, about the reason for her abrupt exit at the HACFL. Mrs. Washington's inability to give a truthful reason created a negative impression in decisionmaker's mind and she never received a job offer from those employers.

262.   At the time of Mrs. Washington's termination from the HACFL, her salary was $76,862.00. She currently receives $36,862.00 less than when she was employed at the HACFL.

263.   Mrs. Washington should still be employed with the HACFL and would have been able to work for the company well past the age of retirement (65).

264.   Mrs. Washington was hired by the Urban League of Broward County on February 24, 2016. Her starting salary was $35,000.00 and on March 14, 2017, she received a promotion to Housing Program Coordinator, which increased her salary to $40,000.00 – more than $30,000 less than she earned at the HACFL.

## XIV. DEFAMATION & LIBEL

**A. The Prevailing Law:**

265.    Under Florida law, defamation is generally defined as "the unprivileged publication of false statements which naturally and proximately result in injury to another." Wolfson v. Kirk, 273 So. 2d 774, 776 (Fla. 4th DCA 1973).

266.    To state a claim for common law defamation, a plaintiff must allege that "(1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff." Alan v. Wells Fargo Bank, N.A., 604 F. App'x 863, 865 (11th Cir. 2015).

267.    In a defamation *per se* action, the plaintiff does not need to show any special damages, *see* Johnson v. Fin. Acceptance Co., 159 So. 364, 365 (Fla. 1935), because "[p]er se defamatory statements are 'so obviously defamatory' and 'damaging to reputation' that they 'give[ ] rise to an absolute presumption both of malice and damage," Alan, 604 F. App'x at 865 (*quoting* Wolfson, 273 So. 2d at 776).

268.    A written publication is defamatory per se if it "(1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) **tends to injure one in his trade or profession.**" Id. (*citing* Richard v. Gray, 62 So. 2d 597, 598 (Fla. 1953)). (emphasis added)

269.    Actual malice can be found if Defendants published defamatory statements with a reckless disregard of the truth or used slipshod or sketchy investigative techniques.

270.    Reckless disregard of the truth can be shown when there is little investigative effort expended initially or signals of the falsehood of reporting are ignored, or no additional inquiries were made after the author knew or should have known that the published accounts were untrue.

271.    Actual malice can also be proved by circumstantial evidence. Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. Reader's Digest Assn. v. Superior Court, 37 Cal.3d 244, 257 (1984).

**B. Intentionally False & Misleading Statements Made About Mrs. Washington By the HACFL Through Their Legal Counsel:**

272.    The Defendants – via their counsel – intentionally made a number of false and misleading statements against Mrs. Washington.

273.    In order to create the myth that they terminated Mrs. Washington because of "legitimate, nondiscriminatory reasons," the HACFL and their attorneys have engaged in defamation against Mrs. Washington by making false statements about her management style (repeatedly using words such as "harsh," "oppressive," etc.), as well as her character as a human being.

274.    The numerous defamatory statements made by the HACFL and their counsel about Mrs. Washington have been detailed in the paragraphs above, but one example includes the statement: "[Mrs. Washington] was well aware of her overbearing management style, the low employee morale, and excessive turnover in her department." [HACFL Position Statement, 6.]

275.    Despite ten years' worth of positive evaluations, the Defendants and their counsel chose to ignore the mount of evidence demonstrating that Mrs. Washington did not have a "harsh" or "oppressive" management style.

276.    By knowingly making materially false and misleading statements regarding Mrs. Washington's management style, the HACFL has further damaged Mrs. Washington's her reputation and tainted her character.

277.    The HACFL's defamatory statements regarding Mrs. Washington's work performance and management style also constitute a form of retaliation against Mrs. Washington for standing up against the unlawful employment decisions made the HACFL and English.

278.    If the finder of fact accepts the HACFL's legal defenses are true, the falsity of the Defendants' statements will continue to cause injury to Mrs. Washington as she seeks justice for the unlawful employment actions taken against her by the HACFL and Mr. English.

**C. Attorneys' Actions Violate the Florida Rules of Professional Conduct:**

279.    "Many of the lawyer's professional responsibilities are prescribed in the Rules of Professional Conduct and in substantive and procedural law."

280.    Local Rule 11.1 of the District of South Florida, part c, discusses the "standards of professional conduct of members of the Bar of this Court." "For a violation of any of these canons

in connection with any matter pending before this Court, an attorney may be subjected to appropriate disciplinary action."

281.   In Rule 3-43 of the "Rules Governing the Florida Bar" states: "The commission by a lawyer of any act that is unlawful or **contrary to honesty and justice may constitute a cause for discipline whether the act is committed in the course of the lawyer's relations as a lawyer or otherwise**, whether committed within Florida or outside the state of Florida, and whether the act is a felony or a misdemeanor." (emphasis added)

282.   In Chapter 4, titled "Rules of Professional Conduct Preamble: A Lawyer's Responsibilities," it clearly states: "[E]very lawyer is responsible for observance of the Rules of Professional Conduct."

283.   The actions of the HACFL's attorneys constitute intentional violations of the "Rules Governing the Florida Bar."

284.   Although a lawyer is expected to "zealously" assert the client's position, they must not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

285.   The Defendants are engaging in unethical activity because the HACFL is paying their attorneys to deceive and obscure the truth – in a gross attempt to deceive the finder of fact and obtain a favorable verdict.

## XV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Individual Disparate Treatment in Violation of Title VII)

286.   Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

287.   By the actions described above, among others, Defendants have violated Title VII.

288.   By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her race, color, perceived national origin and/or gender in violation of Title VII by denying her the same terms and conditions of employment available to employees who are white and/or male.

289.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, the Plaintiff has suffered, and continues to suffer, monetary and/or economic

-39-

harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

290.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, the Plaintiff has suffered, and continues to suffer, emotional distress and is entitled to an award of compensatory damages.

291.   Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights in violation of Title VII for which the Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Individual Disparate Treatment in Violation of Section 1981)

292.   Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

293.   By the actions described above, among others, Defendants have violated Section 1981.

294.   By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her race and/or color in violation of Section 1981 by denying her the same terms and conditions of employment available to employees who are white, including, but not limited to, denying her terms and conditions of employment equal to that of employees who are classified as white.

295.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, the Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

296.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, the Plaintiff has suffered, and continues to suffer, emotional distress and is entitled to an award of compensatory damages.

297.   Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to the Plaintiff's rights under Section 1981 for which the Plaintiffs is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the ADEA)

298.   Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

299.   By the actions described above, among others, Defendants have violated the ADEA.

300.   By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her age in violation of the ADEA by denying her the same terms and conditions of employment available to lesser qualified individuals under the age of 40.

301.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the ADEA, the Plaintiff suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

302.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the ADEA, the Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

303.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the ADEA, the Plaintiff has suffered, and continues to suffer, emotional distress and is entitled to an award of compensatory damages.

## FOURTH CAUSE OF ACTION
### (Discrimination in Violation of the Florida Civil Rights Act of 1992)

304.   Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

305.   By the actions described above, among others, Defendants have violated the Florida Civil Rights Act of 1992.

306.   By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her race, color, perceived national origin, gender and/or age in violation of the Florida Civil Rights Act of 1992 by denying her the same terms and conditions of employment available to employees who are white, male and/or lesser qualified individuals under the age of 40.

307.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Florida Civil Rights Act of 1992, the Plaintiff suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

308.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Florida Civil Rights Act of 1992, the Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

309.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Florida Civil Rights Act of 1992, the Plaintiff has suffered, and continues to suffer, emotional distress and is entitled to an award of compensatory damages.

310.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to the Plaintiff's rights under Section 1981 for which the Plaintiffs is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)

311.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

312.    The Defendant's conduct as alleged above constitutes retaliation against the Plaintiff because she engaged in activities protected by Section 1981, Title VII and the ADEA. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's retaliatory animus.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of Title VII)

313.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

314.    The Defendant's conduct as alleged above constitutes retaliation against the Plaintiff because she engaged in activities protected by Title VII and the ADEA. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's retaliatory animus.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the ADEA)

315.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

316.    The Defendant's conduct as alleged above constitutes retaliation against the Plaintiff because she engaged in activities protected by Title VII and the ADEA. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's retaliatory animus.

## EIGHTH CAUSE OF ACTION
### (Common Law Defamation "Per Se")

317.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

318.    Through their attorneys, the Defendants, jointly and individually, have defamed the Plaintiff by knowingly, intentionally, willfully, and/or negligently publishing statements about the Plaintiff which they knew or should have known to be false.

319.    By the actions described above, among others, Defendants, through their counsel, have violated 28 U.S. Code § 4101.

320.    By falsely stating numerous times throughout their pleadings and/or oral arguments to the EEOC that Mrs. Washington had a "harsh" and "oppressive" management style which resulted in a high rate of turnover for the HACFL, the Defendants and their attorneys have engaged in per se defamation.

321    The Defendants have intentionally made false and injurious claims regarding Mrs. Washington's professionalism and character in an effort to deceive the finder of fact.

322.    The Defendants' gross attempts to assassinate Mrs. Washington's character and further tarnish her reputation have left her feeling embarrassed, humiliated and slightly depressed.

## NINTH CAUSE OF ACTION
### (Common Law General Defamation)

323.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

324.   Through their attorneys, the Defendants have defamed the Plaintiff by knowingly, intentionally, willfully, and/or negligently publishing statements about the Plaintiff which they knew or should have known to be false.

325.   By falsely stating numerous times throughout their pleadings and/or oral arguments to the EEOC that Mrs. Washington had a "harsh" and "oppressive" management style which resulted in a high rate of turnover for the HACFL, the Defendants and their attorneys have engaged in per se defamation.

326.   The Defendants have intentionally made false and injurious claims regarding Mrs. Washington's professionalism and character in an effort to deceive the finder of fact.

327.   The Defendants' gross attempts to assassinate Mrs. Washington's character and further tarnish her reputation have left her feeling embarrassed, humiliated and slightly depressed.

## TENTH CAUSE OF ACTION
### (Common Law Intentional Infliction of Emotional Distress)

328.   Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

329.   Defendants' knowing and intentional publication of the harmful statements against the Plaintiff has foreseeably and proximately caused the Plaintiff emotional distress.

330.   Defendants' intentional actions were committed with the knowledge that they would cause extreme physical pain and suffering and cause severe emotional distress to the Plaintiff.

331.   Defendants' actions were willful malicious, deliberate, and were done with reckless or negligent indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions.

## XVI. PRAYERS FOR MAKE WHOLE RELIEF

332.   Mrs. Washington has filed this action in "good faith" and genuinely believes that any objective and reasonable person will conclude that her race, color, perceived national origin, gender and/or age played a "motivating factor" in the adverse employment actions taken against her by the HACFL and Mr. English.

333.   Mrs. Washington's complaint does more than "state[ ] a plausible claim for relief." Twombly. It demonstrates by a preponderance of the evidence, that the legitimate reasons offered

by the Defendants were merely a pretext for their engagement of unlawful discrimination and retaliation against Mrs. Washington and Mrs. Lopez.

334.    Based on all of the facts and circumstances, an inference can be established that Mr. English and the HACFL acted with bias and had Mrs. Washington been white, male and/or under the age of 40, she would have not been fired and would still be working for the HACFL today.

WHEREFORE, the Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.   A declaratory judgment that the adverse employment actions, conduct and practices of Defendants complained of herein are unlawful and violate Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17, the Florida Civil Rights Act of 1992.

B.   A declaratory judgment that the negative and false statements about Mrs. Washington's character and management style constitute defamation – both general and per se.

C.   A verbal and written apology from each Defendant and their attorneys for intentionally defaming her character, mischaracterizing Mrs. Washington's management style and Mrs. Washington wants an apology from the HACFL and their attorneys for mischaracterizing her management style, tarnishing her reputation and intentionally defaming her character.

D.   An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

E.   An injunction and order to institute and carry out policies, procedures, practices and provide that provide equal employment opportunities for non-Whites, and which eradicate the effects of its past and present unlawful employment practices;

F.   An award of monetary damages to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, seniority and other benefits of employment;

G.   An award of damages to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for humiliation, embarrassment, and emotional distress;

H.   An award of damages to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfilment;

I.   An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including prejudgment and post-judgment interest;

J.   An award for punitive damages – an amount to be determined by an impartial jury – that punishes the Defendants for acting with "malice and/or reckless indifference" to Mrs. Washington's federally protected rights and deters similar tortfeasors from engaging in similar conduct in the future;

K.   An award of costs that Plaintiff has incurred in this action;

L.   An award in an amount no less than the what the HACFL paid to their legal counsel to advance defamatory and libelous statements made regarding Mrs. Washington's character

and management style and falsely accusing her of being largely responsible for the HACFL's high turnover rate;

M.  Such other and further relief as the Court may deem just and proper in an amount no less than $35 million; and

N.  An award of affirmative relief, including but not limited to: requiring members of HACFL's upper management to undergo racial sensitivity and diversity training, diversify its Board of Directors to better reflect the community it serves and the implementation of additional measures that will ensure that the public policy goals of our nation's antidiscrimination laws to upheld.

## XVII. REQUEST FOR AN EXPEDITED DISCOVERY & JURY TRIAL, OR IN THE ALTERNATIVE, REQUEST TO CONVERT COMPLAINT INTO A MOTION FOR SUMMARY JUDGMENT TO PREVENT FURTHER HARMFUL DELAY

335.    Plaintiff's discharge, as well as the Defendants' refusal to rehire Mrs. Washington, occurred under circumstances that give rise to an inference of discrimination based on race, color, sex and/or age.

336.    The HACFL has repeatedly denied any and all wrongdoing, and will continue to do so since very few employers admit guilt when accused of racism, sexism and violations of our nation's antidiscrimination laws.

337.    Since the HACFL's defense will be similar to the arguments raised before the EEOC, Mrs. Washington respectfully asks the Court to strike any claims made by the Defendants that Mrs. Washington had a "harsh" or "oppressive" management style and/or was responsible for the company's high turnover rate.

338.    This complaint has been drafted in a way to meet the requirements for the McDonnell-Douglas tripartite formula and to show that the HACFL and Mr. English acted discriminatorily against Mrs. Washington.

339.    Regardless of whether the Defendants and their attorneys admit any wrongdoing, the prevailing law and facts alleged in this complaint are sufficient enough to support a reasonable inference that the Defendants engaged in racial, sexual and/or age discrimination against Mrs. Washington.

340.    Based on all the facts and circumstances and a liberal construction of our nation's antidiscrimination laws prohibiting, Mrs. Washington believes that an impartial judge and/or

racially diverse jury will infer from the fact that the reasons provided by the HACFL her termination and refusal to rehire are false, that the real reason for the adverse employment decisions made against her was due to her membership in various protected classes (e.g. race, sex and/or age).

341.   Even if one were to believe the materially false statements put forth by the Defendants and their attorneys, a mixed-motive case still exists, and the case should be decided by an impartial and racially diverse jury.

342.   Nearly two years of Mrs. Washington's life have been wasted due to the failure of the EEOC to conduct and complete an impartial investigation into Mrs. Washington's claims. In order to prevent further harmful delay, Mrs. Washington respectfully asks for an expedited discovery to acquire relevant documents exclusively in the Defendants' possession and an expedited hearing before an impartial jury.

343.   If the district court judges refuses to uphold the U.S. Constitution and enforce our nation's antidiscrimination laws by allowing an impartial jury to decide the merits of Mrs. Washington's claims, Mrs. Washington respectfully asks in the alternative, for the Court to convert this complaint into an expedited motion for summary judgment to prevent further harmful delay.

## XVII. REQUEST FOR APPOINTMENT OF AN IMPARTIAL & NON-BIASED FEDERAL JUDGE

344.   Although Article III federal judges take an oath to remain impartial, uphold the U.S. Constitution and enforce the various laws of this land, they are still human beings and harbor biases and prejudices – conscious and unconscious – like every other person on this planet.

345.   Mrs. Washington respectfully asks the Court to **not** appoint a federal judge who has a history of not allowing *pro se* litigants the opportunity to have a hearing before an impartial jury, particularly when litigants are African-American and/or litigating civil rights or employment discrimination cases. This indicates the existence of a racial, gender and/or anti-pro se non attorney bias.

Dated: Lauderhill, Florida
      June 27, 2018

Respectfully submitted,

By: _Carolyn Hicks-Washington_
    Carolyn Hicks-Washington
    *Pro Se* Litigant

3613 Lime Hill Road
Lauderhill, Florida 33319
(252) 673-0834
chwash20031@yahoo.com



18 - 15277



A TRUE COPY

JUN 27 2018

BRENDA D. FORMAN
CLERK OF THE CIRCUIT COURT
BROWARD COUNTY, FL

# Exhibit A

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Carolyn H. Washington<br>3613 Lime Hill Road<br>Lauderhill, FL 33319 | From: | Miami District Office<br>Miami Tower, 100 S E 2nd Street<br>Suite 1500<br>Miami, FL 33131 |
|---|---|---|---|

|  | ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |  |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No: |
|---|---|---|
| **510-2016-02801** | **MICHAEL S. MATHELIER,**<br>**Investigator** | **(305) 808-1797** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐   More than 180 days have passed since the filing of this charge.

☐   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☐   The EEOC is terminating its processing of this charge.

☐   *The EEOC will continue to process this charge.*

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☒   The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

*Nigar Santos Wright*

**MICHAEL J. FARRELL,**
**District Director**

MAR 30 2018

*(Date Mailed)*

cc:     Kopp Andrea Ayala
        Human Resources Director
        HOUSING AUTHORITY OF THE CITY OF FT LAUDERDALE
        500 West Sunrise
        Fort Lauderdale, FL 33311

*Signed Receipt on 4/5/18*
*Certified Mail = 7017 2680 0001 0632 8674 (Rtn)*

# Exhibit B



**B L U E R O C K**
L E G A L, P.A.
A   P R I V A T E   L A W   F I R M

Direct Dial: (305) 981-4300
Facsimile:  (305) 981-4304
dgonzalez@bluerocklegal.com

February 2, 2017

<u>**Via: U.S. Mail**</u>
Katherine Gonzalez, Investigator
Equal Employment Opportunity Commission
100 S.E. 2nd Street, Suite 1500
Miami, FL 33131

Re:  <u>Carolyn Washington v. The Housing Authority of the City of Ft. Lauderdale, Florida</u>
EEOC Charge No. 510-2016-02801

Dear Ms. Gonzalez:

As you file will reflect, this law firm represents The Housing Authority of the City of Ft. Lauderdale, Florida ("Respondent") in defense of the charge of employment discrimination filed by Carolyn Washington ("Charging Party"). This letter and the attached documents will serve as the Respondent's position statement in response to the charge.

<u>**Preliminary Statement**</u>

Respondent is a municipal agency that provides housing opportunities to qualifying individuals. Respondent administers public housing programs sponsored by the federal, state and local governments. The Respondent receives partial funding from the U.S. Department of Housing and Urban Development ("HUD"), and is required to follow HUD's strict regulations in managing communities.

The Charging Party worked for Respondent as the Assistant Director of Section 8 from 2005 to 2010, and as the Assistant Director of Assisted Housing from 2010 to 2015. The Respondent's "Section 8" Department is a subsidized housing program in which participants receive housing subsidies for the rental of housing in the private marketplace. The Housing Authority administers that program with an internal staff of trained employees who accept applications, supervise the process of awarding housing subsidies to applicants, monitor the quality and care of the living units available to participants, and every other aspect of the program. It is a busy office performing important work.

1

The Charging Party and her supervisor were terminated from employment at the same time and for the same reasons. The Charging Party could not keep a stable staff of competent personnel in the department. Ms. Washington had an oppressive management style and, for several years, employees had resigned from the department citing the way that they had been treated by her. Employee turnover in the department was extreme during the last year of her employment. The Charging Party was terminated on November 13, 2015. Since then, turnover has moderated.

The present charge is for alleged "age" discrimination. The Charging Party alleges that she was employed by the Respondent as an Assistant Director of Assisted Housing until she was "terminated because of [her] age by Executive Director, Tam English, and Chief Financial Officer, Michael Tadros." She alleges that Mr. English "on more than one occasion mentioned to my Supervisor, Veronica Lopez, and I that we were getting older and who do we have to replace us." She claims that "[t]his was a pattern or practice" because "in 2010, we were provided with an additional workload that included a title change, that was previously assigned to" two other employees. The Charging Party claims that she was discharged on November 16, 2015, and that she was replaced "by Anita Flores," who she alleges is "under 40 years of age." The Charging Party also claims that she was subjected to hiring discrimination after she applied to the Director of Housing Choice Voucher Program position and was not given an interview for the position. She alleges that the reason she was given for her termination was that the Respondent "was moving in a different direction."

We have conducted an investigation and we have determined that the charge is entirely without merit. The Charging Party was terminated for legitimate reasons that had nothing to do with age discrimination. The Charging Party had a harsh management style that created a difficult and uncomfortable work environment, increased workplace stress, and decreased employee morale. The Charging Party's harsh management style drove many employees away over the years. The Charging Party's department had extreme levels of employee turnover and resulting instability. The Respondent terminated the Charging Party in order to improve its work environment and maintain a stable workforce.

### Background Information

The Charging Party was hired by the Respondent in October, 2005, as the Assistant Director of Section 8. The Respondent had then and has now three departments, "Section 8," "Public Housing," and "Affordable Housing." "Section 8" is housing voucher program in which the Respondent provides financial assistance to qualifying residents to aid the residents with their housing rental costs in the private marketplace. The Respondent does not own any of the residential properties that are part of Section 8. The residential properties are owned by private landlords, and qualifying residents use the Housing Authority's financial assistance to pay rent to private landlords.

Conversely, in "Public Housing," the Respondent owns and manages residential properties and rents out property units to qualifying low-income residents. The Housing Authority operates and maintains its own properties with local managers and maintenance staff. Rental payments are made by participants in the program to the Housing Authority, not a private landlord. The Respondent also has a third department, "Affordable Housing," in which the Respondent also

provides affordable housing owned and is managed by the Respondent for qualifying low-income residents.

The Charging Party was initially employed in Section 8, not Public Housing or Affordable Housing. As the Assistant Director of Section 8, the Charging Party's job duties entailed assisting the Director of Section 8 with running the whole department. This included directly supervising Section 8 staff, ensuring compliance with federal, state, and local laws and regulations that govern the Respondent, preparing reports to agencies such as the U.S. Department of Housing and Urban Development ("HUD"), reviewing applications for Section 8 assistance, training staff members, and many other duties. The Charging Party worked at an administrative office that has a staff of approximately 20 employees, though the number of employees working in the department tended to fluctuate under the Charging Party's supervision. The Charging Party was directly supervised by Ms. Veronica Lopez, the Director of Section 8.

The Charging Party was knowledgeable about Section 8. She had strong knowledge of housing regulations and how the department was supposed to function. However, a very important issue with the Charging Party was apparent for some time. She exhibited a harsh and overbearing management style and inability to get along with the subordinate employees in the department. She was known to berate employees, make sarcastic and demeaning comments, and deliver criticism harshly.

The Charging Party received annual performance reviews from her supervisor, Ms. Lopez. While the reviews were mostly positive, they contained negative comments about the Charging Party's communication with and leadership of employees. The performance reviews are attached as Exhibit A. These negative comments consistently appeared on her performance reviews throughout her employment. The Charging Party was continually reminded of her mistreatment of employees. The Housing Authority tolerated this part of her performance for years because of her valuable knowledge of Section 8 programs, but she continually failed to improve.

The Charging Party's 2007 performance review noted a complaint by one of the Charging Party's subordinates that the Charging Party responded to inquiries "indicating impatience" or "sarcastic comments" such as "well you guys think you know everything" and "were you not listening when I explained this to you." In 2009, her performance review noted that the Charging Party "may become frustrated in the low performance of employees" and which results in her "delivering criticism that may be tinged with an opinion on the reason for the employee's failure to perform." The performance review recommended management training so that the Charging Party can improve how she delivers criticism. Her 2010 performance review noted that the Charging Party "needs to learn to monitor her body language to avoid transmitting the wrong message" and that "she should strive to maintain control of all areas of communication."

These performance evaluations were completed by the Charging Party's supervisor, Veronica Lopez. Ms. Lopez was terminated along with the Charging Party and for the same reasons as the Charging Party, fomenting instability in the staff in the department.

In 2010, the Charging Party's title was changed to Assistant Director of Assisted Housing, which included management responsibilities over both Section 8 and Public Housing. She retained

her management responsibilities in Section 8, but the new title added limited supervisory duties over two community managers in the Public Housing department. Community managers are on-site managers of the residential properties in Public Housing Department, whose duties include collecting rent, attending to the needs of residents, inspecting property units, scheduling and performing maintenance, among other duties. With the title change, the Charging Party supervised two community managers and several residential properties in the Public Housing Department. She continued to be directly supervised by Ms. Lopez, who was given the new title of Director of Assisted Housing. The Respondent added these additional supervisory duties to the Charging Party and Ms. Lopez because the Respondent was shrinking its Public Housing Department, and the Charging Party and Ms. Lopez were able to take on management duties of the smaller department.

The Charging Party's management style did not improve. A performance review dated February 2, 2011, noted that, when working with subordinates, she must "strive to assure that when asking open questions she waits until the full response is obtained prior to questioning further and then giving guidance attempting not to show her frustration through body language." A second performance review from 2011, dated September 8, 2011, noted that "she becomes frustrated at time with some employees' failure to discharge their duties" and that her frustration "influence[s] her own delivery of expectations" and that she must improve her delivery of criticism. Her 2012 performance review noted that she must "understand that" employees "are to be evaluated against performance standards not against each other." Her 2014 performance review noted that she would "benefit from training in Conflict Resolution and should seek the opportunity to participate in such training to assist her in mediating issues arising between employee and/or with her own subordinates."

The Charging Party's management style created a difficult and uncomfortable work environment that drove many employees away. This created considerable turnover and instability in the Respondent's workforce for several years. We have attached as Exhibit B a list of the employees that abandoned employment with the Respondent over the years. It is important to note that Respondent only employs approximately 20 employees at the office where the Charging Party worked, and the Charging Party also supervised an additional two employees Community Managers that worked at other locations. In 2012, 12 employees (more than half) terminated employment. In 2013, 9 employees left (nearly half). In 2014, 7 employees left.

And finally, in 2015, the year that the Charging Party was terminated from employment, 14 employees left the department. In the year of her termination, nearly 75% of the employees working for the Charging Party left their jobs. In a few cases over the years, an employee in the department had been terminated from employment usually because the employee did not have the skills necessary to do the job. The overwhelming majority of these employees, however, quit their jobs. The Respondent was consistently turning over an average of greater than 50% of its staff every year.

Many of the employees who left specifically cited the Charging Party's management style issues as the reason for leaving. One employee, a Community Manager named Felix Mercedes, would not even speak to the Charging Party when he resigned. He had started in June, 2013, and resigned in November, 2014. He went to the Respondent's Human Resources Manager, Ms.

Andrea Ayala, and resigned abruptly. He returned his assigned mobile phone and keys to Ms. Ayala. Ms. Ayala informed him that he must return his phone and keys to his supervisor, the Charging Party. Mr. Mercedes refused to be in the same room with the Charging Party. He did not want to see or speak to the Charging Party. Mr. Mercedes's resignation was sudden and he was so emotional that he did not complete an exit interview, which is the Respondent's standard procedure for exiting employees.

Several employees who resigned did provide Exit Interviews, and they cited the Charging Party's harsh management and the uncomfortable work environment as a reason for their resignation. Those Exit Interview Forms are attached as Exhibit C. In each attached Exit Interview, the resigning employee rated the work environment as "Poor" and stated, in response to a question about whether the employee would want to work for the same supervisor (the Charging Party) if they returned, that they would not. One employee who resigned, Ms. Anita Flores, in response to the question of how the Respondent could have prevented her from leaving, stated "removed me from the supervision of Carolyn Hicks Washington [the Charging Party]." Ms. Flores resigned in June, 2012.

Other resigning employees had similarly negative comments. Ms. Barbara Colas complained of a poor work environment that included "yelling across the office" and complained of the "way clients and coworkers were spoken to." Ms. Raquel Brutus-Thomas stated that her feelings changed about her position after she was first hired due to "environment and management" and that the work environment was "stressful and burdensome due to high turnover" and "decrease in morale. She rated her supervisor (the Charging Party) as "Poor" in the areas of "showing fairness," "providing appropriate recognition," "solving problems promptly," "following policies and procedures," "communicating with staff," "encouraging feedback," and "knowing how to do her job." She also reported feeling "harassed" by her supervisor "in a manner to suggest" that employees "are taking questionable measures to get their work done or required to go beyond the scope of what is required and/or necessary."

The instability caused by the Charging Party created staffing problems for the Respondent. The work in the Section 8 Department can be, at times, stressful and can require long hours. But the staff shortages occasioned by the Charging Party made matters much worse. The Respondent was continuously understaffed, which forced other employees to take on extra work. Employees were often required to work late into the night and occasionally on weekends to complete the work. This dynamic had the effect of further reducing employee morale.

The Respondent's Executive Director, Mr. Tam English, had been concerned about the excessive turnover for some time by the time he made the decision to terminate the Charging Party. While he realized that any employer will have some natural turnover, he was concerned that the turnover in Section 8 was far greater than any other agency in the area. The Housing Authority of Broward County, for example, had a staff of employees that reportedly enjoyed working for them and that there was very little turnover.

Mr. English decided that a change needed to be made to improve employee morale and to maintain a stable workforce. He decided that the Charging Party and Ms. Lopez needed to be

terminated and new management hired. Thus, on November 13, 2015,[1] Mr. English met with the Charging Party and informed her of her termination from employment. Mr. English told the Charging Party that the Respondent was "moving in another direction." The Respondent reorganized its management structure, which included eliminating the Charging Party's position after she was terminated. Mr. English declined to discuss the details with the Charging Party for two reasons. First, the Charging Party was well aware of her overbearing management style, the low employee morale, and excessive turnover in her department. The second reason was to protect the Charging Party's future employment prospects. As the Respondent is a government agency, Mr. English knew that the reason for the Charging Party's termination would become part of the public record. Mr. English did not desire to limit the Charging Party's future job prospects by unnecessarily discussing the negative details in the public record.

The Charging Party's claim in the charge that she was replaced by Anita Flores is false. The Respondent did not replace the Charging Party. Instead, the Respondent eliminated her position and only hired a new Director of Assisted Housing to replace Ms. Lopez. The person who was hired as the Director of Assisted Housing was Ms. Medina Johnson-Jennings. It is also false that the Charging Party was replaced by someone "under 40 years of age," as alleged in the charge. Ms. Johnson was 43 years of age at the time she was hired.

Ms. Flores was rehired by the Respondent shortly before the Charging Party was terminated. She was rehired as a Community Manager in the Affordable Housing department. She was placed at a residential property in the Public Housing department taking care of maintenance, collecting rent, inspecting units, and performing other managerial duties at the property. She was rehired into that position because she expressly refused to work with the Charging Party. She was not rehired to the Charging Party's position.

Ms. Flores had previously been employed as an "Intake Coordinator" under the supervision of the Charging Party, and her job duties included reviewing and processing applications for Section 8 assistance and supervising intake staff. She resigned in January, 2015, and her Exit Interview is attached. She resigned because she said that she could no longer stand working under the Charging Party. Ms. Flores applied to be a Community Manager in the Affordable Housing department because that position placed her at a residential property and away from the Charging Party and Ms. Lopez. At the time that she was rehired, Ms. Flores was not aware that the Charging Party and Ms. Lopez might be terminated.

After the Charging Party had been terminated, Ms. Flores was offered a transfer to her prior position of Intake Coordinator in Section 8. She accepted the transfer, as she knew that she would no longer have contact with the Charging Party and Ms. Lopez in that position. Ms. Flores is still currently employed as an Intake Coordinator by the Respondent. She was never employed as Assistant Director of Assisted Housing, the Charging Party's former role.

After terminating the Charging Party, the Respondent saw an immediate improvement in its retention of employees. In 2016, the year after the Charging Party was terminated, there were only 5 employees turned over in the Section 8 office, a remarkable decrease from the 14 that were

---

[1] Although the charge alleges that her termination was on November 16, 2015, the Charging Party was actually terminated on November 13, 2015.

turned over in the prior year of 2015. This was the Respondent's lowest number of employee turnover since 2011.

The Charging Party applied after her termination for a vacancy as Director of Assisted Housing. She was not given an interview. The position that she applied for as Director of Assisted Housing had more responsibility than her prior position as Assistant Director of Assisted Housing. In other words, the Charging Party was applying for her boss' former job as the head of the Department.

The Respondent had just terminated the Charging Party for all of the reasons set forth above. The Respondent was certainly not going to "promote" her by rehiring her to an even higher management position after just having terminated her. The Charging Party was essentially asking for a promotion to her former supervisor's job after having just been terminated from her own job. The reasons for not having granted her an interview for this position are obvious.

The Charging Party's claim in the charge that that Mr. English ever said to the Charging Party that she was "getting older" or anything to that effect is a simple falsehood. The Charging Party simply fabricated that claim. There is absolutely no evidence that Mr. English ever considered the Charging Party's age.

It is worth noting that the Charging Party has claimed on prior occasions that her termination was premised on a variety of protected status. On December 4, 2015, after the Charging Party was terminated, she sent a letter to the Respondent where she made outlandish and unsupported accusations claiming that she was terminated because of her "race, color, gender, and age discrimination." The letter is attached as Exhibit D.

The present charge is for age discrimination. That claim has no more merit than the other claims for race, color and gender discrimination that have now been implicitly abandoned by the Charging Party.

The present charge should be dismissed.

Sincerely,

Daniel Eric Gonzalez

7

# EXHIBIT A

# Housing Authority of the City of Fort Lauderdale
## Performance Review

**Employee Name:**          Carolyn H Washington
**Job Title:**              Section 8 Director
**Department:**             Section 8
**Review Period Start:**    8/10/2006
**Review Period End:**      8/10/2007
**Last Review Date:**       3/20/2007
**Reviewer Name:**          Veronica Lopez
**Reviewer Title:**         Section 8 Director

## CURRENT GOALS

## PERFORMANCE ELEMENTS

### Quality
The work Carolyn H produces continues to be usually highly accurate and thorough. She displays a strong dedication and commitment to excellence not only in herself but for the department and the agency. Carolyn H applies the feedback she receives to improve her performance and she monitors her work to meet quality standards.

### Job Knowledge
Carolyn H performs extremely well with very little, if any, supervision or assistance needed. She demonstrates a high level of competency in the skills and knowledge required. She learns and applies new skills quickly. She is also willing to learn new things and review new forms of applying her knowledge. She displays a better than usual understanding of the interrelationship between her job and the jobs of others. She takes advantage of the resources and tools available to her.

### Problem Solving
Carolyn H is skilled at gathering and analyzing information from multiple sources. She addresses problem solving situations by analyzing options and developing several alternative solutions. In group situations, she contributes actively to help solve problems. Carolyn H identifies most problem situations within appropriate time frames and she usually resolves or minimizes most problems before they grow into larger issues.

### Communications
Carolyn H listens carefully, asks perceptive questions, and quickly comprehends new or highly complex matters. She demonstrates excellent written communications skills. She displays effective verbal communications skills. Carolyn H keeps others adequately informed and she selects appropriate methods of communication. One of Carolyn's subordinates complained that at times Carolyn H. may respond to their inquiries indicating impatience or in what they have perceived to be sarcastic comments such as "well you guys think you know everything" and/or "were you not listening when I explained this to you?". Further review with other caseworkers did not show the same opinions. We have advised Carolyn H. of these comments and she has expressed that it is hard to maintain being patient when the same explanations have to be repeated over and over again. In my own interactions with Carolyn H. I have not detected sarcasm or impatience and Carolyn has in fact advocated for some of our employees who are undergoing

probation insisting on providing every opportunity for training on the job prior to resorting to disciplinary action.

## Initiative
Carolyn H is a total self-starter, taking independent actions and well-calculated risks. She is resourceful at taking advantage of opportunities and will also seek to taken on assignments when she sees the need to fulfill a role. Carolyn H. will as well take a desk and manage it as a caseworker does in the absence of a position. She usually advises when she needs help.

## Adaptability
Carolyn H incurs no problems in immediately adapting to changes in her job and the work environment as needed. She easily balances competing demands on her time. She can adjust her approach or method to fit different situations.

## Planning & Organization
Carolyn H rarely incurs problems in smoothly integrating changes into existing plans. She generally plans and prioritizes well. She plans and organizes her time well and she plans ahead for additional resources. Carolyn H sets measurable, realistic goals and objectives for herself in spite of what has been a continuous uphill battle with maintaining qualified staff during her time with us.

## Judgment
Carolyn H can be relied upon to make decisions even under the tightest time frames. Her decisions are on target and reflect her reliable, sound judgment skills. She verifies that the appropriate people are included in the decision-making process. She makes confident decisions in most areas of her job. Carolyn H can usually support and explain the reasoning for her decisions.

## Innovation
When faced with unexpected challenges, Carolyn H is resourceful. She generates many usable and ingenious suggestions for improving work. She displays creativity and original thinking in her work. Carolyn H has developed innovative approaches and ideas.

## Managing People
Carolyn H sets a high priority on ensuring that she is available to her subordinates. She works closely with her subordinates, providing performance feedback. She does not hesitate to take appropriate responsibility for her subordinates' activities and she dedicates considerable effort to developing the skills of her subordinates.

## Leadership
Carolyn H exhibits a high degree of confidence in herself as well as in others. She tolerates a great deal of pressure and she quickly assumes a strong leadership role when action is needed. Carolyn H influences others to perform better.

## Cost Consciousness
Carolyn H pays attention to conserving organizational resources. She contributes positively to the organization's profits and revenues.

# SUMMARY
Carolyn H. is an asset to our agency. Her dedication to improving the quality of our services on a day to day basis and indefatigable drive is to be commended and supported by the administration  Due to the

issues we have faced with employees turnover due to promotions, she has been unable to accomplish some of the goals we had set up for this past 12 months. We are extending these goals as shown below.

## PLANS FOR IMPROVEMENT

### FUTURE GOALS

**Training in PIC reporting and corrections to be accomplished within the next six months. Carolyn did attend a PIC training offered through Tenmast further on hands training to be accomplished after changing to the new system.**

**Provide written updates on a monthly basis on status of re certifications, holds, inspections, adjustments done and IR's. ONGOING.**

**Set up a schedule to review quality inspections within the next 60 days.**

**Will maintain ongoing assessment of employees'performance utilizing error analysis system, working closely with QA Coordinator. Was to begin June 2006 has been extended to October 2006.**

**Will learn check run procedures to serve as back up to Fiscal Coordinator within the next six months. ACCOMPLISHED.**

**Schedule regular meetings with Inspector Supervisor to monitor compliance with SEMAP. ONGOING.**

### EMPLOYEE COMMENTS

*I accept the goals presented. I will continue to strive to assist in efforts to improve the Program with my knowledge & desire to move families toward or to self-sufficiency. The challenges are on-going in the department. Seeking to hire new staff and train while improving Program techniques.*

**Employee Acknowledgment**
I have reviewed this document and discussed the contents with my manager. My signature means that I have been advised of my performance status and does not necessarily imply that I agree with the evaluation.

_____     11/4/06
Employee Signature/Date

**REVIEWER COMMENTS** Recommend 5 to interest

Reviewer Signature/Date

**Housing Authority of the City of Fort Lauderdale**
**Performance Review**

| | |
|---|---|
| **Employee Name:** | Carolyn H Washington |
| **Job Title:** | Section 8 Director |
| **Department:** | Section 8 |
| **Review Period Start:** | 8/10/2008 |
| **Review Period End:** | 8/10/2009 |
| **Last Review Date:** | 08/10/2008 |
| **Reviewer Name:** | Veronica Lopez |
| **Reviewer Title:** | Section 8 Director |

## CURRENT GOALS

## PERFORMANCE ELEMENTS

### Quality

The work Carolyn H produces continues to be usually highly accurate and thorough. She displays a strong dedication and commitment to excellence not only in herself but for the department and the agency. Carolyn H applies the feedback she receives to improve her performance and she monitors her work to meet quality standards. She is self motivated and has valuable critical skills that contribute to her high standards of quality in the work she produces.

### Job Knowledge

Carolyn H performs extremely well with very little, if any, supervision or assistance needed. She demonstrates a high level of competency in the skills and knowledge required. She learns and applies new skills quickly. She is also willing to learn new things and review new forms of applying her knowledge. She displays great understanding of the interrelationship between her job and the jobs of others. She takes advantage of the resources and tools available to her. She successfully completed Financial Training course and we have enrolled for Regulatory Course with Nan McKay. Also completed PIC and all EIV trainings. Carolyn is at this time a recognized expert in the field since she never stops trying to learn or reinterpret regulations being enforced daily.

### Problem Solving

Carolyn H is very skilled at gathering and analyzing information from multiple sources. She addresses problem solving situations by analyzing options and developing several alternative solutions. In group situations, she contributes actively to help solve issues that have arisen. Carolyn H identifies most problem situations within appropriate time frames and she usually resolves or minimizes most problems before they grow into larger issues. Her communication skills when dealing with clients of different backgrounds are a valuable resource to the organization; she is straightforward in her approach to problems which adds to the assurance that misunderstandings may be avoided. She is also able to see both

sides of an issue assuring that both employees and clients are fairly treated when resolving conflicts.

**Communications**
Carolyn H listens carefully, asks perceptive questions, and quickly comprehends new or highly complex matters. She demonstrates excellent written communications skills. She displays effective verbal communications skills. Carolyn H keeps others adequately informed and she selects appropriate methods of communication. Her file reviews that she complements with detailed findings in emails as well as accompanying them with pertinent information to achieve resolution are an integral part of our ongoing training and of the appraisal process to evaluate employees.

**Initiative**
Carolyn H is a total self-starter, taking independent actions and well-calculated risks. She is resourceful at taking advantage of opportunities and will also seek to taken on assignments when she sees the need to fulfill a role. She usually advises when she needs help. An improvement in delegating tasks during this period has been observed and a continuing of this practice should allow her to further excel in bringing new management solutions to the program.

**Adaptability**
Carolyn H incurs no problems in immediately adapting to changes in her job and the work environment as needed. She easily balances competing demands on her time. She can adjust her approach or method to fit different situations. Throughout all tasks she almost invariably maintains a positive attitude.

**Planning & Organization**
Carolyn H rarely incurs problems in smoothly integrating changes into existing plans. She generally plans and prioritizes well. She plans and organizes her time well and she plans ahead for additional resources. Setting up goals has been extremely difficult during this period: we have experienced an another software transition that has taken time away from daily duties but in spite of this Carolyn has been able to reduce the number of hours she was working and still assist with the quality assurance of the program.

**Judgment**
Carolyn H can be relied upon to make decisions even under the tightest time frames. Her decisions are on target and reflect her reliable, sound judgment skills. She verifies that the appropriate people are included in the decision-making process. She makes confident decisions in most areas of her job. Her decisions are well documented which is an example of her confidence in the knowledge used to issue them.

**Innovation**

When faced with unexpected challenges. Carolyn H is resourceful. She is always reevaluating methodology and follows up with continuous written direction for staff. She has always displayed creativity and original thinking in her work. Carolyn H does maintain a watchful vigil upon how processes are working for staff and clients and is capable of adapting a procedure to new requirements.

## Managing People

Carolyn H is always available to her subordinates. She works hand in hand with them providing continuous training and performance feedback both verbally and through emails. She does not hesitate to take appropriate responsibility for her subordinates' activities or her own activities. She is direct and has established as per previous guidance. a system to follow up on her task assignments through Microsoft Outlook. Though evaluation of the employees work is ongoing Carolyn must set up as tasks for herself the evaluations of her employees through the calendar to assure they are accomplished timely. At times Carolyn may become frustrated with low performance of employees. especially considering the extensive time spent in providing guidance through reviews of adjustments and in helping them in their professional growth by increasing their knowledge and both quantity and quality of their work. This may result in delivering criticism that may at times be tinged with an opinion on the reason for the employees' failure to perform. External management training will be provided so that she can focus on identifying just the behavior trying to leave all feelings. motivations and assumptions out of the statement provided to the employee. Focus should be on the cost to the department with appropriate disciplinary action when and if warranted to assure employees clearly understand the consequences of their action/inaction which is the definition of the responsibility they have accepted upon accepting the position.

## Leadership

Carolyn H exhibits a high degree of confidence in herself as well as in others. She tolerates a great deal of pressure and she quickly assumes a strong leadership role when action is needed. Ms. Washington. leads by example producing work that is impeccable.

## Cost Consciousness

Carolyn H pays attention to conserving organizational resources. She contributes positively to the organization's profits and revenues by being very conscious about the payments to be issued. It will be the departmental and Carolyn H. goal to assure this consciousness is permeated to all members of the staff.

## SUMMARY

Carolyn's has spent in the past a great number of hours in assisting in the positive transition and training of newer employees. all employees have received and successfully completed now formal Occupancy Specialists training and should be expected to perform at a higher level. in addition QA mini-trainings have been performed on an ongoing basis by QA Coordinator. Interviewing and Fraud

Control. this plus the recovery of Occupancy Supervisor position should assist in cutting the number of hours she expends in reviewing files.   She is dedicated. resourceful. trustworthy and a definite asset to the Housing Authority. she is willing and able to learn new areas.   This opportunity will be provided to her. During the upcoming period she will be encouraged to continue to delegate. A % increase is recommended.

**FUTURE GOALS**

**Complete Regulatory and Executive Training Courses.**
**Provide written updates on a monthly basis on status of re certifications, holds, inspections, adjustments done and IR's. ONGOING.**
**Will maintain ongoing assessment of employees' performance utilizing error analysis system, working closely with QA Coordinator.**
**Schedule regular meetings with Inspector Supervisor to monitor compliance with SEMAP.   Accomplished but ongoing.**

**EMPLOYEE COMMENTS**

*It has been a pleasure working with my supervisor, Vernica Lopez and the Section 8 team. We have accomplished a great deal in meeting the needs of the program by complying with HUD regulations & HACFL policies. Thanks for sharing your knowledge in all aspects of the housing arena. I look forward to reaching higher goals as we grow the department.*

**Employee Acknowledgment**
I have reviewed this document and discussed the contents with my manager. My signature means that I have been advised of my performance status and does not necessarily imply that I agree with the evaluation.

*Carolyn Hicks West*                    11/16/2009
*Employee Signature/Date*

**REVIEWER COMMENTS**

                              11/16/09
*Reviewer Signature/Date*

# Housing Authority of the City of Fort Lauderdale
## Performance Review

**Employee Name:**           Carolyn H. Washington
**Job Title:**                    Assistant Section 8 Director
**Department:**              Section 8
**Review Period Start:**    08/10/2009
**Review Period End:**     08/10/2010
**Reviewer Name:**        Veronica Lopez
**Reviewer Title:**          Section 8 Director

## PERFORMANCE ELEMENTS

### Job Knowledge
Carolyn not only demonstrates competency in the skills and knowledge required to perform her job but also great interest in expanding her knowledge. She learns and applies new skills quickly and with great enthusiasm

### Quality
Carolyn displays total commitment to excellence and strong dedication to assure that the Department and employees under her supervision maintain strict adherence to quality to assure issuance of correct payments to landlords and appropriate application of HUD regulations and the HACFL's policies.

### Quantity
Carolyn usually produces a high quantity of work and demonstrates a strong commitment to increasing productivity; if an increase in duties or responsibilities requires it Carolyn will freely engage in as many hours as needed to assure tasks under her responsibility are completed.

### Cooperation
Antonio usually establishes and maintains good working relationships. He exhibits tact and consideration in his relations with others. Her outlook is generally positive and her manner pleasant. She does not hesitate in taking over tasks not assigned to her and works cooperatively in group situation taking responsibility when needed to accomplish a department's goal

### Problem Solving
Carolyn identifies most problem situations within appropriate time frames. Her information gathering and analysis well meet the requirements of her position. She does not hesitate to take responsibility for difficult decisions regarding clients, she should assure that the background and details leading to policies decisions are appropriately recorded.

### Dependability
Carolyn assumes full responsibility for her own actions and outcomes. She displays great dedication to her job and keeps her commitments without delay or follow-required. Carolyn responds promptly to requests for service and assistance. Her attendance and punctuality record are impeccable. Carolyn is always positively responsive to assignments or even taking responsibility for issues that need to be resolved even if they have not been assigned to her.

### Initiative

**Carolyn** has shown initiative throughout her tenure with the department and is always willing to respond to the needs of the agency by seeking increased responsibility. She takes independent and sound actions. She should continue to foster this initiative in the employees she supervises allowing them to take responsibility for their actions and follow up.

## Planning & Organization
Carolyn mostly manages her time in an efficient manner and generally plans and prioritizes well but should delegate and then follow up to evaluate the work of her subordinates to liberate her time for managerial tasks.

## Judgment
Carolyn makes confident decisions in all areas of her job. Her decisions are generally accurate and sound. And she can support and explain the reasoning for her decisions which are based in Department and/or HUD regulations. Most of her decisions are made in a timely manner. However, when conflict arises between a client and other employees under her supervision she should insist on making the employee work his/her way to a recommendation and then only document her response accepting or rejecting the decision presented so as to assist those she supervises on becoming more independent and responsible.

## Adaptability
Carolyn H incurs no problems in immediately adapting to changes in her job and the work environment as needed. She easily balances competing demands on her time. She can adjust her approach or method to fit different situations.

## Innovation
When faced with unexpected challenges, Carolyn H is resourceful. She generates many usable and ingenious suggestions for improving work. She displays creativity and original thinking in her work. Carolyn H has developed innovative approaches and ideas.

## Managing People
Carolyn H sets a high priority on ensuring that she is available to her subordinates. She works closely with her subordinates, providing performance feedback. She does not hesitate to take appropriate responsibility for her subordinates' activities and she dedicates considerable effort to developing the skills of her subordinates.

## Leadership
Carolyn H exhibits a high degree of confidence in her as well as in others. She tolerates a great deal of pressure and she quickly assumes a strong leadership role when action is needed. Carolyn H influences others to perform better.

## Cost Consciousness
Carolyn H pays attention to conserving organizational resources. She contributes positively to the organization's profits and revenues.

## Oral Communications
Carolyn effectively communicates orally with co-workers and presents ideas in an organized, clear and concise manner. When listening, she pays attention and shows interest in what others say, asking Carolyn is a skillful, well-prepared presenter and she actively works to make meetings successful though meetings should be more structured. Carolyn needs to learn to monitor her body language to avoid transmitting the wrong message. It is at times difficult not to express frustration within certain situations but as an experienced Supervisor she should strive to maintain control of all areas of communication.

**Written Communications**

Carolyn's writing is exceptionally clear, and effective. She has never presented any written item showing spelling and/or grammatical mistakes. When replying to requests for guidance Carolyn always takes a proactive approach and makes reference to policies and procedures which are applicable to the circumstances so contributing to the training of employees. She easily varies her writing style to meet different situations.

**Customer Service and Attire**

Carolyn is consistently neat in appearance. She presents herself always in a professional manner.

**SUMMARY:** Carolyn is a highly valuable employee she is always willing to take on new responsibilities and recently has accepted to assist the Director in supervising the PH department. She is always responsive to requests for assistance and shows a high degree of integrity and is enthusiastic about learning new areas. During this year, we have provided Carolyn with the opportunity to take management and communication skills courses that should assist her in further improving her managerial skills since the present set up of the Department whereas she is not directly supervising the OS will allow her to increase her involvement in planning and strategizing for the future needs of the department and the agency.

GOALS
1. Set up a schedule to review reports regularly (Hold and ARS to assure that Supervisors are appropriately following up on their subordinates' work. On-going
2. Continue to use Microsoft outlook to follow-up on requests to subordinates. Ongoing
3. Review internal findings of QA Coordinator to identify training needed by employees assuring that supervisors follow up in either scheduling or conducting training as needed.
4. Become familiar with VMS reporting system and managing voucher issuance.
5. Monitor Intake's progress in voucher issuance and follow up to lease up analyzing data to appropriately predict department's lease up needs.

**Employee Comments**

**Employee Acknowledgment**

I have reviewed this document and discussed the contents with my manager. My signature means that I have been advised of my performance status and does not necessarily imply that I agree with the evaluation.

Carolyn H. Washington _(signature)_ _11/29/2010_
*Employee Signature/Date*

**REVIEWER COMMENTS- A 5 % increase is recommended.**

_Reviewer Signature/Date_



# Housing Authority of the City of Fort Lauderdale Performance Review

**Employee Name:** Carolyn H. Washington
**Job Title:** Assistant Director of Assisted Housing Programs
**Department:** Section 8 and Public Housing
**Review Period Start:** August 2, 2010
**Review Period End:** February 2, 2011
**Reviewer Name:** Veronica Lopez
**Reviewer Title:** Director of Assisted Housing Programs

## PERFORMANCE ELEMENTS

**Job Knowledge**

Carolyn not only demonstrates competency in the skills and knowledge required to perform her job but also great interest in expanding her knowledge. She has thrown her energy into renewing and reinforcing her knowledge in PH during this period of time utilizing every source available through HUD's publications and without waiting for formal training to be received.

**Quality**

Carolyn continues to display in this position the total commitment to excellence and strong dedication to assure that the new Department of Assisted Housing comprising both PH and Section 8 Programs excels and that employees under her supervision maintain strict adherence to quality to assure continuance of issuance of correct payments to landlords in Section 8 and appropriate application of HUD regulations and the HACFL's policies in both the Section 8 and Public Housing Programs. During this period of assessment within the PH Program Carolyn has placed emphasis in the quality of our services reviewing responses to Work Order requests, preventative maintenance needs and timely reexamination of tenants in PH to assure the HACAFL provides safe, decent and sanitary units while complying with HUD requirements.

**Quantity**

Carolyn usually produces a high quantity of work and demonstrates a strong commitment to increasing productivity; if an increase in duties or responsibilities requires it Carolyn will freely engage in as many hours as needed to assure tasks under her responsibility are completed. During this evaluation period it she has had to increase the number of hours she has provided to her job since during the last three months of her new assignment she had to perform most duties on her own only receiving off-site assistance from her Supervisor.

**Cooperation**

Carolyn is always willing to assist with whatever is necessary to get the task done. Her outlook is generally positive. She does not hesitate in taking over tasks not assigned to her and works cooperatively in group situations taking responsibility whenever it is needed to accomplish the HACF's goals and comply with both regulatory and policy requirements.

**Problem Solving**

Carolyn continues to identify problem situations within appropriate time frames utilizing whenever possible preventive measures rather than waiting for a crisis to arise in spite of the fact that during this period many matters have been presented to her without having had previous opportunity to become aware that the seed problems already existed within the new assignment to PH. Her information gathering

1



# Housing Authority of the City of Fort Lauderdale Performance Review

and analysis well meet the requirements of her position. She does not hesitate to take responsibility for difficult decisions.

## Dependability
Carolyn displays great dedication to her job and keeps her commitments without delay or follow-required. Carolyn responds promptly to requests for service and assistance. Her attendance and punctuality record are impeccable. Carolyn is always positively responsive to assignments or even taking responsibility for issues that need to be resolved even if they have not been assigned to her she is a proponent that if it affects the agency it affects all of us regardless of assigned responsibilities.

## Initiative
Carolyn has shown initiative throughout her tenure with the department and is always willing to respond to the needs of the agency by seeking increased responsibility. She takes independent and sound actions. She should continue to foster this initiative in the employees she supervises allowing them to take responsibility for their actions and follow up.

## Planning & Organization
Carolyn mostly manages her time in an efficient manner and generally plans and prioritizes well but should delegate and then follow up to evaluate the work of her subordinates to liberate her time for managerial tasks.

## Judgment
Carolyn makes confident decisions in all areas of her job. Her decisions are generally accurate and sound. And she can support and explain the reasoning for her decisions which are based in Department and/or HUD regulations. Most of her decisions are made in a timely manner.

## Adaptability
Carolyn incurs no problems in immediately adapting to changes in her job as the management of this new assignment to PH demonstrates where she has had to balance competing demands on her time while her Supervisor was on medical leave and only providing off site support.

## Innovation
When faced with unexpected challenges, Carolyn H is resourceful. She generates many usable and ingenious suggestions for improving work such as changing the Vacancy Report format. She displays creativity and original thinking in her work.

## Managing People
Carolyn sets a high priority on ensuring that she is available to her subordinates. She works closely with her subordinates, providing performance feedback. She does not hesitate to take appropriate responsibility for her subordinates' activities and she dedicates considerable effort to assure they receive necessary training to develop their skills. She encourages high standards in compliance with HUD regulations and clearly delineates expectations through appropriate documentation.

## Leadership
Carolyn exhibits a high degree of confidence in her as well as in others. She tolerates a great deal of pressure and as demonstrated during this period she quickly assumes a strong leadership role when action is needed.

2



# Housing Authority of the City of Fort Lauderdale Performance Review

**Cost Consciousness**

Carolyn pays attention to conserving organizational resources. She contributes positively to the organization's profits and revenues.

**Oral Communications**

Carolyn effectively communicates orally with co-workers and presents ideas in an organized, clear and concise manner. Carolyn is bright and exceptionally knowledgeable as well as direct, she may become impatient at times when addressing an employee that has failed to accomplish tasks appropriately and timely. She must strive to assure that when asking open questions she waits until the full response is obtained prior to questioning further and then giving guidance attempting not to show her frustration through body language. Carolyn is a skillful, well-prepared presenter and she actively works to make meetings successful, she prepares agendas for meetings which allows for focused utilization of the time of all involved.

**Written Communications**

Carolyn's writing is exceptionally clear, and effective. Her written material shows great quality without any spelling or grammatical mistakes or typos. When replying to requests for guidance Carolyn always takes a proactive approach and makes reference to regulations and/or policies and procedures which are applicable to the circumstances so contributing to the training of employees. She easily varies her writing style to meet different situations.

**Customer Service and Attire**

Carolyn is always neat and professional in appearance setting up an example for all subordinates.

**SUMMARY:** Carolyn is a highly valuable employee she is always willing to take on new responsibilities and recently has accepted to assist the Director in supervising the PH Department. She is always responsive to requests for assistance and shows a high degree of integrity and is highly enthusiastic about learning new areas. During this year, we have provided Carolyn with the opportunity to take management and communication skills courses that have assisted her in further improving her managerial skills.

GOALS
1. Set up a schedule to review reports regularly (Timely Annual Re examinations )
2. Continue to use Microsoft outlook to follow-up on requests to subordinates. **Accomplished from Annual Review of previous position.**
3. Review samples of internal findings of QA Coordinator to identify training needed by employees assuring that supervisors follow up in either scheduling or conducting training as needed.
4. Become familiar with HUD's VMS and Unit Vacancy reporting systems.
5. Monitor Intake's progress in voucher issuance and follow up to lease up analyzing data to appropriately predict department's lease up needs.
6. Monitor Vacancy Turn Around and Work Order systems to optimize service to tenants in PH and compliance with HUD regulations.

# Housing Authority of the City of Fort Lauderdale Performance Review

**Employee Comments**

*I will continue to strive for the betterment of the company. I truly appreciate the team players that has assisted in my efforts to continue to meet the goals of the agency.*

**Employee Acknowledgment**

I have reviewed this document and discussed the contents with my manager. My signature means that I have been advised of my performance status and does not necessarily imply that I agree with the evaluation.

_Carolyn Ansla Wood_ 5/12/2011

*Employee Signature/Date*

**REVIEWER COMMENTS —** *Mrs. Washington will be scheduled this year for PH Executive management and TAx Credits Certification*

_____

*Reviewer Signature/Date*

*Recommend*

4

# Housing Authority of the City of Fort Lauderdale
## Performance Review

| | |
|---|---|
| **Employee Name:** | Carolyn H. Washington |
| **Job Title:** | Assistant Director of Assisted Housing |
| **Department:** | Section 8 and Public Housing |
| **Review Period Start:** | September 8, 2010 |
| **Review Period End:** | September 8, 2011 |
| **Reviewer Name:** | Veronica Lopez |
| **Reviewer Title:** | Section 8 Director |

## PERFORMANCE ELEMENTS

### Job Knowledge

Carolyn has demonstrated competency in the skills and knowledge required to perform her job but also great interest in expanding her knowledge. She has continued to reinforce her knowledge in PH during this period of time utilizing every source available through HUD's publications and Field Office's guidance.

### Quality

It is difficult to renew the wording in this evaluation since Carolyn continues show her commitment to excellence to assure that the Department of Assisted Housing excels in spite of barriers encountered with resistance from subordinates to new and necessary changes that require a continued adherence to quality to assure excellent service to our tenants and section 8 participants as well as timely issuance of correct payments to landlords in Section 8 and appropriate application of HUD regulations and the HACFL's policies in both the Section 8 and Public Housing Programs. During this period of assessment within the PH Program Carolyn has placed emphasis in the quality of our services reviewing responses to Work Order requests, preventative maintenance needs and timely reexamination of tenants in PH to assure the HACFL provides safe, decent and sanitary units while complying with HUD requirements. She has provided instructional emails to Managers requiring that they comply with HUD requirements and housing regulations and they maintain the documentation to support their actions and improve our REAC scores.

### Quantity

Carolyn produces a high quantity of work and demonstrates a strong commitment to increasing productivity in the employees she supervises; if an increase in duties or responsibilities requires it Carolyn continues to become involved for as many hours as needed to assure tasks under her supervision are completed.

### Cooperation

Carolyn is always willing to assist with whatever is necessary to get the task done. Her outlook is generally positive though she becomes frustrated at times with some employees' failure to discharge their duties and responsibility in an ethical manner. She never hesitates to implement new directives or accomplish tasks not regularly assigned to her but that need to be resolved.

### Problem Solving

Carolyn continues to identify most problem situations within appropriate time frames. She needs to engage her subordinates in understanding their responsibility to identify potential problem situations in a timely fashion by guiding them through the identification of potential and existing problems (difference between what is and what should be) and their solution so that they can be prevented/resolved

1

## Housing Authority of the City of Fort Lauderdale
## Performance Review

independently in the case of PH Managers, such as in preventative maintenance tasks within PH. Her information gathering and analysis meets the requirements of her position but she must now transmit that knowledge to her subordinates in PH. Carolyn never hesitates to take responsibility for difficult decisions. Carolyn should identify training that can assist Managers in PH to prioritize and resolve timely and in compliance with HUD regulations and PH ACOP.

**Dependability**
Carolyn displays great dedication to her job and keeps her commitments without delay or follow-required. Carolyn always responds promptly to all requests for service and assistance. Her attendance and punctuality records are impeccable. Carolyn is always positively responsive to assignments and continues to take responsibility for issues that need to be resolved even if they have not been assigned to her she continues to be able to see the overall effect that our work ethics and attitudes have on our performance.

**Initiative**
**Carolyn** takes independent and immediate actions as necessary along with the responsibility and accountability they entail. She should continue to foster this initiative in the employees she supervises allowing them to take responsibility for their actions and follow up.

**Planning & Organization**
Carolyn mostly manages her time in an efficient manner and generally plans and prioritizes well but should delegate and then follow up to evaluate the work of her subordinates to liberate her time for managerial tasks. We are suggesting that Carolyn uses a Prioritization Matrix basis to assist her employees in achieving utmost resolution of problems and timely management of their work and responsibilities.

**Judgment**
Carolyn makes confident decisions in all areas of her job. Her decisions are generally accurate and sound. And she can support and explain the reasoning for her decisions which are based in Department and/or HUD regulations. Her decisions are made in a timely and conscientious manner.

**Adaptability**
Carolyn incurs no problems in immediately adapting to changes in her job requirements and will look for the tools she needs to accomplish the goals required by HUD and the department.

**Innovation**
When faced with unexpected challenges, Carolyn H is resourceful. She displays creativity and original thinking in her work.

**Managing People**
Carolyn sets a high priority on ensuring that she is available to her subordinates. She works closely with her subordinates, providing continuous written performance feedback. She does not hesitate to take appropriate responsibility for her subordinates' activities and she dedicates considerable effort to assure they receive necessary training to develop their skills. She demands high standards in compliance with HUD regulations and clearly delineates expectations through appropriate documentation. However, PH staff has proven to be a challenge since previous management styles may have fostered a cycle of dependence and non-accountability which imbues some of our PH staff's attitudes towards their duties. Carolyn has at times allowed these attitudes to influence her own delivery of expectations due to the frustration experienced when procedures, policies and regulations already in place are not followed

## Housing Authority of the City of Fort Lauderdale
### Performance Review

appropriately affecting overall performance of the department in spite that all appropriate training has been provided to staff. Carolyn should strive to assure that her delivery of guidelines places the stress in the appropriate recipient which is the staff failing to accomplish goals defined as per their job descriptions and if necessary provide them with the management tools they need such as problem identification and solution, etc.

### Leadership
Carolyn quickly assumes a strong leadership role when action is needed. Leadership is a process by which a person influences others to accomplish an objective directing the results in a more cohesive and coherent manner. To assist her on this Carolyn should provide each Manager with a strong sense of direction by defining goals to accomplish for each development and for each Manager with the final goal of being a high performer in 2012, and the impact this will have in the overall achievement of the agency. This can also increase the number of preventative actions from the Managers to avoid the crisis management environment and organizational climate to which they appear to have become accustomed. Carolyn's Supervisor will assist on this task.

### Cost Consciousness
Carolyn pays attention to conserving organizational resources. She contributes positively to the organization's profits and revenues.

### Oral Communications
Carolyn effectively communicates orally with co-workers and presents ideas in an organized, clear and concise manner. Since at this time Carolyn is encountering some staff members which are being required to comply with more necessarily stringent rules than in their past experience she should utilize some techniques that will allow her to present the requirements in a positive manner, simply issuing an order can annoy people; therefore, you can give the illusion of choice; by setting up two deadlines both of which would meet her requirements.

### Written Communications
Carolyn's writing is exceptionally clear, and effective. Her written material shows great quality without any spelling or grammatical mistakes or typos. When replying to requests for guidance Carolyn always takes a proactive approach and makes reference to regulations and/or policies and procedures which are applicable to the circumstances so contributing to the training of employees. She easily varies her writing style to meet different situations.

### Customer Service and Attire
Carolyn is always neat and professional in appearance setting up an example for all subordinates.

**SUMMARY:** Carolyn continues to be a valuable and dependable employee. Her integrity and commitment to quality is exceptional. We are confident that she will be able with the appropriate support to take the Public Housing Section to full compliance and its staff to reflect the quality required as an employee of the HACFL. This year's PHAs score do not reflect the efforts put forth to achieve higher points due to low Physical Inspection score of Suncrest and delays in vacancy turnaround scores due to delays from administration regarding units scheduled for demolition and disposition. Further training on leadership, Public Housing and Tax Credit Properties Management will be pursued.

GOALS
1.  Set up a schedule to review reports regularly (Timely Annual Re examinations ) Accomplished and Ongoing.

# Housing Authority of the City of Fort Lauderdale
## Performance Review

2. Review samples of internal findings of QA Coordinator to identify training needed by employees assuring that supervisors follow up in either scheduling or conducting training as needed.
3. Become familiar with HUD's VMS and Unit Vacancy reporting systems. Ongoing.
4. Monitor Intake's progress in voucher issuance in section 8 and follow up to lease up analyzing data to appropriately predict department's lease up needs.
5. Monitor Vacancy Turn Around and Work Order systems to optimize service to tenants in PH and compliance with HUD regulations.
6. Work closely with Capital Funds Coordinator to identify issues with PH developments and future plans.
7. Establish a methodology to share effectively the vision and goals of the Department and the HACFL with other supervisors and PH managers to increase their active and positive participation in the achievement of said goals.

**Employee Comments**

**Employee Acknowledgment**
I have reviewed this document and discussed the contents with my manager. My signature means that I have been advised of my performance status and does not necessarily imply that I agree with the evaluation.

_Carolyn Biel Whipp_ ___ 10/24/2011
*Employee Signature/Date*

**REVIEWER COMMENTS**

_____ 10/24/11
*Reviewer Signature/Date*

4

# Housing Authority of the City of Fort Lauderdale
## Performance Review

| | |
|---|---|
| **Employee Name:** | Carolyn H. Washington |
| **Job Title:** | Assistant Director of Assisted Housing |
| **Department:** | Section 8 and Public Housing |
| **Review Period Start:** | ~~September 8, 2011~~  8/1/11 |
| **Review Period End:** | ~~September 8, 2012~~  8/1/12 |
| **Reviewer Name:** | Veronica Lopez |
| **Reviewer Title:** | Director of Assisted Housing |

## PERFORMANCE ELEMENTS

### Job Knowledge

Carolyn has demonstrated competency in the skills and knowledge required to perform her job but also great interest in expanding her knowledge. She has handled every challenge skillfully, thoroughly, and effectively basing her decisions on HUD's guidance and regulations and progressively increasing her knowledge of operations through hard work and continuous study. Her ability to review and question her own knowledge is what keeps her learning. She rarely needs to seek further advise and when she does is just because she strictly questions herself to assure she has come to a fair resolution on a dilemma brought upon by the vagueness of HUD's regulations in some areas.

### Quality

Carolyn uses expertise appropriate to the situation or problem and assists in enhancing the expertise of her subordinates by reviewing with them the possible answers to complicated questions and encouraging them to discover through analysis of the situations and the regulations the right action to take, always taking into account the well being of our clients both in PH and Section 8 Programs. Carolyn produces exceptional, precise, well organized quality work and expects the same from her subordinates. .Carolyn continues to provide expert file reviews. During this period of assessment within the PH Program Carolyn has continued to keep the emphasis on the quality of our services through on site review of units, in spite that throughout most of 2012 she has had reduced staffing both in Maintenance and Public Housing Management forcing her to perform direct services to the clients in re examinations, inspections, etc. She continues to document well the importance of quality in all of our actions since they directly impact our appropriate usage of federal funding and the responsibility to provide decent safe and sanitary housing as well as excellent customer service.  REAC under her supervision scores improved in all Sailboat and Sunnyreach. In Sailboat an employee's failure to follow up on a supervisor's request resulted in the building losing a great number of points on a single scoring issue (Knock offs) and in Sunnyreach due to the still ongoing rehabilitation of the building and a speck of paint in one sprinkler we also lost a large number of points.

### Quantity

Carolyn produces a high quantity of work and demonstrates a strong commitment to increasing productivity in the employees she supervises; if an increase in duties or responsibilities requires it Carolyn continues to become involved for as many hours as needed to assure tasks under her supervision are completed.

### Cooperation

Carolyn is always willing to assist with whatever is necessary to get the task done. Her Supervisors have never received a negative answer when requesting her assistance. She maintains satisfactory relationships with employees, landlords, and/or participants in PH and Section 8 Programs.

# Housing Authority of the City of Fort Lauderdale
## Performance Review

**Problem Solving**
Carolyn continues to identify most problem situations within appropriate time frames. Carolyn has exhibited satisfactory skill in communicating with clients and managing difficult situations. Carolyn never hesitates to take responsibility for difficult decisions. Carolyn should identify training such as assertive skills techniques that can assist Managers in PH to assure they obtain the necessary cooperation from others to resolve issues that arise in a timely fashion.

**Dependability**
Carolyn displays great dedication to her job and keeps her commitments without delay or follow-required. Carolyn always responds promptly to all requests for service and assistance. Her attendance and punctuality records are impeccable. Carolyn is always positively responsive to assignments and continues to take responsibility for issues that need to be resolved even if they have not been assigned to her she continues to be able to see the overall effect that our work ethics and attitudes have on our performance.

**Initiative**
**Carolyn** takes independent and immediate actions as necessary along with the responsibility and accountability they entail. She displays outstanding level of initiative with little or no supervision.

**Planning & Organization**
Carolyn should further delegate and then follow up to evaluate the work of her subordinates to liberate her time for managerial tasks. We had suggested for Carolyn to use a Prioritization Matrix basis to assist her employees in achieving utmost resolution of problems and timely management of their work and responsibilities. Assigns priorities well and usually meets goals on time. Carolyn should work setting specific, measurable and attainable goals that she wants to reach during this coming period and maintain the data with the assistance of the prioritization matrix for which we have provided information.

**Judgment**
Carolyn makes confident decisions in all areas of her job. Carolyn is very reliable and consistent in making sound decisions.

**Adaptability**
Carolyn incurs no problems in immediately adapting to changes in her job requirements and will look for the tools she needs to accomplish the goals required by HUD and the department.

**Innovation**
When faced with unexpected challenges, including a reduced staffing Carolyn H has continued to show her resourcefulness and willingness to step up to do whatever is needed on the field for the benefit of the clients and the Agency's compliance with HUD regulations.

**Managing People**
Carolyn sets very high expectations and works with her employees to meet them continuing to provide written performance feedback though she does on hesitate to take appropriate responsibility for their work while assuring that she applies and gives credit to them for good performance, ideas, changes, etc.
She is easily available to her employees and provides continuous feedback. She searches and prepares training. Carolyn has a genuine interest in assisting her employees in their growth though she should sharpen her listening skills to encourage more open communication with them.

## Housing Authority of the City of Fort Lauderdale
## Performance Review

**Leadership**
Part of a good leader's characteristics is to exhibit emotional intelligence where we ensure that physical reactions, body language and personal statements promote constructive dialogue among subordinates, peers, and superiors. During this period, Carolyn has shown great growth in this area though facilitating positive interactions. Carolyn must further delegate authority more effectively giving her subordinates autonomy but establishing regular and scheduled check points to monitor performance while understanding that though we grow to expect more of some employees than others we should be expecting the same performance from each since they are to be evaluated against performance standards not against each other.

**Cost Consciousness**
Carolyn pays attention to conserving organizational resources. She contributes positively to the organization's profits and revenues.

**Oral Communications**
Carolyn effectively communicates orally with co-workers and presents ideas in an organized, clear and concise manner.

**Written Communications**
Carolyn's writing is exceptionally clear, and effective. Her written material shows great quality without any spelling or grammatical mistakes or typos. When replying to requests for guidance Carolyn always takes a proactive approach and makes reference to regulations and/or policies and procedures which are applicable to the circumstances so contributing to the training of employees. She easily varies her writing style to meet different situations.

**Customer Service and Attire**
Carolyn is always neat and professional in appearance setting up an example for all subordinates.

**SUMMARY:** Carolyn has effectively assisted in asserting the expectations in the quality of services to be expected for Public Housing throughout not only the department but also with cooperating departments. The expectation of quality work is now well entrenched and that is a great achievement. Sometimes it has taken for Carolyn to actually demonstrate the performance expected by example and these changes have taken place under an atmosphere of constant change and challenges due to demolition/dispositions and staff's expectations that they could lose their positions. There have been no late re exams in PH as a matter of fact re exams have been accomplished within 60 days minimum (began at 120 to 90 days). Three of our developments successfully passed REAC Inspections though two (Sunnyreach and Sailboat) will have to be re-inspected this year due to unexpected failure of one large item in each one. Overall TARs have continued to be at least at a 2 % lower than during previous periods of management as listed in the goals below.

**GOALS**
1. Continue to improve TARs progressively to achieve at least 1 % overall average as a maximum. During the period of 2009 to 2010 from all developments, the rent collection performance report shows that from 2009 to 2010 we had 4.06 % uncollected rents, between 2010 to 2011 we had achieved only 1.52 % not collected and for this last period, from 08/01/2011 to 08/31/2012 we were as of 07/31/2012 at 1.79 % uncollected rent.

3

# Housing Authority of the City of Fort Lauderdale
## Performance Review

2. Improve the quality of information being entered into the system to increase accuracy of data to be pulled to support PHAs scores and to identify reasons for vacancy turnaround delays and take actions to resolve them. These reports should be generated and analyzed monthly.

3. Become familiar with HUD's VMS and Unit Vacancy reporting systems. Ongoing.

4. Monitor Intake's progress in voucher issuance in section 8 and follow up to lease up analyzing data to appropriately predict department's lease up needs.

5. Monitor Vacancy Turn Around and Work Order systems to optimize service to tenants in PH and compliance with HUD regulations. Goal is to achieve a turnaround of 15 days from move out to move in for all units not in mod. This is a more achievable goal now since we are no longer holding out units for possible relocations of PH residents affected by demolition and/or disposition of units.

**Employee Comments**

*Recommend Training:*
*. HCV Executive Management*

**Employee Acknowledgment**

I have reviewed this document and discussed the contents with my manager. My signature means that I have been advised of my performance status and does not necessarily imply that I agree with the evaluation.

_____
Employee Signature/Date

## REVIEWER COMMENTS

_____
Reviewer Signature/Date

4

HOUSING AUTHORITY OF THE CITY OF FORT LAUDERDALE
**Performance Review**

**Employee Name:** Carolyn H. Washington
**Job Title:** Assistant Director
**Department:** Assisted Housing
**Review Period Start:** 8/2/2013
**Review Period End:** 8/2/2014
**Last Review Date:** 8/1/2013
**Reviewer Name:** Veronica Lopez
**Reviewer Title:** Director Assisted Housing

# PERFORMANCE COMPETENCIES

**Job Knowledge**
Carolyn demonstrates significant expertise at her job because of her in-depth knowledge and skills. She is an exceptionally fast learner and able to quickly put new skills to use. She performs extremely well with very little, if any, supervision or assistance needed. Carolyn displays a better than usual understanding of the interrelationship between her job and the jobs of others. She is knowledgeable about current developments in her field. She effectively uses the resources and tools available to her.

**Quality**
Carolyn understands well the importance of quality in our performance and the responsibility to provide decent safe and sanitary housing as well as excellent customer service. Carolyn requires quality work from her subordinates and continues to be even stricter with the work she performs herself. Carolyn needs to document her reviews in a concise manner on a monthly basis to avail of this information for SEMAP documentation at the end of the year.

**Cooperation**
Carolyn always assists in whatever is necessary to get the task done. She is quick to embrace responsibilities always with a positive attitude.

**Dependability**
Carolyn assures that her work reflects her dedication. Follow up is rarely required she will incorporate changes in plans to the benefit of the department without delay. Carolyn is rarely if ever absent and schedules those absences in a timely fashion to allow for planning she has exceeded her supervisor's expectations in more than one area.

**Initiative**
**Carolyn** takes independent and immediate actions on a daily basis as necessary along with the responsibility and accountability they entail.

## Planning & Organization

Carolyn makes a point of providing recognition and credit for the work she delegates. She delegates tasks and responsibilities to others as a regular part of her work. Carolyn usually assigns tasks to people based on their skills, experience, strengths, and limitations. Her subordinates usually receive the authority and independence they need to effectively carry out their delegated responsibilities. However, when she delegates work, she needs to be clearer in defining expectations and then to monitor those activities regularly by establishing a system whether it is a prioritization matrix or other to keep track of pending issues. She integrates changes as needed and plans ahead for additional resources.

## Judgment

Carolyn does not hesitate to make decisions on very challenging matters and has confidence in her decision making abilities. She can be relied upon to make decisions even under the tightest time frames. Her decisions are on target and reflect her reliable, sound judgment skills. She can clearly explain the reasoning and provide good support for her decisions. Carolyn verifies that the appropriate people are included in the decision making process.

## Adaptability

Carolyn readily adapts to her position's demands aiming for the overall compliance with HUD requirements and the Department's needs taking on additional responsibilities if needed. As an example Carolyn, embraced the new National FSS Study and took a leadership role assuring that its implementation which was not among our projections for the year was successfully integrated into her scope of duties.

## Managing People

Carolyn maintains full responsibility for her subordinates' activities. She makes every effort to make herself accessible to her subordinates. She provides clear direction and is usually able to gain compliance from others. Carolyn includes subordinates in most planning. Carolyn needs to assure that she maintains a log of pending issues that she must review and/or set it up in Microsoft Outlook to assure that performance of her subordinates is measured as the year progresses.

## Leadership

Carolyn quickly assumes a strong leadership role when action is needed. She exhibits an appropriate level of confidence in herself as well as in others and she reacts well in pressure situations. Carolyn should benefit from training in Conflict Resolution and should seek the opportunity to participate in such training to assist her in mediating issues arising between employees and/or with her own subordinates.

## Consciousness

Carolyn has always paid attention to conserving organizational resources.

## Customer Service and Attire

Carolyn is always neat and professional in appearance setting up an excellent example for all subordinates her commitment to good customer service is exemplary whereas she will assume any role including assisting with the reception area and or Occupancy as needed to assure clients are seen timely and efficiently.

## Communications

Carolyn is extremely thorough and proactive about keeping others well informed. She displays very good verbal skills, communicating clearly and concisely. She demonstrates excellent written communications skills. Carolyn listens and comprehends well. She selects appropriate methods of communication.

**Cost Consciousness**
Carolyn has little difficulty operating within her approved budget.

**Problem Solving**
Carolyn addresses problem solving situations by analyzing options and developing several alternative solutions. She identifies most problem situations within appropriate time frames. Her information gathering and analysis meet the requirements of her position. She participates well in group problem solving situations.

**Quality**
The quality of work Carolyn produces far exceeds expectations for accuracy and thoroughness. She displays a strong dedication and commitment to excellence. She works hard to improve quality in her own work and promotes quality awareness throughout the organization. Carolyn consistently and carefully monitors her work to ensure its quality. She applies the feedback she receives to improve her performance.

## SUMMARY

Overall, Carolyn's performance has continued to be that of an employee who is an asset to the department and the agency during this review period. She meets expectations for all her responsibilities and she is always willing and able to go further to assist in the growth of the department. Carolyn needs to monitor more the work of those under her direct supervision in a manner that does not require an increase of her workload such as requiring reports from staff on a monthly basis on areas which are not available through the software reports.

## DEVELOPMENT PLANS

**Strengths to build on**
Expand your strengths in acknowledging results and providing positive feedback by taking a leadership role in a situation where there is poor morale or inferior results. Use your strong communication skills to increase motivation and improve performance.

**Areas to work on**
Assess and monitor the impact of delegated tasks on subordinates and adjust their workloads to accommodate increased responsibilities if necessary and possible within the constraints of budgets..

Present delegation in a positive way that will encourage employees to accept the challenge and additional responsibility. Involve employees in the delegation process by asking for volunteers to take on assignments.

Describe your expectations clearly and thoroughly. Explain the outcome expected, any guidelines or procedures that apply to the task, and the resources available. Indicate how questions and problems should be handled.

Stay aware of your subordinates' activities and results in order to avoid surprises. Set up periodic status meetings or ask for regular status reports. Discuss how to stay informed of unusual circumstances or changes.

Continue to use positive feedback as a motivator. Notice work that is well done and provide timely recognition. Be specific in describing the accomplishment, why it deserves commendation, and its impact on the results of the organization.

Help your subordinates understand the overall purpose of their tasks. Describe the function of the department and how it contributes to the success of the organization. Help your employees identify the needs of their internal and external customers and how their work meets these needs. Get their input.

Focus on defining the outcome desired from the employees rather than controlling the process used.

When providing direction, specify the employee's authority to take independent action and indicate how questions or problems outside their authority should be handled.

Develop goals for your key projects or areas of responsibility. Include clear, measurable descriptions of the expected results and the dates by which they will be completed. Refer to organizational or department objectives such as SEMAP, and make sure that their goals support them.

Ensure that all day-to-day maintenance and corrective actions are taken in your area of responsibility in order to prevent routine issues from developing into major problems.

Analyze what might go wrong in your work to head off possible problems before they arise. Where problems are highly likely to occur or would have serious consequences, implement a plan to prevent the problem or minimize its impact.

Improve file maintenance by using the computer to store memos, e-mails, and reports in order to minimize the number of paper files. Purge paper and electronic files of unnecessary items, and archive old material that needs to be retained. This will assist further in our efforts to go paperless.

## CURRENT GOALS

**Improve QA of information for PHAS**
**Due Date:** 8/1/2014
**Description:** Improve QA information for PHAS
**Results:** accomplished and ongoing

**Monitor FSS success improve services**
**Due Date:** 8/1/2014
**Description:** Monitor FSS success for clients and improve delivery of services and its documentation.
**Measurement:** review of documentation and graduation numbers
**Results:** Accomplished and ongoing Further Carolyn successfully and professionally integrated the National FSS Study many demands into her daily routine assuring that the HACFL was marked as a successful participant and enhancing our participation and the participation of our clients.

## TARS
**Due Date:** 8/1/2014
**Description:** TAR improved to achieve goals projected.
**Measurement:** Monthly review of TAR percentage accomplished and ongoing.
**Results:** Accomplished and Ongoing.

**Monitor HQS Inspections Q/A**

**Due Date:** 8/1/2014
**Description:** Monitor HQS Inspections timeliness and conduct QA Inspections of Inspector Supervisor and/or request from McCright and Associates.
**Measurement:** SEMAP Indicator 5/6 records showing both timeliness of inspections and a record of appropriate number of QA inspections for Inspectors Supervisor
**Results:** Partially accomplished, and ongoing inspections were timely however, QA Inspections were neither conducted by Carolyn nor scheduled by McCright for the Inspector's Supervisor

## FUTURE GOALS

**1.Monthly monitoring of Indicators 3, 5 and 6 as well as monthly documentation of these Indicators to allow for correction of any issuances that may be found.**
 **Results:  Timely identification of issues encountered on a monthly basis and accumulation of supportive documentation for achieving 100 % in SEMAP Indicators.**

**2.  Continue with current goals.**

**3.  Be throughly familiar with all aspects of closing the month, initializing, completing a successful check run and providing Accounting data to report to VMS.**
**Results:  Prepare and conduct successful checkrun**

## EMPLOYEE COMMENTS

*I accept the challenge to maintain and prepare for SEMAP by conducting monthly outreach*

**Employee Acknowledgment** *to supervisors & reviewing files & QA inspections*
I have reviewed this document and discussed the contents with my manager. My signature means that I have been advised of my performance status and does not necessarily imply that I agree with the evaluation.

*Carolyn Nicls Waston*          6/8/2015
*Employee Signature/Date*

## REVIEWER COMMENTS

                6/8/15
*Reviewer Signature/Date*

*Recommend 2% Increase*

# EXHIBIT B

## Employees Terminated Or Resigned While Carolyn Washington Worked For Housing Authority

### 2007

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Bell, Erika | 10/3/2006 | 4/27/2007 | Office Assistant |

Total:  1

### 2008

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Berg, Gary | 6/4/2007 | 5/1/2008 | Occupancy Specialist |
| Berkeley, Laraine | 10/16/2006 | 5/2/2008 | Occupancy Specialist |
| McCray, Oliver | 6/10/2008 | 12/3/2008 | Occupancy Specialist |

Total:  3

### 2009

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Obied, Zaki | 12/9/2008 | 1/15/2009 | Occupancy Specialist |
| Telfort, Rosny | 11/28/2005 | 4/2/2009 | Outreach Specialist |
| Johnson, Goldie | 7/28/2008 | 4/17/2009 | Office Assistant |
| Jones Jr, Jackie | 9/25/2006 | 5/22/2009 | Inspection Clerk |
| Maldanado, Diego | 12/1/2008 | 7/17/2009 | Occupancy Specialist |

Total:  5

### 2010

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Malave-Lopez, Juan | 7/30/2008 | 3/5/2010 | Occupancy Specialist |
| Salgueiro, Idania | 4/6/2009 | 6/4/2010 | Occupancy Specialist |
| Moise, Herve | 9/10/2009 | 8/27/2010 | Occupancy Specialist |
| Diaz-Dicke, Rosalie | 7/7/2008 | 10/22/2010 | FSS Coordinator |

Total:  4

1

## 2011

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Eusebio, Albert | 10/11/2010 | 1/4/2011 | Occupancy Specialist |
| Schoenberg, Lee | 8/11/2008 | 6/30/2011 | Assist. Community Mgr |
| Savage, Karen | 7/19/2010 | 7/20/2011 | Occupancy Specialist |
| White, Jacqueline | 6/14/2010 | 11/14/2011 | Occupancy Specialist |
| Williams, Roderick | 7/25/2011 | 12/2/2011 | Occupancy Specialist |

Total:  5

## 2012

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Pollard, Latisha | 1/30/2012 | 3/16/2012 | Occupancy Specialist |
| Slaton, Ruby | 1/1/2007 | 6/8/2012 | Community Mgr. |
| Hernandez, Ana | 1/27/1999 | 6/11/2012 | FSS Coordinator |
| White, Vicki | 7/25/2011 | 6/20/2012 | Community Mgr. |
| Brown, Cynthia | 1/9/2012 | 6/29/2012 | Occupancy Specialist |
| Butler, Kera | 9/12/2011 | 7/26/2012 | Occupancy Specialist |
| Trotter, Willie | 4/6/2009 | 7/27/2012 | FSS Case Manager |
| White, Shane | 5/7/2008 | 7/27/2012 | Occupancy Specialist Supervisor |
| Fulton, Tahkia | 1/24/2011 | 8/10/2012 | Occupancy Specialist |
| Hires, Thomas | 7/30/2012 | 9/14/2012 | FSS Case Manager |
| Ciceron, Merlie | 6/25/2012 | 10/1/2012 | Occupancy Specialist |
| Brewster, Linsey | 9/12/2012 | 10/5/2012 | Occupancy Specialist |

Total:  12

## 2013

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Portuhondo, Geraldine | 6/22/2009 | 3/22/2013 | Inspection Clerk |
| Felder, Ruby | 12/16/1980 | 3/28/2013 | Clerical |
| Mirabal, Carmen | 3/15/2010 | 4/12/2013 | Intake Coordinator |
| Gayle, Joshua | 9/10/2012 | 6/18/2013 | Occupancy Specialist |
| Hill, Maneashia | 10/8/2012 | 8/23/2013 | Office Assistant |
| Jourdain, Marie | 9/18/2013 | 10/11/2013 | Office Assistant Inspections |
| Chapman, Christina | 7/9/2013 | 11/24/2013 | Occupancy Specialist |
| Tuero, Dunia | 11/18/2013 | 11/28/2013 | Occupancy Specialist |
| Taylor, Colin | 1/11/2000 | 12/31/2013 | Inspectors Supervisor |

Total:  9

## 2014

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Smith, Lechant | 10/3/2012 | 1/24/2014 | Occupancy Specialist |
| Delancy, Nicole | 5/8/2014 | 8/29/2014 | Occupancy Specialist |
| Cruickshank, Aretha | 10/28/2013 | 9/8/2014 | Occupancy Specialist |
| Dessources, Cherline | 3/9/2010 | 10/10/2014 | Occupancy Specialist |
| Hope, Hermetha | 6/1/2009 | 11/7/2014 | Occupancy Specialist |
| Mercedes, Felix | 6/24/13 | 11/17/2014 | Community Manager |
| Elliott, Aniska | 12/15/2014 | 12/17/2014 | Occupancy Specialist |

Total:  7

## 2015

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Colas, Barbara | 11/19/2007 | 1/23/2015 | FSS Case Manager |
| Comrie-Picou, Melody | 9/22/2014 | 1/23/2015 | Occupancy Specialist |
| Flores, Anita | 12/3/01 | 1/29/2015 | Intake Coordinator |
| Noel, Harold | 10/13/2014 | 2/12/2015 | Occupancy Specialist |
| Jomant, Dawn | 12/1/2014 | 3/2/2015 | Occupancy Specialist |
| Lachman, Brandon | 6/24/2013 | 5/1/2015 | Intake Specialist |
| Lee, Sade | 2/23/2015 | 6/22/2015 | Occupancy Specialist |
| Clark, Sheila | 7/20/2015 | 8/14/2015 | Occupancy Specialist |
| Moss, Shawnta | 9/6/2011 | 9/9/2015 | Occupancy Specialist |
| Brown, Antonio | 1/11/2006 | 9/25/2015 | FSS Coordinator |
| Pagan, Minerva | 7/13/2015 | 10/2/2015 | Occupancy Specialist |
| Thompson, Ashyea | 5/18/2015 | 10/6/2015 | Intake Coordinator |
| Hill, Joyce | 1/24/2011 | 11/6/2015 | Outreach Specialist |
| Coley, Latonya | 10/12/2015 | 11/6/2015 | Occupancy Specialist |

Total:  14

## Employee Terminated Or Resigned After Carolyn Washington Was Terminated

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Gutierrez, Luz | 10/5/2015 | 12/25/2015 | Occupancy Specialist |
| Brutusthomas, Raquel | 2/8/2010 | 12/28/2015 | Occupancy Specialist Supervisor |
| Villa, Miguel | 3/2/2006 | 1/4/2016 | Inspector |
| Mezadieu, David | 3/9/2016 | 6/17/2016 | Program Analyst |
| Hamm, Tanginika | 3/30/2010 | 10/7/2016 | Occupancy Specialist |

Total:  5

3

# EXHIBIT C

# Exit Interview Form

1. What factors led you to accept a job with us? *I had previously worked with the agency and was capable of doing the job.*

2. Have your feelings changed since then? *Yes. I am still capable of doing the job I am just no longer willing to accept the disrespect of my supervisor.*

3. How would you describe the level of training you received here? *HACFL is definately a training agency where IH & SB are concerned.*

4. How would you rate your job performance here? *I believe that each day I gave the work 100% of me.*

5. How would you rate the following aspects of your employment here?

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Advancement opportunities: | ☐ | ☑ | ☐ | ☐ |
| Performance reviews: | ☐ | ☑ | ☐ | ☐ |
| Work environment: | ☐ | ☐ | ☐ | ☑ |
| Your pay: | ☐ | ☐ | ☑ | ☐ |
| Your benefits: | ☐ | ☐ | ☑ | ☐ |

6. What did you enjoy about working here? *Initally there was a good working environment where everyone was able to work cohesively.*

7. How would you rate your supervisor in the following areas?

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Shows fairness: | ☐ | ☐ | ☑ | ☐ |
| Provides appropriate recognition: | ☐ | ☑ | ☐ | ☐ |
| Solves problems promptly: | ☐ | ☑ | ☐ | ☐ |
| Follows policy and procedures: | ☐ | ☐ | ☑ | ☐ |
| Communicates effectively with staff: | ☐ | ☐ | ☑ | ☐ |
| Encourages feedback: | ☐ | ☑ | ☐ | ☐ |
| Knows how to do his/her job: | ☐ | ☐ | ☑ | ☐ |

8. If you came back to our organization, would you like to work for the same supervisor? *Yes for Mrs. Lopez No for Mrs. Washington*

9. Are you leaving for a similar job? *Yes.*

10. What role does salary play in your decision to leave? *None.*

11. What could we have done to prevent you from leaving? *Removed me from the Supervison of Carolyn Hicks-Washington*

Employee ___*(signature)*___ [signature]          Date _1/29/2015_

HR Representative _____ [signature]          Date _____

www.theHRSpecialist.com

# Exit Interview Form

1. What factors led you to accept a job with us? A Career in Social Services

2. Have your feelings changed since then? No, Social Services is still
my goal & chosen field of interest

3. How would you describe the level of training you received here? _____

4. How would you rate your job performance here? In the begining poor I
obtained my knowledge from co worker support & certification

5. How would you rate the following aspects of your employment here?

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Advancement opportunities: | ☐ | ☐ | ☑ | ☐ |
| Performance reviews: | ☐ | ☐ | ☐ | ☑ |
| Work environment: | ☐ | ☐ | ☐ | ☑ |
| Your pay: | ☐ | ☐ | ☐ | ☑ |
| Your benefits: | ☐ | ☐ | ☑ | ☐ |

6. What did you enjoy about working here? The clients, interacting with
them, having the opportunity to service & impact they lives

7. How would you rate your supervisor in the following areas?

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Shows fairness: | ☐ | ☐ | ☐ | ☑ |
| Provides appropriate recognition: | ☐ | ☐ | ☐ | ☑ |
| Solves problems promptly: | ☐ | ☐ | ☐ | ☑ |
| Follows policy and procedures: | ☐ | ☐ | ☑ | ☐ |
| Communicates effectively with staff: | ☐ | ☐ | ☐ | ☑ |
| Encourages feedback: | ☐ | ☐ | ☑ | ☐ |
| Knows how to do his/her job: | ☐ | ☑ | ☐ | ☐ |

8. If you came back to our organization, would you like to work for the same supervisor? No

9. Are you leaving for a similar job? Yes

10. What role does salary play in your decision to leave? A big one

11. What could we have done to prevent you from leaving? What led me to leave
was the ~~experience~~ continuous favoritism, unequal treatment
(see back)

Employee _[signature]_   Date 1/23/15
[signature]

HR Representative _____   Date _____
[signature]

www.theHRSpecialist.com

11. (to both clients & staff ) & unfairness in pay. I am disheartened by the events in 2014 concerning Mr. Brown & and the reason I wasn't allowed the same pay or merit increase. From the begining I've had to strive harder & catch on faster to keep my job, had it not been for my co-workers & former supervisor coaching & supporting I would have been let go years ago.

Additional Comments from Barbara Coles

Poor | Performance reviews - Not timely

Poor | Work environment - too much drama, negative Conversations, Toxic. Yelling across the Office. Way Clients & Coworkers are spoken to

Poor | Pay - Denied increase for promotion and merit

⑦ Supervisor ratings

Poor | Shows fairness - Does not feel this her FSS Clients are treated properly when she is absent by Antonio

# Exit Interview Form

1. What factors led you to accept a job with us? *Close to my home better wages*

2. Have your feelings changed since then? *definately*

3. How would you describe the level of training you received here? *Scattered, not consistent, not enough*

4. How would you rate your job performance here? *Fair*

5. How would you rate the following aspects of your employment here?

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Advancement opportunities: | ☐ | ☐ | ☐ | ☑ |
| Performance reviews: | ☐ | ☑ | ☐ | ☐ |
| Work environment: | ☐ | ☐ | ☐ | ☐ |
| Your pay: | ☐ | ☐ | ☑ *to* | ☑ |
| Your benefits: | ☐ | ☐ | ☑ *to* | ☐ |

6. What did you enjoy about working here? *Some good working relationships*

7. How would you rate your supervisor in the following areas?

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Shows fairness: | ☐ | ☐ | ☑ | ☑ |
| Provides appropriate recognition: | ☐ | ☐ | ☑ *to* | ☑ |
| Solves problems promptly: | ☐ | ☐ | ☐ | ☑ |
| Follows policy and procedures: | ☐ | ☐ | ☐ | ☑ *flip/flop or Policy/Plece* |
| Communicates effectively with staff: | ☐ | ☐ | ☐ | ☑ |
| Encourages feedback: | ☐ | ☐ | ☐ | ☑ |
| Knows how to do his/her job: | ☐ | ☐ | ☑ | ☐ |

8. If you came back to our organization, would you like to work for the same supervisor? *no*

9. Are you leaving for a similar job? *Similiar*

10. What role does salary play in your decision to leave? *enormous*

11. What could we have done to prevent you from leaving? *absolutely nothing*

Employee *Joyce Hill* [signature]          Date *11/4/15*

HR Representative _____ [signature]          Date _____

# Exit Interview Form

1. What factors led you to accept a job with us? _Recommended by another woman employee & reputation of Agency_

2. Have your feelings changed since then? _Yes, they have due to Environment & management_

3. How would you describe the level of training you received here? _I came in as an experienced caseworker, training requirement was minimal_

4. How would you rate your job performance here? _Very Good, essential to work flow and office management_

5. How would you rate the following aspects of your employment here?
   * Also see Attached

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Advancement opportunities: | ☐ | ☐ | ☐ | ☑ Limited |
| Performance reviews: | ☐ | ☐ | ☐ | ☑ Lateness |
| Work environment: | ☐ | ☐ | ☐ | ☑ |
| Your pay: | ☐ | ☐ | ☐ | ☑ |
| Your benefits: | ☐ | ☐ | ☑ | ☐ |

6. What did you enjoy about working here? _Originally, due to smaller PHA more intimate setting which allows for better accountability_

7. How would you rate your supervisor in the following areas?
   * Also see Attached for clarifications

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Shows fairness: | ☐ | ☐ | ☐ | ☑ |
| Provides appropriate recognition: | ☐ | ☐ | ☐ | ☑ |
| Solves problems promptly: | ☐ | ☐ | ☑ | ☑ |
| Follows policy and procedures: | ☐ | ☐ | ☐ | ☑ |
| Communicates effectively with staff: | ☐ | ☐ | ☐ | ☑ |
| Encourages feedback: | ☐ | ☐ | ☐ | ☑ |
| Knows how to do his/her job: | ☐ | ☑ | ☐ | ☐ |

8. If you came back to our organization, would you like to work for the same supervisor? _NO I would not_

9. Are you leaving for a similar job? _Same industry different position_

10. What role does salary play in your decision to leave? _A major part_

11. What could we have done to prevent you from leaving? _Please See Attached_

Employee _Raquel Bruhis-Thomas_ Date 12/21/2015
          [signature]

HR Representative _____ Date _____
                        [signature]

www.theHRSpecialist.com

# Exit Interview Form

1. What factors led you to accept a job with us? *I had previously worked with the agency and was cabable of doing the job.*

2. Have your feelings changed since then? *yes - I am still capable of doing the job I am just no longer willing to accept the disrespect of my supervisor.*

3. How would you describe the level of training you received here? *HACFL is definately a training agency where PM & SB are concerned.*

4. How would you rate your job performance here? *I believe that each day I gave the work 100% of me.*

5. How would you rate the following aspects of your employment here?

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Advancement opportunities: | ☐ | ☑ | ☐ | ☐ |
| Performance reviews: | ☐ | ☑ | ☐ | ☐ |
| Work environment: | ☐ | ☐ | ☐ | ☑ |
| Your pay: | ☐ | ☐ | ☑ | ☐ |
| Your benefits: | ☐ | ☐ | ☑ | ☐ |

6. What did you enjoy about working here? *Initally there was a good working environment where everyone was able to work cohesively.*

7. How would you rate your supervisor in the following areas?

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Shows fairness: | ☐ | ☐ | ☑ | ☐ |
| Provides appropriate recognition: | ☐ | ☑ | ☐ | ☐ |
| Solves problems promptly: | ☐ | ☑ | ☐ | ☐ |
| Follows policy and procedures: | ☐ | ☐ | ☑ | ☐ |
| Communicates effectively with staff: | ☐ | ☐ | ☑ | ☐ |
| Encourages feedback: | ☐ | ☑ | ☐ | ☐ |
| Knows how to do his/her job: | ☐ | ☐ | ☑ | ☐ |

8. If you came back to our organization, would you like to work for the same supervisor? *yes for Mrs. Lopez No for Mrs. Washington*

9. Are you leaving for a similar job? *yes.*

10. What role does salary play in your decision to leave? *None.*

11. What could we have done to prevent you from leaving? *Removed me from the supervision of Carolyth Hicks-Washington*

Employee _____ Date *1/29/2015*
[signature]

HR Representative _____ Date _____
[signature]

www.theHRSpecialist.com

Exit interview form for elaborated answers. Questions I felt required more explanation that I believe could not simply be captured by rating :

**Question 5**: Rate aspects of employment here. *Advancement opportunities* are limited and therefore rated as *poor*.

- *Performance reviews* are rated *Poor* due to the habitual lateness of execution
- *Work environment* became hostile. Stressful and burdensome due to high turnover. Decrease in morale result in a rating of *Poor.*
- *Your pay:* *Poor* because the rate of pay was allowed to be determined by the Director who utilized no set guidelines or pay scales and did so based on her personal feelings. In doing so, pay based on experience, qualifications and seniority are inconsistent and there have been others with less experience and knowledge coming into the agency making more than existing staff.   The pay increases were also to the discretion of the Director and again without a definitive rating scale. Staff were often told that 'the budget' per the Executive Director and Chief Financial Officer would not allow for a pay increase or limited the amount that could be applied but it was clarified that these were determined by the Director to her discretion.  The rate of pay standards of HACFL is not competitive with other local housing authorities.

**Question 7**:  Supervisor rating in the following areas

- *Showing fairness*- Poor. It was selective based on the employee, landlord and participants.  The bias was obvious when certain staff/clients/landlords were not treated the same regarding similar actions or inactions. Exceptions were made for certain clients and/or landlords going against policy and procedures.
- *Provide appropriate recognition*-Poor. Selective to the individual and based on favoritism.  An employee can be efficient and take initiative but if that person isn't a selective favorite, that individual would not receive recognition and in fact be harassed in a manner to suggest they are taking questionable measures to get their work done or required to go beyond the scope of what is required and/or necessary.
- *Solves problems promptly*- Poor depending on the problem and who is involved. Interoffice issues often went ignored or were not handled impartially.
- *Follows policies and procedures*-Poor because it was subjective to whom it was applied. The inconsistency created an atmosphere of uncertainty and tension in the work environment and often put staff at odds with each other and clients when applying or enforcing the policies and procedures.
- *Communicates effectively with staff*-Poor.  Information provided to staff was inconsistent and often contradictory
- *Encourages feed back*: Poor.  The culture of the work area was to either ignore, deny, go off topic or be on the defensive
- *Knows how to do his/her job*: While the supervisor knew how to do the job it was overshadowed by the bias,  favoritism, inconsistencies  and unfairness often displayed which I rate as Poor.

1

**Question 11:** what could have been done to prevent me from leaving:

If upper management had been more proactive and sincerely invested in dealing with the concerns and complaints prior to staff feeling they only had one solution, leaving.

If as an employee I felt I had an impartial party to turn to regarding work related issues.

Having supervisors who were on the same page and not contradictory in their practices and communication to staff.

A working environment that did not become a burdensome feeling.  Due to the extreme turnover as a supervisor I was required to perform the duties of more than one caseworker at the same time I was expected to also fulfill my position as a supervisor. Yet, while it was expected that I manage multiple caseloads and perform as a supervisor, the compensation was not reflective of the multiple responsibilities.

Having leadership unafraid to follow basic labor laws instead of inventing reasons they could not take action when it suited them or down playing existing apparent issues.

Employee Name: _Racquel B Thomas_                                    Date: 12/22/15

# EXHIBIT D

Carolyn H. Washington
3613 Lime Hill Rd
Lauderhill, FL  33319

December 4, 2015                          sent via email: aayala@hacfl.com
                                                       tenglish@hacfl.com

Housing Authority of the City of Fort Lauderdale
Andrea Ayala, Human Resources Manager
500 W. Sunrise Blvd.
Fort Lauderdale, FL  33311

RE:  Severance Agreement and General Release

Dear Andrea Ayala,

On November 13, 2015, after working more than ten (10) years for the Housing Authority of the City of Fort Lauderdale (HACFL) and more than thirty (30) years at other housing authorities in multiple cities throughout the United States of America, I was abruptly terminated by the Executive Director (ED), Tam English. I asked Mr. English if he could tell me the reason for the termination and he stated it had nothing to do with the recent audit or the status of the files.[1] I was then informed that the reason for my termination was that the housing authority was "moving in another direction." He then shared with me that my supervisor, Veronica Lopez, was also terminated and presented me with an envelope, which included a Severance Agreement and General Release form ("Severance Agreement").

On December 2, 2015, I met with you to discuss my circumstances surrounding my termination. I informed you that I still did not know the exact reason for my abrupt termination since I'd never received "any progressive discipline notices" and wanted to know the specific reason for my termination. Like Mr. English, you were also unable to provide me with a "legitimate, non-discriminatory reason" for my termination. As a result, I have reason to believe that I have been discriminated against due to my race, color, gender and/or age and that the HACFL's termination of my employment violates federal and state antidiscrimination laws, including but not limited to the Civil Rights Act of 1964, the Age Discrimination in Employment Act and the Florida Civil Rights Act of 1992.

I have provided below a summary of some of my accomplishments throughout my career in housing management with the Housing Authority of the City of Fort Lauderdale for over the last ten (10) years:

---

[1] Chief Financial Officer (CFO) Michael Tadros was also present.

1

- From August 2005 until September 2010, I held the position of Assistant Section 8 Director. In those five years, the HACFL continued to be a High Performing/Standard agency and ran a successful Housing Choice Voucher (HCV) program. The department continued to process, implement and administer all required reports to the U.S. Department of Housing and Urban Development (HUD).
- From 2010-2015, under the Leadership of Tam English, the Agency moved in a different direction where my title was changed from Assistant Section 8 Director to the Assistant Director of Assisted Housing with added responsibilities that included seven Public Housing Developments (totaling over 700 units), which consisted of successful rent collection, lease-ups and relocation of families from five Public Housing developments due to Demo/Disposition (HUD approved).
- Assisted the Director of Assisted Housing with creating a training environment for HACFL employees by incorporating NAHRO, a national training company, to use the facilities of the HACFL as a training center. This allowed a number of Section 8 employees to attend trainings at no cost. With an average of 2-3 trainings a year, this benefited the entire agency – including the HACFL Board of Commissioners.
- Assisted with the Homeownership Program via Section 8 and the Family Self-Sufficiency programs. On average, we successfully assisted 5-7 families complete the FSS program annually and assisted 3-5 families to become Section 8 homeowners each year.
- Represented the HACFL in ensuring the MDRC National FSS study met its goal of randomly selecting 100 clients into its program.  Due to the success of the program, an additional 50 clients were randomly selected which brought in additional revenue totaling $60,000.00, which will be dispersed in increments until 2017.
- Worked diligently with the ED and CFO to ensure compliance with all program rules and regulations regarding the streamline process of the program and to ensure compliance with release of funds.
- Maintained close relationships with the Miami HUD field office and its representatives due to requests for approval of Public Housing units undergoing modernization and PHAS reporting requirements.
- Attended various trainings and conferences over the ten (10) year period and was certified as a Family Self-Sufficiency Specialist in August 2014.
- For the past ten (10) years, the Section 8 and Public Housing programs that I have been involved in have been successful especially the external audits that are conducted annually and the most recent HUD audit conducted in August 2015..
- Instrumental in generating fun ideas for the company Christmas Holiday event that that brings employees together for fun-filled activities, as well as the talent show "HACFL Idol" which began in 2005. These events have connected employees who rarely get to interact with each other due to working in different areas throughout the organization.

To be terminated without reason and then be offered a two month severance has been not only humiliating, but hurtful. I have committed the last decade of my life to the Housing Authority of the City of Fort Lauderdale and there's no question that I could have spent

2

another 20 years or more in this position or in a position of equal and/or greater importance. My service record, commitment to the Agency, service to the residents and clients, as well as my dedicated assistance to staff to help meet deadlines was based on my passion for the career field that chose me more than 30 years ago: housing management. I spent long hours working, even on weekends, to ensure the Agency stayed on top and achieved its mission by serving the people in Section 8 and other Public Housing programs to become self-sufficient.

As reflected by the professional accomplishments listed above, whatever "new direction" the housing authority wanted to go in, Mrs. Lopez and I were more than capable of helping the housing authority achieve its goals.[2] As a result, I have every reason to believe that I was unlawfully terminated and that the reason provided by Tam English for my termination was nothing more than a pretext for discrimination based on my race, color, gender and/or age.

Thus, the terms provided in the HACFL's Severance Agreement are unacceptable. In order to avoid potential litigation for violating my civil and human rights, I ask that the following changes be made to the Severance Agreement:

- A **Lump Sum Severance Payment** of current salary prior to termination [plus all benefits received during employment] until November 13, 2025;
- Removal of Section 2B titled "**Paid Time Off Payment.**" Regardless of whether I was terminated or not, this payment in the amount of Sixteen Thousand, Five Hundred Fifty-One Dollars and Forty-Eight Cents ($16,553.48) is due to me and is not contingent upon me signing the Agreement. The PTO and all leave in which I am entitled must be paid out at the next pay period to be released no later than December 10, 2015[3]; and
- A Letter of Recommendation.

If these terms are not accepted in exchange for relinquishing my constitutional and statutory rights (e.g. agreeing to arbitration when I have a constitutional and statutory right to a jury trial) after unlawfully terminating me, then I am confident that the EEOC and/or an impartial jury in a state or federal court would conclude that my race, color, gender

---

[2] Five years ago, the Agency moved in a different direction removing the supervisor of the Public Housing developments (a total of seven developments with over 700 units) and added the responsibility to the Section 8 Directors. The supervisor that was removed continued to retain a supervisory position within the Housing Authority of the City of Fort Lauderdale as the Agency changed directions.

[3] During my meeting with Andrea, I was informed that I was due the Paid Time Off payment at the end of my termination since a portion of the amount listed in the Severance Agreement ($18,031.60) was paid in the amount of $1,478.12 during the last pay period ending 11/21/2015 and that I would receive the remainder of the Paid Time Off payment on the next pay period ending 12/5/2015 (check date of 12/10/2015). The amount ($18,031.60 - $1,478.12) owed is $16,553.48.

and/or age played a "motivating factor" as to why the HACFL terminated me, as well as Veronica Lopez.

While the HACFL deliberates on how to proceed, I ask that I be given a complete copy of my personnel file while employed with the Housing Authority of the City of Fort Lauderdale no later than December 11, 2015.

As an HR professional, you are aware that no business is exempt from complying with our nation's antidiscrimination laws. Although my termination was handled in an unprofessional and unlawful manner, it is my hope that we can resolve this matter professionally without the aid of the courts. If not, my next step will be to immediately file a complaint with both the Florida Commission on Human Rights and the EEOC.[4]

Best,

*Carolyn H. Washington*

Carolyn H. Washington

cc: Tam English, CEO

---

[4] I completed the EEOC's questionnaire and their preliminary assessment system has already indicated that my "situation may be covered by the laws that EEOC enforces."

4

# Exhibit C

**Subject:** **EEOC Charge 510-2016-02801 - Additional Information from respondent**

From: MICHAEL.MATHELIER@EEOC.GOV

To: chwash20031@yahoo.com

Date: Thursday, October 19, 2017, 11:15:36 AM EDT

Good Morning Ms Washington,

Conducted some additional investigation related to your case however, Interviewed several individuals

I could not find supporting evidence that showed you were discriminated against on the bases of age.

Therefore, we are going to suspend and dismiss this matter and issue you a right to sue.

 510-2016-02801.RFI additional Infromation - response from Respondent.pdf
831.4kB

# BLUEROCK
## L E G A L, P.A.
### A   P R I V A T E   L A W   F I R M

Direct Dial: (305) 981-4300
Facsimile: (305) 981-4304
dgonzalez@bluerocklegal.com

October 19, 2017

**Via: U.S. Mail**
Michael Mathelier, Investigator
Equal Employment Opportunity Commission
100 S.E. 2nd Street, Suite 1500
Miami, FL 33131

      Re.:   <u>Carolyn Washington v. Housing Authority of the City of Ft. Lauderdale, Florida</u>
            EEOC Charge No. 510-2016-02801

Dear Mr. Mathelier:

As your file will reflect, this law firm represents The Housing Authority of the City of Ft. Lauderdale, Florida ("Respondent") in defense of the charge of employment discrimination filed by Carolyn Washington ("Charging Party"). This letter and the attached documents are in response to your e-mail requesting additional information dated August 29, 2017. Each request is numbered and the responses are as follows:

1. Was the Housing Authority Department understaffed due to budget cuts during the relevant period?

**Response:** No. The Respondent was understaffed due to an inability to find enough qualified applicants to fill all vacancies before others left. A "budget cut," in any event, would be expected to create over-staffing, if anything. Staff levels typically reflect the budget, and a cut in budget would be expected to lead to a staffing cut.

2. If so, when was the budget cut placed on the department?

**Response:** Not applicable. The Respondent was not understaffed due to a budget cut.

3. When was the decision to upgrade the department to go paperless made?

1

**Response:** The decision to begin scanning files was made in about 2010 or 2011. Staff finally began to scan new intake files in 2014, but that ended when the intake coordinator quit and remaining staff did not have the time or direction to continue.

4. Did Respondent achieve the paperless goal?

**Response:** At the end of 2016, 95% of the files were scanned. The balance will be scanned during 2017 as files come up for recertification.

5. If so, when? Name of Director / Assistant director, was Charging Party a part of the transition and working during that relevant point in transitioning to paperless?

**Response:** Respondent's Chief Financial Officer, Mike Tadros, and former Director of Assisted Housing, Veronica Lopez, were leading the effort. Mr. Tadros provided general overview of the transition to paperless. Ms. Lopez supervised the day-to-day activities in the transition. Ms. Lopez was in charge of assigning tasks in the transition to other employees. Charging Party sat in on a few meetings regarding the transition to paperless, but Respondent is not aware that she played any formal role in the transition beyond attending a few meetings. Ms. Lopez may have assigned Charging Party tasks in the transition. Ms. Lopez is no longer employed by Respondent.

6. How many staff members existed before the budget cut?

**Response:** Staffing budget was not reduced.

7. How many staff members were affected by the budget cut?

**Response:** None.

8. Were any employees terminated due to the budget cut?

**Response:** No

9. Provide a copy of the Organizational Chart of the Department during CP's tenure

**Response:** Attached at Exhibit A.

10.   Provide a copy of the current year to date Organizational Chart

**Response:**   Attached at Exhibit B.

11.   Provide the name of all employee for Housing Authority during the Relevant period. Name, Date of Birth, Sex, Date of Hire, Job Title, Department.

**Response:**   The reference to "Relevant period" in this request is not defined.  Respondent will provide the requested information for all employees who were employed by the Respondent in November, 2015, which was the month that the Charging Party was terminated.  A spreadsheet with such information is attached at Exhibit C.

12.   Provide the name of all employees affected either by layoff/terminated by Budget cut during relevant period

**Response:**   There were no layoffs.

13.   Name, Date of Birth, Job Title, Department/ Section, Supervisor, Date of hire, race, National Origin, starting salary, Salary during Budget cut Date of termination

**Response:**   Not applicable because there were no layoffs.

14.   Did the Department move from a Paper based system to Paperless? If so,

**Response:**   Respondent has both a paper system and scanned files.

15.   Did the extra heavy workload cause employees to leave the department?

**Response:**   Ms. Raquel Brutus-Thomas reported a burdensome work environment due to high turnover as a reason for leaving.  She also reported a poor supervisor as a reason for leaving. Her Exit Interview Form is attached at Exhibit D.  Her supervisor was the Charging Party. Respondent is unaware of any other employees who left after reporting an extra heavy workload as a reason for leaving.

16.   Identify all employees who transferred from CP's Department to another department

3

**Response:**

There is no time period associated with this request. Respondent will provide a list of employees who transferred from the Charging Party's department, Section 8, to another department, in the last several years.

| Name | Job Title | Department Transferred From | Department Transferred To | Job Title | Date of Transfer |
|------|-----------|-----------------------------|---------------------------|-----------|------------------|
| Pamela Jamel | Inspector | Section 8 | Affordable Housing | Assistant Community Manager | 3/17/14 |
| Ruth Ramos | Occupancy Specialist | Section 8 | Tax Credit | Assistant Community Manager | 10/14/13 |
| Laura Valdes | Intake Coordinator | Section 8 | Public Housing | Community Manager | 3/8/10 |

18. Were there any employees who quit because of being overwhelmed by the workload?

**Response:** See response to question #15.

19. Did anyone complain about the department being understaffed? – Was the understaff the cause of Ms. Washington's poor leadership style? Provide evidence to support that theory?

**Response:** Respondent did not receive any written complaints about the department being understaffed, but Respondent's Human Resources Coordinator, Ms. Andrea Ayala, generally recalls comments and conversations in the workplace between employees in which employees complained about vacant positions and the additional workload caused by the understaffing. The understaffing was due to constant staff turnover caused by the poor leadership of the department's managers, including the Charging Party. The Respondent was constantly understaffed by 2-3 employees because of the Charging Party, not any budgeting issues.

Respondent cannot speculate about the cause of the Charging Party's poor leadership style. Respondent knows only that the Charging Party exhibited a poor leadership style that resulted in

a difficult work environment and employee resignations.  See exit interviews attached at Exhibit D.

20.  Provide the following:

On an Excel Spreadsheet tab 1:

List of Employees who replaced Charging Party (CP) either on a temporary capacity or permanently during Relevant period to Current date.

Provide a statement of the service provided to Respondent (R) after CP was terminated

If a Contract vendor was hired to assist Respondent to identify a Problem that existed during CP's tenure, please submit a summary statement of the solution the contractor provided.

Tab 2

Name of Individual – Permanent replacement or temporary status employee, Contract service or salaried, Date Hired, Date  Service Ended, Reason for Termination of service

Tab 3

Charging Party's Replacement

Provide the information by Timeline

From date Charging Party was terminated to current replacement

Name of Employee- Date of Birth, Race, National Origin, Sex, Date of Hire, Employee Temporary or Permanent, Date of Termination, Reason for termination, Still Employed

**Response:**   The Charging Party's position, Assistant Director of Assisted Housing, was not replaced.  The position was eliminated when the Charging Party was terminated.  The Director of Assisted Housing, Ms. Veronica Lopez, was also terminated at about the same time the Charging Party was terminated.  The Respondent then hired a single "Director of Housing Choice Voucher Program" to take over the head management duties of the Respondent's Section 8 department.

5

The following individuals have been employed as the "Director of Housing Choice Voucher Program":

1.  Beatriz Cuenca-Barberio
    - **Title:** Interim Director of Housing Choice Voucher Program
    - **DOB:** Unknown. She was hired from an outside contractor.
    - **Race:** Unknown. She was hired from an outside contractor.
    - **National Origin:** Unknown. She was hired from an outside contractor.
    - **Sex:** Female
    - **Date of Hire:** December 1, 2015
    - **Temporary or Permanent:** Temporary. She filled the position until the hire of a permanent Director of Housing Choice Voucher Program.
    - **Date of Termination:** March 2, 2016
    - **Reason for Termination:** Employment was temporary, a permanent replacement was hired.

Ms. Cuenca-Barberio was hired from an outside contractor, Miami Beach Community Development Corporation, to temporarily fill the role of Director of Housing Choice Voucher Program during the time that Respondent searched for a permanent Director.

2.  Medina Johnson
    - **Title:** Director of Housing Choice Voucher Program
    - **DOB:** November 3, 1972
    - **Race:** African American
    - **National Origin:** Unknown
    - **Sex:** Female
    - **Date of Hire:** February 16, 2016
    - **Temporary or Permanent:** Permanent
    - **Date of Termination:** March 24, 2017
    - **Reason for Termination:** Resigned

3.  Barbara Baer
    - **Title:** Director of Housing Choice Voucher Program
    - **DOB:** May 18, 1955
    - **Race:** Caucasian
    - **Date of Hire:** May 9, 2017
    - **Temporary or Permanent:** Permanent
    - **Date of Termination:** Still employed

In 2014, Respondent hired Quadel Consulting and Training, LLC, to review the Respondent's Housing Choice Voucher Program.  Quadel performed a thorough review of the program to identify areas of improvement and proposed recommendations for streamlining processes, including, for example, revising the Respondent's administrative procedures, changing the timing of unit inspections, using online applications for the Housing Choice Voucher Program to cut down on paper handling, creating new scanning procedures, among other recommendations.

If you need any more information from us, please feel free to contact us.

Sincerely,

Daniel Eric Gonzalez, Esq.

# EXHIBIT A

# ORGANIZATIONAL CHART

## SECTION 8 DEPARTMENT



# EXHIBIT B

THE HOUSING AUTHORITY OF THE CITY OF FORT LAUDERDALE, FLORIDA
ORGANIZATIONAL CHART



# EXHIBIT C

| # | Last Name | First Name | Date Hired | Date Terminated | Job Title (Position) | Department (Employer) | Birth Year | Sex (Employee) |
|---|---|---|---|---|---|---|---|---|
| 2 | ALCANTARA | ELYZEE | 10/13/2008 | | Assistant Regional Manager | NW GARDENS REG | 1989 | FEMALE |
| 3 | ALCINEUS | ANDREA | 10/13/2014 | 09/16/2016 | Porter Maintenance Aide | Maintenance | 1977 | FEMALE |
| 4 | AYALA | BURTRON | 07/28/1982 | | Chief Administrative Officer | Administration | 1959 | MALE |
| 5 | BAKER | MARQUIS | 06/24/2013 | 01/29/2016 | Community Manager | Maintenance | 1970 | MALE |
| 6 | BANNER | KALI | 03/31/2014 | 08/26/2016 | Apprentice | Maintenance | 1991 | MALE |
| 7 | BELL | JENNESE | 02/24/2014 | 06/02/2017 | Inspectors Supervisor | Inspections | 1980 | MALE |
| 8 | BLACK | TRAMAINE | 11/09/2015 | 07/14/2017 | Junior Supervisor | Maintenance | 1980 | MALE |
| 9 | BRANTLEY | | 11/16/2015 | | Apprentice | Maintenance | 1973 | MALE |
| 10 | BRUTUS-THOMAS | RAQUEL ALVEREZ | 02/08/2010 | 12/28/2015 | Occupancy Specialist Supervisor | Administration | 1983 | FEMALE |
| 11 | BURCH | KVARIS ALVEREZ | 11/16/2015 | 12/19/2016 | Apprentice | Maintenance | 1972 | MALE |
| 12 | BUTTERFIELD | KIMBERLY | 05/09/2006 | | Outreach Specialist | Administration | 1962 | FEMALE |
| 13 | CHIN | KERYANN | 06/18/1985 | | Purchasing Coordinator | Administration | 1973 | FEMALE |
| 14 | COACHMAN | LISA | 07/01/1998 | | Supervisor | Maintenance | 1973 | FEMALE |
| 15 | COBY | MARIE | 09/14/2011 | | Accounting Clerk AP | Administration | 1959 | FEMALE |
| 16 | COLEY | LATONYA | 10/12/2015 | 11/06/2015 | Occupancy Specialist | Administration | 1975 | FEMALE |
| 17 | COX | ADRIENE | 10/06/2015 | | FSS Coordinator | Family Self Sufficiency | 1975 | FEMALE |
| 18 | CRAWFORD | PATRICIA | 11/14/2011 | 04/28/2017 | Office Custodian | Maintenance | 1958 | FEMALE |
| 19 | CURTISS | DARIUS | 03/23/2015 | 03/11/2016 | Apprentice | Maintenance | 1958 | MALE |
| 20 | DANDROW | ELLEN | 08/31/2015 | | Assistant Community Manager | Administration | 1935 | FEMALE |
| 21 | DAVIS | EUGENE | 07/01/1998 | | Maintenance Mechanic | Maintenance | 1972 | MALE |
| 22 | DEVLUGT | RUDOLPH | 09/22/2014 | | Community Aide | Maintenance | 1939 | MALE |
| 23 | DEWAR | SHAWN | 07/08/2004 | | Accountant I | Administration | 1964 | MALE |
| 24 | DOOPAN | SUBAITRI | 07/06/2015 | | Community Manager | Administration | 1976 | FEMALE |
| 25 | ENGLISH | TAM | 10/18/2013 | | Executive Director | Administration | 1970 | MALE |
| 26 | EUGENE | CARINE | 08/28/2006 | | FSS Coordinator | Family Self Sufficiency | 1966 | FEMALE |
| 27 | EUSEBIO | XIOMARA | 03/02/2015 | | Intake Specialist | Administration | 1972 | FEMALE |
| 28 | EVANS | ROBERT | 12/07/2010 | | Administration | Administration | 1964 | MALE |
| 29 | EVANS | HOWARD | 01/25/2010 | | Maintenance and Training Admin | Administration | 1948 | MALE |
| 30 | EVANS | MATTHEW | 08/06/2013 | 06/23/2017 | Porter Maintenance Aide | Maintenance | 1987 | MALE |
| 31 | EVERETT | LINO | 08/01/2013 | | Community Manager | Maintenance | 1984 | MALE |
| 32 | FELPEWRIGHT | ANITA | 06/24/2013 | 06/14/2016 | Community Manager | MAINTENANCE | 1972 | FEMALE |
| 33 | FLORES | SHARON | 11/16/2015 | | Intake Coordinator | Administration | 1978 | FEMALE |
| 34 | FURTADO | | 07/13/2009 | | Construction Administrator | Administration | 1958 | FEMALE |
| 35 | GAREL | MARVA | 09/20/1993 | | Accountant II | Administration | 1957 | FEMALE |
| 36 | GAREL | ALEXIS | 07/23/2002 | | Community Manager | Administration | 1983 | FEMALE |
| 37 | GARMON | THOMAS | 11/16/2015 | 12/08/2015 | Apprentice | Maintenance | 1976 | MALE |
| 38 | GEORGES | MARIE | 05/03/2010 | | Occupancy Specialist | Administration | 1974 | FEMALE |
| 39 | GIORDANOCAL | ALBERTO | 07/31/2013 | | Maintenance Technician | Maintenance | 1982 | MALE |

| | Last Name | First Name | Date Employed | Date Terminated | Type of Func Employee | Department Employee | Date Birth Employee | Sex of Employee |
|---|---|---|---|---|---|---|---|---|
| 40 | GRADY | TRINKA | 04/04/2014 | | Regional Manager | NW GARDENS REG | 1967 | |
| 41 | GRIFFIN | CHAUNCEY | 09/08/2015 | 11/30/2015 | Apprentice | Maintenance | 1977 | FEMALE |
| 42 | GUTIERREZ | LUZ | 10/05/2015 | 12/25/2015 | Occupancy Specialist | Administration | 1981 | FEMALE |
| 43 | HAMM | TANGINIKA | 03/30/2010 | 10/07/2016 | Occupancy Specialist | Administration | 1976 | FEMALE |
| 44 | HANBERRY JR | GEORGE | 10/12/2015 | | Apprentice | Maintenance | 1978 | MALE |
| 45 | HARDEN | TERRELL | 11/26/2012 | 03/25/2016 | Porter Maintenance Aide | Maintenance | 1990 | FEMALE |
| 46 | HAROLD | SHIRLEY | 01/29/2011 | 02/22/2016 | Outreach Specialist | Administration | 1953 | FEMALE |
| 47 | HILLSMAN | PAMELA | 01/24/2011 | | Receptionist Clerk | Administration | 1956 | FEMALE |
| 48 | HILL | JOYCE | 02/21/2006 | | Porter Maintenance Aide | Maintenance | 1944 | MALE |
| 49 | JOYCE | PAMELA | 04/28/2010 | 11/06/2015 | Receptionist Clerk | Administration | 1990 | FEMALE |
| 50 | JACKSON | BRYAN | 09/11/2006 | | Security Specialist | SECURITY | 1988 | FEMALE |
| 51 | JACKSON | NATHANIEL | 10/20/2014 | | Inspector | Inspections | 1957 | FEMALE |
| 52 | JAMEL | PAMELA | 11/16/2015 | | Inspections | Maintenance | 1993 | FEMALE |
| 53 | JAMES | DAMITA | 08/11/2006 | 06/16/2017 | Apprentice | Maintenance | 1991 | MALE |
| 54 | JENKINS | ERRICK | 09/19/2011 | 07/31/2017 | Apprentice | Maintenance | 1982 | MALE |
| 55 | JOHNSON | OTIS | 11/25/2013 | | GED Teacher Counselor | Education | 1976 | FEMALE |
| 56 | JOHNSON | LISA | 08/03/2003 | 03/04/2016 | Porter Maintenance Aide | Maintenance | 1986 | FEMALE |
| 57 | JOHNSON | AUNTARIA | 09/18/2011 | | Porter Maintenance Aide | Maintenance | 1977 | FEMALE |
| 58 | JOHNSON | CALVIN | 11/25/2013 | 11/13/2015 | Operations Manager | Administration | 1982 | MALE |
| 59 | JONES | JHANTAE | 11/04/2001 | | Porter Maintenance Aide | Maintenance | 1971 | MALE |
| 60 | KING | MELISSA | 09/19/2011 | | Occupancy Specialist | Administration | 1987 | FEMALE |
| 61 | LEE | LATIA | 11/04/2001 | | Director Assisted Hsg | Administration | 1982 | FEMALE |
| 62 | LOPEZ | VERONICA | 03/10/2003 | | Apprentice | Maintenance | 1952 | FEMALE |
| 63 | LOVE | ANGELO | 09/08/2013 | 01/10/2017 | Assistant to the Ed | Administration | 1978 | MALE |
| 64 | LOVE | GLORIA | 01/28/1992 | | Maintenance Supervisor | MAINTENANCE | | FEMALE |
| 65 | MAISONET JR | JOSE | 09/09/2013 | | Porter Maintenance Aide | Maintenance | 1975 | MALE |
| 66 | MCBRIDE | SEDRICK | 04/29/2013 | | Porter Maintenance Aide | Maintenance | 1984 | MALE |
| 67 | MINGEY II | CHRISTOPHER | 07/11/2013 | | Porter Maintenance Aide | Maintenance | 1981 | MALE |
| 68 | MOORE | KEYNIKA | 11/02/2012 | | Apprentice | Administration | 1991 | FEMALE |
| 69 | MOOREFIELDS | CHRISTINE | 05/28/2013 | | Assistant Community Manager | Administration | 1956 | FEMALE |
| 70 | MOOYOUNG | MARCO | 10/12/2015 | 04/29/2017 | FSS Coordinator | Family Self Sufficiency | 1965 | MALE |
| 71 | MOSLEY | WILLIE | 07/26/2010 | | Program Compliance Specialist | Administration | 1972 | MALE |
| 72 | MOTEN | ANTHONY | 08/16/1994 | | Director | Administration | 1960 | MALE |
| 73 | MURRAY | MICHAEL | 10/31/2011 | | Maintenance Technician | Maintenance | 1989 | MALE |
| 74 | PALMER | MYLTON | 03/05/1997 | | Assistant Director | Maintenance | 1951 | MALE |
| 75 | PAYNE | COWANNIE | 10/14/2014 | | Porter Maintenance Aide | Maintenance | 1960 | MALE |
| 76 | POLYGARPE | HARRY | 11/16/2015 | | Assistant Community Manager | Administration | 1977 | MALE |
| 77 | POOLE | THEODORE | 06/27/2007 | | Community Aide | Tenant Services | 1954 | MALE |
| 78 | PRASKOVA | PENKA | 11/01/2013 | | Maintenance Supervisor | Maintenance | 1966 | FEMALE |

| # | Employee Last Name | Employee First Name | Date Hired | Date Terminated | Employee Position/Title | Department/Employee Class | Year Born | Sex |
|---|---|---|---|---|---|---|---|---|
| 78 | RHODES | MARK | 09/11/2015 | 11/09/2015 | Apprentice | Maintenance | 1991 | MALE |
| 79 | RICARDO | RENE | 09/26/2006 | | Supervisor | Maintenance | 1964 | MALE |
| 80 | RILEY | RAYAN | 09/06/2005 | | Assistant Community Supervisor | Administration | 1978 | MALE |
| 81 | ROSARIO | LIZA | 06/15/2015 | | Occupancy Specialist Supervisor | Administration | 1973 | FEMALE |
| 82 | SANTAGO | JOSE | 11/22/2010 | | Porter Maintenance Aide | Maintenance | 1972 | MALE |
| 83 | SIMMONS | DEMETRIUS | 10/21/2014 | | Porter Maintenance Aide | Maintenance | 1984 | MALE |
| 84 | SMITH | BROSHEA | 09/08/2014 | 08/26/2016 | Apprentice | Maintenance | 1996 | MALE |
| 85 | SMITH | JONTREAL | 07/09/2013 | | Community Manager | Administration | 1977 | FEMALE |
| 86 | SMITH | SABOO | 06/27/2011 | | Maintenance Technician | Maintenance | 1988 | MALE |
| 87 | SNEED | CEDRICK | 08/01/2013 | 01/05/2016 | Porter Maintenance Aide | Maintenance | 1979 | MALE |
| 88 | STEWART | CHERYL | 02/04/2002 | | Director of Development | Administration | 1965 | FEMALE |
| 89 | STRAWBRIDGE | JO-ETT | 04/29/2013 | | Maintenance Supervisor | Maintenance | 1954 | MALE |
| 90 | STRIGGLES | MICHAEL | 03/13/2006 | | Chief Financial Officer | NW GARDENS REG | 1982 | MALE |
| 91 | TADROS | NATHANIEL | 11/16/2014 | 04/12/2016 | Apprentice | Administration | 1986 | MALE |
| 92 | THORPE JR | IVAN | 04/29/2013 | | Housekeeper | Maintenance | 1979 | MALE |
| 93 | TILME | MARIE | 04/09/1985 | | Office Assistant | Administration | 1956 | FEMALE |
| 94 | TINSLEY SMALLS | BARBARA | 11/20/2014 | | Community Manager | Administration | 1967 | FEMALE |
| 95 | TURNER | KAREN | 11/28/2005 | | Inspector | Inspections | 1949 | FEMALE |
| 96 | VALDES | LAURA | 03/02/2006 | 01/04/2016 | Inspector | Inspections | 1951 | FEMALE |
| 97 | VILLA | MIGUEL | 03/07/2014 | | Inspector | Inspections | 1951 | MALE |
| 98 | WALKER | RONALD | 08/10/2005 | 11/13/2015 | Assistant Director | Administration | 1969 | MALE |
| 99 | WASHINGTON | CAROLYN | 10/03/2011 | | Housekeeper | MAINTENANCE | 1956 | FEMALE |
| 100 | WASHINGTON | GAIL | 08/11/2015 | | Apprentice | Maintenance | 1959 | FEMALE |
| 101 | WATSON | JOE | 06/08/2015 | | Intake Specialist | Administration | 1963 | MALE |
| 102 | WATSON | KAREN ANN | 02/25/2015 | 10/28/2016 | Porter Maintenance Aide | Maintenance | 1981 | FEMALE |
| 103 | WHITEHEAD | FRANKLIN | 07/28/2005 | 01/06/2017 | Junior Supervisor | Maintenance | 1985 | MALE |
| 104 | WHITT | KRYSTAL | 05/26/2015 | | Lease Agent | LEASING | 1978 | FEMALE |
| 105 | WILLIAMS | TEDRICK | 03/23/2015 | | Porter Maintenance Aide | Maintenance | 1972 | MALE |
| 106 | WILLIAMS | ROBERT | 07/24/2012 | | Warehouse Logistic Manager | Maintenance | 1963 | MALE |
| 107 | WILLIAMS | HENRY | 09/09/2013 | | Assistant Community Manager | Administration | 1977 | MALE |
| 108 | WRIGHT | SHANNON | 09/28/2013 | | Porter Maintenance Aide | Maintenance | 1961 | FEMALE |
| 109 | WRIGHT | WINSTON | 11/16/2011 | | Porter Maintenance Aide | MAINTENANCE | 1984 | MALE |
| 110 | WAILEY | ALVINA | 06/15/2000 | | Maintenance Technician | Maintenance | 1980 | FEMALE |
| 111 | YANCEY | TAWONIA | 07/03/1991 | | Supervisor | Maintenance | 1960 | FEMALE |
| 112 | YANCEY | TIMOTHY | 06/15/2000 | | Maintenance Technician | Administration | 1983 | MALE |
| 113 | YARBOUGH | CRYSTAL | 08/28/2015 | 02/21/2016 | Assistant Community Manager | Administration | 1983 | FEMALE |

# EXHIBIT D

## Exit Interview Form

1. What factors led you to accept a job with us? _Recommended by another woman employee & reputation of agency_

2. Have your feelings changed since then? _Yes, they have due to environment & management_

3. How would you describe the level of training you received here? _I came in as an experienced caseworker, training requirement was minimal_

4. How would you rate your job performance here? _Very good, essential to work flow and office management_

5. How would you rate the following aspects of your employment here?
   * _Also see Attached_

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Advancement opportunities: | ☐ | ☐ | ☐ | ☑ Limited |
| Performance reviews: | ☐ | ☐ | ☐ | ☑ Lateness |
| Work environment: | ☐ | ☐ | ☐ | ☑ |
| Your pay: | ☐ | ☐ | ☑ | ☐ |
| Your benefits: | ☐ | ☐ | ☐ | ☐ |

6. What did you enjoy about working here? _Originally, due to smaller PHA more intimate setting which allows for better accountability_

7. How would you rate your supervisor in the following areas?
   * _Also see Attached for clarification_

| | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Shows fairness: | ☐ | ☐ | ☐ | ☑ |
| Provides appropriate recognition: | ☐ | ☐ | ☐ | ☑ |
| Solves problems promptly: | ☐ | ☐ | ☑ | ☑ |
| Follows policy and procedures: | ☐ | ☐ | ☐ | ☑ |
| Communicates effectively with staff: | ☐ | ☐ | ☐ | ☑ |
| Encourages feedback: | ☐ | ☐ | ☐ | ☑ |
| Knows how to do his/her job: | ☐ | ☑ | ☐ | ☐ |

8. If you came back to our organization, would you like to work for the same supervisor? _No I would not_

9. Are you leaving for a similar job? _Same industry different position_

10. What role does salary play in your decision to leave? _A major part_

11. What could we have done to prevent you from leaving? _Please see Attached_

Employee _Raquel Bethus-Thomas_ [signature]   Date 12/21/2015

HR Representative _____ [signature]   Date _____

www.theHRSpecialist.com

Exit interview form for elaborated answers. Questions I felt required more explanation that I believe could not simply be captured by rating :

<u>Question 5</u>: Rate aspects of employment here. *Advancement opportunities* are limited and therefore rated as *poor*.

- *Performance reviews* are rated Poor due to the habitual lateness of execution
- *Work environment* became hostile. Stressful and burdensome due to high turnover. Decrease in morale result in a rating of *Poor*.
- *Your pay: Poor* because the rate of pay was allowed to be determined by the Director who utilized no set guidelines or pay scales and did so based on her personal feelings. In doing so, pay based on experience, qualifications and seniority are inconsistent and there have been others with less experience and knowledge coming into the agency making more than existing staff. The pay increases were also to the discretion of the Director and again without a definitive rating scale. Staff were often told that 'the budget' per the Executive Director and Chief Financial Officer would not allow for a pay increase or limited the amount that could be applied but it was clarified that these were determined by the Director to her discretion. The rate of pay standards of HACFL is not competitive with other local housing authorities.

<u>Question 7</u>: Supervisor rating in the following areas

- *Showing fairness*- Poor. It was selective based on the employee, landlord and participants. The bias was obvious when certain staff/clients/landlords were not treated the same regarding similar actions or inactions. Exceptions were made for certain clients and/or landlords going against policy and procedures.
- *Provide appropriate recognition*-Poor. Selective to the individual and based on favoritism. An employee can be efficient and take initiative but if that person isn't a selective favorite, that individual would not receive recognition and in fact be harassed in a manner to suggest they are taking questionable measures to get their work done or required to go beyond the scope of what is required and/or necessary.
- *Solves problems promptly*- Poor depending on the problem and who is involved. Interoffice issues often went ignored or were not handled impartially.
- *Follows policies and procedures*-Poor because it was subjective to whom it was applied. The inconsistency created an atmosphere of uncertainty and tension in the work environment and often put staff at odds with each other and clients when applying or enforcing the policies and procedures.
- *Communicates effectively with staff*-Poor. Information provided to staff was inconsistent and often contradictory
- *Encourages feed back*: Poor. The culture of the work area was to either ignore, deny, go off topic or be on the defensive
- *Knows how to do his/her job*: While the supervisor knew how to do the job it was overshadowed by the bias, favoritism, inconsistencies and unfairness often displayed which I rate as Poor.

**Question 11:** what could have been done to prevent me from leaving:

If upper management had been more proactive and sincerely invested in dealing with the concerns and complaints prior to staff feeling they only had one solution, leaving.

If as an employee I felt I had an impartial party to turn to regarding work related issues.

Having supervisors who were on the same page and not contradictory in their practices and communication to staff.

A working environment that did not become a burdensome feeling. Due to the extreme turnover as a supervisor I was required to perform the duties of more than one caseworker at the same time I was expected to also fulfill my position as a supervisor. Yet, while it was expected that I manage multiple caseloads and perform as a supervisor, the compensation was not reflective of the multiple responsibilities.

Having leadership unafraid to follow basic labor laws instead of inventing reasons they could not take action when it suited them or down playing existing apparent issues.

Employee Name: Raquel B Thomas

Date: 10/20/15

2

# Exhibit D

6/20/2018                                                        Print Window

Subject:  RE: Follow-Up Charge #510-2016-02801 additional information request

From:  humanrights.areamust@gmail.com

To:  MICHAEL.FARRELL@EEOC.GOV; MICHAEL.MATHELIER@EEOC.GOV; KATHERINE.GONZALEZ@EEOC.GOV

Cc:  chwash20031@yahoo.com

Date:  Friday, December 1, 2017, 5:53:01 PM EST

Hello Mr. Farrell:

I am available to speak on Monday, December 4, 2017. Please let me know what time works best for you.

Also, can you please ask Mr. Mathelier us with a copy of Mr. Washington's investigative file since it was never provided pursuant to the EEOC's "Federal EEO Complaint Processing Procedures," which are located here: https://www.eeoc.gov/eeoc/publications/fedprocess.cfm.

Best,

Marcus Washington

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you.

**From:** MICHAEL FARRELL [mailto:MICHAEL.FARRELL@EEOC.GOV]
**Sent:** Friday, December 1, 2017 5:50 PM
**To:** Marcus Luther X <humanrights.areamust@gmail.com>; MICHAEL MATHELIER <MICHAEL.MATHELIER@EEOC.GOV>; KATHERINE GONZALEZ <KATHERINE.GONZALEZ@EEOC.GOV>
**Cc:** 'Carolyn Washington' <chwash20031@yahoo.com>
**Subject:** Re: Follow-Up Charge #510-2016-02801 additional information request

Ms. Gonzalez and Mr. Mathelier, I will handle all communications with Ms. Washington's representative from here forward. There is no need for you to engage in any further communications in this regard.

Print Window

6/20/2018

Mr. Washington, I am available most of the day on Monday, 12/4 and Friday, 12/8. Please advise me of the best date, time and phone number to reach you at.

Thank you. Mike Farrell.

Get Outlook for iOS

**From:** Marcus Luther X <humanrights.areamust@gmail.com>
**Sent:** Friday, December 1, 2017 5:36:09 PM
**To:** MICHAEL MATHELIER; KATHERINE GONZALEZ; MICHAEL FARRELL
**Cc:** 'Carolyn Washington'
**Subject:** RE: Follow-Up Charge #510-2016-02801 additional information request

Please see attached.

Best,

Marcus Washington

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you.

**From:** MICHAEL MATHELIER [mailto:MICHAEL.MATHELIER@EEOC.GOV]
**Sent:** Friday, December 1, 2017 3:25 PM
**To:** Marcus Luther X <humanrights.areamust@gmail.com>; KATHERINE GONZALEZ <KATHERINE.GONZALEZ@EEOC.GOV>; MICHAEL FARRELL <MICHAEL.FARRELL@EEOC.GOV>
**Cc:** 'Carolyn Washington' <chwash20031@yahoo.com>
**Subject:** RE: Follow-Up Charge #510-2016-02801 additional information request

Mr. Washington,

If you are an attorney representing Ms. Washington, we request that you submit a letter of representation to our office for our record.

Once we receive this letter and we render a decision we be in contact with you to address this matter further.

Thank you

Print Window

0/20/2010

**From:** Marcus Luther X [mailto:humanrights.areamust@gmail.com]
**Sent:** Friday, December 01, 2017 2:03 PM
**To:** MICHAEL MATHELIER <MICHAEL.MATHELIER@EEOC.GOV>; KATHERINE GONZALEZ <KATHERINE.GONZALEZ@EEOC.GOV>; MICHAEL FARRELL <MICHAEL.FARRELL@EEOC.GOV>
**Cc:** 'Carolyn Washington' <chwash20031@yahoo.com>
**Subject:** RE: Follow-Up Charge #510-2016-02801 additional information request

Mr. Mathelier,

I appreciate you trying to "help us," but the best way to have done so as an "impartial" investigator was to simply follow the EEOC's procedural rules.

If Mrs. Washington's case wasn't as strong as you thought it should be, you should have asked her these additional questions **before** you decided to suspend and dismiss her case without explanation or any citation of the law on October 19, 2017.

Although Mrs. Washington will answer further additional questions on or before December 11, 2017, we maintain that you have violated Mrs. Washington's right to due process because you did not have jursidiction to dismiss her case after completing your investigation.

Best,

Marcus Washington

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you.

**From:** MICHAEL MATHELIER [mailto:MICHAEL.MATHELIER@EEOC.GOV]
**Sent:** Friday, December 1, 2017 1:52 PM
**To:** Marcus Luther X <humanrights.areamust@gmail.com>
**Cc:** 'Carolyn Washington' <chwash20031@yahoo.com>
**Subject:** RE: Follow-Up Charge #510-2016-02801 additional information request

Please be advise the case is still open.

I am advising you

Ms Washington case was missing some information to make her case stronger

Please provide me the answers we are requesting.

6/20/2018

We are working to very hard on this file so please help us help you.

**From:** Marcus Luther X [mailto:humanrights.areamust@gmail.com]
**Sent:** Friday, December 01, 2017 1:34 PM
**To:** MICHAEL MATHELIER <MICHAEL.MATHELIER@EEOC.GOV>
**Cc:** 'Carolyn Washington' <chwash20031@yahoo.com>
**Subject:** RE: Follow-Up Charge #510-2016-02801 additional information request

Mr. Mathelier,

Please see your e-mail below:

"On Thursday, October 19, 2017 11:15:36 AM, MICHAEL MATHELIER <MICHAEL.MATHELIER@EEOC.GOV> wrote:

Good Morning Ms Washington,

Conducted some additional investigation related to your case however, Interviewed several individuals

I could not find supporting evidence that showed you were discriminated against on the bases of age.

Therefore, we are going to suspend and dismiss this matter and issue you a right to sue."

Mrs. Washington did not seek for you to reconsider your dismissal. You have already suspended and dismissed this matter, so how are you now asking Mrs. Washington to answer further questions? If you are not going to provide Mrs. Washington with a copy of her investigative file and allow her to have a hearing before an administrative judge issues his/her determination pursuant to the EEOC's procedural rules, then you need to issue your second final decision so we can resubmit the appeal.

Best,

Marcus Washington

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you.

**From:** MICHAEL MATHELIER [mailto:MICHAEL.MATHELIER@EEOC.GOV]
**Sent:** Friday, December 1, 2017 1:22 PM
**To:** Marcus Luther X <humanrights.areamust@gmail.com>
**Cc:** 'Carolyn Washington' <chwash20031@yahoo.com>
**Subject:** RE: Follow-Up Charge #510-2016-02801 additional information request

Good Afternoon Mr. Washington,

Print Window

6/20/2018

We are requesting Ms. Washington provide our office with a response by next week, so we can conclude our investigation.  Please review the questions related to her charge and provide a response.

Thank you

**From:** Marcus Luther X [mailto:humanrights.areamust@gmail.com]
**Sent:** Friday, December 01, 2017 1:16 PM
**To:** MICHAEL MATHELIER <MICHAEL.MATHELIER@EEOC.GOV>
**Cc:** 'Carolyn Washington' <chwash20031@yahoo.com>
**Subject:** RE: Follow-Up Charge #510-2016-02801 additional information request

Hi Mr. Mathelier,

My name is Mr. Marcus Washington. Upon Mrs. Carolyn Hicks-Washington's request, I will be representing her for the remainder of the EEOC's involvement in the above referenced matter.

As you are aware, Mrs. Washington's most recent submission to yourself, Supervisory Investigator Katherine Gonzalez and EEOC Director Michael Farrell on November 17, 2017 requested for the **EEOC** to remove you as the investigator for this case and asked the **EEOC** – not you – to reconsider the decision you made since you have failed up follow the procedural rules of the EEOC and exceeded your jurisdiction by making a "final" determination to dismiss Mrs. Washington's claims without allowing her a chance to see her file and/or request a hearing before an Administrative Judge.

The fact that you are ignoring Mrs. Washington's request and asking her additional questions after dismissing her claims is harmfully delaying an expedited resolution from occurring in this matter. As a result, I am requesting for you to provide me with the e-mail address for both Mrs. Katherine Gonzalez and Mr. Michael Farrell.

We are seeking for this extremely important procedural issue to be resolved by Mrs. Gonzalez and Mr. Farrell before Mrs. Washington answers any of your additional questions.

Best,

Marcus Washington

212-365-8287

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you.

6/20/2018

**From:** Carolyn Washington [mailto:chwash20031@yahoo.com]
**Sent:** Friday, December 1, 2017 12:45 PM
**To:** Marcus Luther X. <humanrights.areamust@gmail.com>
**Subject:** Fw: Follow-Up Charge #510-2016-02801 additional information request

Review

Sent from Yahoo Mail for iPhone

Begin forwarded message:

On Friday, December 1, 2017, 12:08 PM, MICHAEL MATHELIER <MICHAEL.MATHELIER@EEOC.GOV> wrote:

Good Afternoon Ms. Washington

I have a few questions related to your charge for consideration

In your charge you indicated that Respondent had a pattern of practice of replacing the Director and Assistant Director with younger employees.  Do you remember the age of Andrea Ayala and Scott Strawbridge?

Did Respondent replace them with you and Veronica Lopez as Director and Assistant Director?

Were you and Veronica prepared by Respondent to take over the role of Director and assistant director of Section 8?

Do you know if Andrea and Scott were terminated because of their age as well or were they transferred to another department?

How old were you when you started in the department and was promoted into the position?

You indicated Mr. English met with you and Ms. Lopez about training other employees to take over your role did they want you to select someone as qualified or younger and could do the work load if so do you have any evidence?

Did the agency looked to fill the department more younger employees?

If so, why do you suppose?

Did the department suffer a higher turn over prior to you being hired, why do you believe the employees who quit, were over worked and under paid? Stressed out due to the work load, or quit because of the management style you and Ms. Lopez exhibited.

Did Mr. English or you ever initiated talks on retirement from the role you held?

Hiring

Did you ever act as the Acting Director during your tenure with the agency?

Did do you believe you had more educational qualification then the Director Respondent hired instead of you?

Did Respondent send you any denial notice to hire or interview due to your previous role in the department as Assistant Director?

Did you send any email to respondent for any status update for the position?

timeline you stated that you applied for the Director of Housing Voucher program position which was an open position the same department you were terminated.

Why do you believe Respondent discriminated against you for that position?

Please provide me a response by December 11, 2017.

Thank you,

Michael Mathelier

**From:** Carolyn Washington [mailto:chwash20031@yahoo.com]
**Sent:** Thursday, November 30, 2017 8:50 AM
**To:** MICHAEL MATHELIER <MICHAEL.MATHELIER@EEOC.GOV>; KATHERINE GONZALEZ <KATHERINE.GONZALEZ@EEOC.GOV>; MICHAEL FARRELL <MICHAEL.FARRELL@EEOC.GOV>
**Subject:** Follow-Up Charge #510-2016-02801

Good Morning Mr. Mathelier,

6/20/2018

This email is a follow-up on the above charge regarding the status of the case as stated below in your last email to me.

"This email it to advise you that your case is still under review and a final decision has not been made. Once a final review has been made you will be notified."

Please advise.

Sincerely,

Carolyn Hicks Washington

# Exhibit E

6/16/2018       (111,392 unread) chwash20031@yahoo.com - Yahoo Mail

Find messages, documents, photos or people

Archive    Move    Delete    Spam

Compose

**From:** MICHAEL FARRELL [mailto:MICHAEL.FARRELL@EEOC.GOV]
**Sent:** Monday, February 12, 2018 6:31 PM
**To:** Marcus Luther X <humanrights.areamust@gmail.com>; MICHAEL MATHELIER <MICHAEL.MATHELIER@EEOC.GOV>
**Subject:** RE: Read: Mrs. Carolyn Hicks Washington's Answers to Mr. Mathelier's Questions.

Mr. Washington,

*My recollection is that this Agency expended an extraordinary amount of resources on the case you are referencing, including a lengthy conversation between you and me.*

Our conversation unfortunately ended in disagreement.  EEOC will stand behind its actions and decisions in this matter.

I regret that we were unable to reach agreement in this matter.  However, I cannot justify the ongoing, and potentially indefinite, expenditure of Agency resources you seem to be pursuing in this matter.



**Michael Farrell**
**District Director**

U S Equal Employment Opportunity Commission (EEOC) - Miami District
100 S. E. 2nd Street, Suite 1500
Miami FL 33131
305-808-1850 (P)
Michael.Farrell@eeoc.gov

Warning: All information contained in this email message is privileged and confidential for use ONLY by the Equal Employment Opportunity Commission (EEOC) and the intended recipient(s). If you are not an intended recipient, you are hereby notified that any use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please delete all copies of the message and its attachments and notify the sender immediately. Your receipt of this message is not intended to waive any applicable privilege. Emails that are sent or received by the EEOC will be retained according to EEOC's record retention schedule.

**From:** Marcus Luther X [mailto:humanrights.areamust@gmail.com]
**Sent:** Sunday, February 11, 2018 11:45 AM
**To:** MICHAEL FARRELL <MICHAEL.FARRELL@EEOC.GOV>; MICHAEL MATHELIER <MICHAEL.MATHELIER@EEOC.GOV>
**Subject:** RE: Read: Mrs. Carolyn Hicks Washington's Answers to Mr. Mathelier's Questions.

Michael,

I am following up with you after patiently waiting for you to respond to my series of e-mails sent in December 2017 following our conversation regarding Mr. Mathelier's "investigation" and decision to dismiss Mrs. Washington's claims.

I have not been provided with an update of any sort regarding the status of Mr. Washington's case with the EEOC. You never got back to me to inform me of whether or not Mr. Mathelier is still acting as an investigator of this case. I also explained to you that Mr. Mathelier prematurely dismissed Mrs. Washington's claims of race/color discrimination and they should be reinstated because the facts and evidence support that her race, color and/or perceived national origin played a motivating factor in her termination and the HACFL's refusal to rehire her. I explained that we wanted to avoid any further harmful delays and you told me you would contact me the following week with an update. After a month and a half, I am now writing again to seek answers to these questions.

Your silence speaks volumes and if you were genuinely committed to equal opportunity and enforcing the civil rights laws of this country, the enthusiasm you initially showed in your attempt to convince me that Mr. Mathelier & the EEOC were acting impartially would still be present – even if y violated Mrs. Washington's constitutional rights to due process and equal protection under the law.

I will be in Miami on March 1st and 13th if you would prefer to discuss this issue in person.

Best,

Marcus Washington

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you.

# Exhibit F

## Employees Terminated Or Resigned While Carolyn Washington Worked For Housing Authority

### 2007

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Bell, Erika | 10/3/2006 | 4/27/2007 | Office Assistant |

Total:  1

### 2008

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Berg, Gary | 6/4/2007 | 5/1/2008 | Occupancy Specialist |
| Berkeley, Laraine | 10/16/2006 | 5/2/2008 | Occupancy Specialist |
| McCray, Oliver | 6/10/2008 | 12/3/2008 | Occupancy Specialist |

Total:  3

### 2009

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Obied, Zaki | 12/9/2008 | 1/15/2009 | Occupancy Specialist |
| Telfort, Rosny | 11/28/2005 | 4/2/2009 | Outreach Specialist |
| Johnson, Goldie | 7/28/2008 | 4/17/2009 | Office Assistant |
| Jones Jr, Jackie | 9/25/2006 | 5/22/2009 | Inspection Clerk |
| Maldanado, Diego | 12/1/2008 | 7/17/2009 | Occupancy Specialist |

Total:  5

### 2010

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Malave-Lopez, Juan | 7/30/2008 | 3/5/2010 | Occupancy Specialist |
| Salgueiro, Idania | 4/6/2009 | 6/4/2010 | Occupancy Specialist |
| Moise, Herve | 9/10/2009 | 8/27/2010 | Occupancy Specialist |
| Diaz-Dicke, Rosalie | 7/7/2008 | 10/22/2010 | FSS Coordinator |

Total:  4

1

## 2011

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Eusebio, Albert | 10/11/2010 | 1/4/2011 | Occupancy Specialist |
| Schoenberg, Lee | 8/11/2008 | 6/30/2011 | Assist. Community Mgr |
| Savage, Karen | 7/19/2010 | 7/20/2011 | Occupancy Specialist |
| White, Jacqueline | 6/14/2010 | 11/14/2011 | Occupancy Specialist |
| Williams, Roderick | 7/25/2011 | 12/2/2011 | Occupancy Specialist |

Total:  5

## 2012

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Pollard, Latisha | 1/30/2012 | 3/16/2012 | Occupancy Specialist |
| Slaton, Ruby | 1/1/2007 | 6/8/2012 | Community Mgr. |
| Hernandez, Ana | 1/27/1999 | 6/11/2012 | FSS Coordinator |
| White, Vicki | 7/25/2011 | 6/20/2012 | Community Mgr. |
| Brown, Cynthia | 1/9/2012 | 6/29/2012 | Occupancy Specialist |
| Butler, Kera | 9/12/2011 | 7/26/2012 | Occupancy Specialist |
| Trotter, Willie | 4/6/2009 | 7/27/2012 | FSS Case Manager |
| White, Shane | 5/7/2008 | 7/27/2012 | Occupancy Specialist Supervisor |
| Fulton, Tahkla | 1/24/2011 | 8/10/2012 | Occupancy Specialist |
| Hires, Thomas | 7/30/2012 | 9/14/2012 | FSS Case Manager |
| Ciceron, Merlie | 6/25/2012 | 10/1/2012 | Occupancy Specialist |
| Brewster, Linsey | 9/12/2012 | 10/5/2012 | Occupancy Specialist |

Total: 12

## 2013

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Portuhondo, Geraldine | 6/22/2009 | 3/22/2013 | Inspection Clerk |
| Felder, Ruby | 12/16/1980 | 3/28/2013 | Clerical |
| Mirabal, Carmen | 3/15/2010 | 4/12/2013 | Intake Coordinator |
| Gayle, Joshua | 9/10/2012 | 6/18/2013 | Occupancy Specialist |
| Hill, Maneashia | 10/8/2012 | 8/23/2013 | Office Assistant |
| Jourdain, Marie | 9/18/2013 | 10/11/2013 | Office Assistant Inspections |
| Chapman, Christina | 7/9/2013 | 11/24/2013 | Occupancy Specialist |
| Tuero, Dunia | 11/18/2013 | 11/28/2013 | Occupancy Specialist |
| Taylor, Colin | 1/11/2000 | 12/31/2013 | Inspectors Supervisor |

Total:  9

## 2014

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Smith, Lechant | 10/3/2012 | 1/24/2014 | Occupancy Specialist |
| Delancy, Nicole | 5/8/2014 | 8/29/2014 | Occupancy Specialist |
| Cruickshank, Aretha | 10/28/2013 | 9/8/2014 | Occupancy Specialist |
| Dessources, Cherline | 3/9/2010 | 10/10/2014 | Occupancy Specialist |
| Hope, Hermetha | 6/1/2009 | 11/7/2014 | Occupancy Specialist |
| Mercedes, Felix | 6/24/13 | 11/17/2014 | Community Manager |
| Elliott, Aniska | 12/15/2014 | 12/17/2014 | Occupancy Specialist |

Total:  7

## 2015

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Colas, Barbara | 11/19/2007 | 1/23/2015 | FSS Case Manager |
| Comrie-Picou, Melody | 9/22/2014 | 1/23/2015 | Occupancy Specialist |
| Flores, Anita | 12/3/01 | 1/29/2015 | Intake Coordinator |
| Noel, Harold | 10/13/2014 | 2/12/2015 | Occupancy Specialist |
| Jomant, Dawn | 12/1/2014 | 3/2/2015 | Occupancy Specialist |
| Lachman, Brandon | 6/24/2013 | 5/1/2015 | Intake Specialist |
| Lee, Sade | 2/23/2015 | 6/22/2015 | Occupancy Specialist |
| Clark, Sheila | 7/20/2015 | 8/14/2015 | Occupancy Specialist |
| Moss, Shawnta | 9/6/2011 | 9/9/2015 | Occupancy Specialist |
| Brown, Antonio | 1/11/2006 | 9/25/2015 | FSS Coordinator |
| Pagan, Minerva | 7/13/2015 | 10/2/2015 | Occupancy Specialist |
| Thompson, Ashyea | 5/18/2015 | 10/6/2015 | Intake Coordinator |
| Hill, Joyce | 1/24/2011 | 11/6/2015 | Outreach Specialist |
| Coley, Latonya | 10/12/2015 | 11/6/2015 | Occupancy Specialist |

Total:  14

## Employee Terminated Or Resigned After Carolyn Washington Was Terminated

| Employee Name | Hire Date | Termination Date | Title |
|---|---|---|---|
| Gutierrez, Luz | 10/5/2015 | 12/25/2015 | Occupancy Specialist |
| Brutusthomas, Raquel | 2/8/2010 | 12/28/2015 | Occupancy Specialist Supervisor |
| Villa, Miguel | 3/2/2006 | 1/4/2016 | Inspector |
| Mezadieu, David | 3/9/2016 | 6/17/2016 | Program Analyst |
| Hamm, Tanginika | 3/30/2010 | 10/7/2016 | Occupancy Specialist |

Total:  5

# Exhibit G

Critic Rejoins Housing Board - tribunedigital-sunsentinel

Home → Collections → Commissioners



*Discover more.*

**Related Articles**

Panel Urges Criminal Charges For Gift Violations
*April 26, 1991*

Gov. Scott reinstates Atkins-Grad as Tamarac commissioner...
*December 19, 2012*

Former commissioner Wasserman-Rubin to undergo brain...
*September 27, 2012*

Atkins-Grad: Not guilty, not going away
*January 26, 2013*

**Find More Stories About**

Commissioners

# Critic Rejoins Housing Board

*Fort Lauderdale Agency Appoints Him To Top Post*

June 23, 2006 | By Bill Hirschman Staff Writer

The Fort Lauderdale Housing Authority, once considered among the finest in the nation, tried Thursday to end 12 years of allegations of mismanagement and fraud by appointing the agency's chief critic to replace the executive director.

Philip Goombs resigned last week after negotiating $112,000 severance pay. He helmed the agency's seven-year expansion, but acknowledged mistakes in judgment.

On Thursday, the authority's commissioners elected insurance agent Tam English to serve full time as interim director at a salary of $62,500 for six months while they seek a replacement.

English, a housing commissioner since 1994, quit the board last December when his colleagues refused to fire Goombs. Mayor Jim Naugle reappointed him last month. English then spoke privately with Goombs, who offered his resignation days later "when he could see there was a consensus" for him to leave, English said Thursday.

With new leadership, the board agreed it will drop its review of possible wrongdoing by the agency's staff, saying it wanted to move forward.

Since the board received an anonymous letter in June 2005, ex-employees publicly have accused the agency of wasting taxpayer money, shortchanging low-income clients, forging paperwork and bypassing fiscal safeguards.

Goombs, who will remain as a consultant through October, was out of town and unavailable for comment. But he has said in earlier interviews that he did nothing wrong.

"I think it's just a matter of not being clear what you could and couldn't do," Goombs said. The agency attorney found "there was nothing illegal. But there were things that could have been done differently," Goombs said.

One example, Goombs acknowledged, was approving more than $600,000 in changes to construction of an administration building without asking commissioners. Minutes after telling them there were no other problems, he revealed construction of a $296,000 parking lot the board knew nothing about.

The allegations have been investigated by the authority's lawyer, a detective agency and the U.S. Department of Housing and Urban Development, which funds several programs. Some accusations were proven, some disproved and several characterized as needing more investigation.

The findings led to policy changes, but no one was fired from the agency. It was unclear whether HUD's inspector general will pursue any criminal charges.

Complaints were rare in the 1980s when the authority and then-director Bill Lindsey were lauded across the nation for innovation and initiative, leading to profiles in Time and The Wall Street Journal.

Twenty years later, the scrappy little agency has mushroomed into a complex, $32 million machine that provides 3,500 low-income people with an affordable place to raise their families.

Three major programs support the poor, the homeless and the elderly: The authority sells single-family houses at a reduced price to first-time buyers. It leases its own apartments at a reduced rent. It also pays part of the rent for families living in apartments owned by private landlords.

1/3

Cirlic Reports Leading Board - Sunsentinel-Sunsentinel

Among the things that Goombs and commissioners say could have been done differently:

Administrators received bonuses for three years that commissioners didn't know about until last fall. The agency's attorney has advised the bonuses appear to violate state law.

Calculation errors on rent overcharged indigent clients.

Despite a 1,000-person waiting list for subsidized housing, Goombs tore down 78 apartments in anticipation of a rebuilding project. At the time, he did not have a contractor, architectural plans or complete funding.

Goombs denied other charges. Ex-employees contended Goombs and his administrators repeatedly ordered staff to give rent vouchers -- even a new house -- to people who were not on the waiting list, including an employee.

The former employees also said they were ordered to falsify documents that assured the federal government that clients' apartments had passed safety inspections. Funding was based partly on safety inspections that never occurred.

Both charges were among criminal allegations sent by the regional HUD office to its Inspector General division. A spokesman declined to comment.

A HUD review team did examine some management issues in May, such as incomplete paperwork, but it "made no major findings," said HUD spokeswoman Gloria Shanahan. HUD recommended the housing authority hire a firm to investigate management issues.

Despite the problems, Goombs told the board last week he was "very proud of the accomplishments we have made as a team" The number of units owned by the authority increased from 39 to 350, bringing in $2.1 million in subsidized rent. The number of people receiving subsidized rent for privately owned apartments increased to about 2,375 from 1,100.

Goombs cited two of his high-profile projects that continue: renovation of affordable homes for first-time home buyers, and the replacement of the Dixie Court Apartments northwest of downtown.

But English told the board at that same meeting that the authority has "drifted off" its mission. On Thursday he said, "The most important thing is to go forward with the mission we set with Dr. Lindsey, which is to serve the tenants and the taxpayers who pay the bills."

Bill Hirschman can be reached at bhirschman@sun-sentinel.com or 954-356-4513.

**See Also**

1. **Cyber Detective**

2. **Criminal Investigator**

3. **Detective Software**

4. **Private Investigator**

5. **Detective School**

6. **Top Employment Agencies**

7. **Net Detective**

8. **Eye Care Centers**

From the Web                                          Sponsored Links by Taboola

*Two Banks That Pay 10 Times The Interest On Your Savings*
MyFinance Bank Referrals

**Enter Name, Wait 6 Seconds, Brace Yourself**
Truthfinder People Search Subscription

**Desktop Users Love This New Grammar App**

# Exhibit H

5/1/2018

Dear Sir or Madam,

It's my absolute pleasure to refer Ms. Carolyn Washington

My Name is Hermetha Hope and I work under Ms. Washington at The Housing Authority of the City Fort Lauderdale for 5 years. (Ms. Washington was not my direct supervisor, she was the assistant director)

I thoroughly enjoyed my time working with Ms. Washington and I came to know her as an asset to absolutely any team. She is honest, dependable, and incredibly hard-working. Beyond that, she is an impressive smart person who is always willing to help.

Her knowledge of policies, procedures and expertise in the Housing field was a huge advantage to our entire office. She put this skillset to work at the Housing Authority of the City of Fort Lauderdale along with her undeniable talent, Ms. Washington has always been an absolute joy to work with. She is a true team player, and always manages to foster positive discussions and bring the best out of myself and others.

Without a doubt, I confidently state that no matter what it is Ms. Washington will be a welcomed addition to any setting.  In addition, Ms. Washington is a dedicated, knowledgeable, and an all-around great person, I know that she will be a beneficial, and pleasant addition, to any organization.

Please feel free to contact me at 786-663-3045 or hermetha@gmail.com should you like to discuss Ms. Washington's qualifications and experience further. I'd be happy to expand on my recommendation.

Sincerely,

Hermetha Hope

May 1, 2018

To whom it may concern,

I am writing this letter of reference for Mrs. Carolyn Washington, who I have had the pleasure of working with for over two years. I am extremely impressed with her enthusiasm, communication skills and professional demeanor when dealing with the clients we serve.

Mrs. Washington is a team player and embraces change. She is a hardworking, dedicated to her job and is passionate with our clients. She was very quick when resolving oncoming issues and went above and beyond for the clients. She has my recommendation and I am happy to further more details if you would like additional information.

Sincerely,

Barbara Tinsley-Smalls

Barbara Tinsley-Smalls

Front Desk Lead

Housing Authority of the City Of Fort Lauderdale

(954)556-4100

BTINSLEYSMALLS@hacfl.com

May 1, 2018

To Whom It May Concern:

It's with great pleasure that I have this opportunity to serve and speak to the character and leadership of Carolyn Washington.

I'm an emerging housing professional with over 11 years of experience within the public housing and property management industries.  I have worked as the Program Administrator for a 1600 Housing Choice Voucher Program – City Agency.  Additionally, I have managed over 360 units of affordable housing under contract for a large public housing authority.  I also have experience as an On-Site Property Manager for a 110 unit project-based section 8 site and private sector 501 unit luxury community.

I've known Carolyn Washington for multiple years.  I've always admired her tenacity, commitment to a task and eagerness to lead.  She exemplifies integrity, ambition and focus.  I have been in several situations where Carolyn and I worked together to achieve a common goal.  While working with Carolyn, she was an integral part of creating a positive and productive work environment.  Carolyn is professional and dedicated to her work.  As our leader Carolyn ensured she utilized fair and consistent managerial skills.

Carolyn Washington's variety of work experience, coupled with her great personality and dedication to achieving quality results, I'm certain that she will be an asset to your organization.

Sincerely,

*Kali' R. Bell*

Kali' R. Bell, LREA
Equity Residential

June 21, 2018

To whom this may concern:

Re: Reference for Carolyn Washington

I have known Carolyn Hick-Washington for over Fourteen plus years and it gives me great pleasure to write this letter of recommendation. I had the pleasure of working with her for ten years at the Housing Authority of the City of Fort Lauderdale.

She hired me as a caseworker, taught me the value of having patience when dealing with the clients as well as staff members. She also taught me and each caseworker time management skills ensuring forty plus files are completed timely with accuracy each month for payment.

I have found her to be honest, reliable, and courteous making it easy for others to follow her lead. She always demanded staff to treat the customers/clients with respect no matter of their lack of education or wealth. She allows people second changes because the future generation is important to her. Yes, I am confident that she will to be valuable to your company.

I recommend Carolyn Hick-Washington for your company because her passion to help others is undeniable. If you should have any question regarding this recommendation letter please, do not hesitate to give me a call.

Sincerely,

Antonio Brown

Antonio Brown
(954) 226-3492
3987 NW 92nd Ave
Sunrise Fl. 33351
Tonybrown@gmail.com

# Exhibit I

6/16/2018   Ex-Housing Chief's Restitution $5,500 | Office of Inspector General, Department of Housing and Urban Development

Helen M. Albert, Principal Deputy Inspector General, performing
the duties of the Inspector General

---

## Ex-Housing Chief's Restitution $5,500

---

**DATE PUBLISHED:** April 5, 2016

**NEWS TYPE:** News

**PROGRAM AREA(S):** Public and Indian Housing

**LINK TO ORIGINAL ARTICLE:** Arkansas Online (http://www.arkansasonline.com/news/2016/apr/02/ex-housing-chief-s-restitution-5-500-20/?f=crime)

(Source: arkansasonline.com) The former executive director of the Hot Springs Housing Authority was ordered in federal court to repay the U.S. Department of Housing and Urban Development more than $5,500 for collecting twice on travel expenses.

Barbara Louise Baer also was sentenced to two years' probation and fined $500 during a brief hearing Thursday before U.S. District Judge Susan O. Hickey in Hot Springs.

Baer pleaded guilty in May to one count of embezzlement and theft of public money, according to federal court records. The government accused her of claiming mileage expenses from the federal agency and from the housing authority for the same travel from Sept. 1, 2010, to April 23, 2014, when she was fired.

The plea agreement stated an audit by the Office of Inspector General for Housing and Urban Development conducted of Baer's business practices at the housing authority showed she submitted mileage expense vouchers for reimbursement by Housing and Urban Development for her business travel using her personal vehicle. At the same time, she was charging the same fuel costs on the housing authority's credit card.

"The defendant stated she was 'double dipping' on almost every vehicle mileage expense report she submitted during her entire employment with the Hot Springs Housing Authority," the plea agreement said.

An Arkansas Democrat-Gazette article in August said the audit found the authority improperly procured or lacked support for 10 contracts totaling $611,338 during Baer's administration. The audit did not mention Baer by name but covered the time period in which Baer was executive director for the housing authority...

# Exhibit J

1/30/2018                                    (6) ANITA FLORES | LinkedIn

 Q Search                                      O       Reactivate
                                                                                          Premium

Online Ed.D. Degree - Our full Doctorate tuition is 1/3 the cost of comparable online programs.   Ad  ···

Contact and Personal Info

ANITA'S Profile

Show more ⌄

Ad  ▷

*Get the latest jobs and industry news*



Marcus Isaiah, explore relevant
opportunities with City of New York,
Adminis

Follow

## ANITA FLORES · 2nd
Intake Coordinator- HACFL

HACFL · Boyd Anderson High School

Fort Lauderdale, Florida · 28 🔗

Connect    | Send InMail |    | More… |

People Also Viewed

**Alec Prado**
—

 **Elizabeth Madrigal** · 3rd
English Teacher/ Photographer

### Highlights

**1 Mutual Connection**
You and ANITA both know Carolyn washington

 **Schauri Dixon** · 2nd
OneStop Enrollment Generalist II at
Florida International University

 **Mohammed Kabiru Farouk** · 3rd
Immediate Past Vice-Chancellor,
Federal University, Kashere

### Experience

**Intake Coordinator**
HACFL
Mar 2013 – Present · 4 yrs 11 mos
Ft Lauderdale

 **Lisa Gomez** · 3rd
Managing Director - Accenture

 **Phillip Lloyd Hamilton** · 2nd
Student Advocate | Relationship Broker
| HigherEd Administrator

**Occupancy Specialist Supervisor**
Ft Lauderdale Housing Authority
2001 – 2012 · 11 yrs

I co-supervised 10 employees , completed employee evaluations, provided customer service to
clients and landlords. processed renwal douments via leases. Review and complete reports, etc.

**Elizabeth Bejar** · 3rd
Vice President for Academic Affairs at
Florida International University

 **Clayton P. Solomon** · 3rd
Assistant United States Attorney -
United States Attorney's Office (EDNY)

**Pricing Coordinator**
Neighbors Supermarket
Aug 1996 – Oct 2001 · 5 yrs 3 mos

Customer Service
Book Keeping, Payroll, Cash Office
Store Pricing, Front End Managing, Service Desk, Sporadic Cashier

 **Wolfgang Acevedo** · 3rd
Individualization.Arranger.Relator.Strategic.\

 **Diana Callejas, MS** · 2nd
Business Intelligence Analyst at
HealthSun Health Plans

### Education

**Boyd Anderson High School**
Diploma
1992 – 1996

Learn the skills ANITA has

**Stepping Up to Leadership**
Viewers: 65,614

**Outlook 2016: Time
Management with Calendar
and Tasks**
Viewers: 53,558

Get a more seamless LinkedIn experience with    ✕
the Windows 10 app. Get the app

**Cert Prep: Word 2016
Microsoft Office Specialist
(77-725)**

 \hpart has given an endorsement for this skill

# Exhibit K

6/18/2018
Case 0:18-cv-00932-Hot Springs Housing Authority Embezzlement Affirmed | Office of Inspector General, Department of Housing and Urban Development
Entered on FLSD Docket 07/19/2018 Page 158 of 158

Helen M. Albert, Principal Deputy Inspector General, performing
the duties of the Inspector General

## Hot Springs Housing Authority Embezzlement Affirmed

**DATE PUBLISHED:** April 5, 2016

**NEWS TYPE:** News

**PROGRAM AREA(S):** Public and Indian Housing

**LINK TO ORIGINAL ARTICLE:** hotspringsdaily.com (http://hotspringsdaily.com/2016/04/hot-springs-housing-authority-embezzlement-affirmed/)

(Source: hotspringsdaily.com)

Dear Editor,

Friday's Sentinel Record had an article describing the felony sentencing of the past Hot Springs Housing director Barbara Baer. Baer was sentenced to two years' probation for embezzlement and fined puny a $500.

What is missing from this article is a description of the complicity and irresponsibility of the majority of the Housing Authority board in allowing this mess to occur. In addition, to embezzling some $5,500, she was a virtual dictator, who had over 60 staff fired, which represented in a 100% annual staff turnover.

When HUD raided the Housing Authority offices to collect evidence, then Chairman, Al Carney spent considerable effort describing how HUD was wrong about Baer and whitewashed her actions. He and the other Board members even refused to terminate Baer until considerable pressure was received from HUD's regional office in Ft Worth. This bunch of blather continued even after HUD issued its report indicating considerable mismanagement by Baer and major inattention by the board. Carney continued to defend his ineptness and unreasonable support for Baer by claiming he had no guidance nor any idea of the problems.

The problem with this series of statements is they are false! During the March 2013 board meeting, fellow board member Russ Thomas and I asked the other three members to launch an investigation into Barbara Baer's performance based on a number of interviews with ex-employees, plus suspicions from the information we were not receiving on Housing Authority performance and results. This resulted in counter accusations by Carney that we had a vendetta against Baer. This position was supported by then Hot Springs School District Superintendent Joyce Craft...